United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LENSCRAFTERS, INC., et al.,                          No. C 04-1001 SBA

        Plaintiffs,                              **ORDER**

        v.                                       [Docket Nos. 29, 31, 32, 40]

LIBERTY MUTUAL FIRE INSURANCE
COMPANY, et al.,

        Defendants.

_____/

      This matter comes before the Court on Plaintiff LensCrafters, Inc., EYEXAM of California, Inc., and EyeMed Vision Care, LLC's (collectively, "LensCrafters") motion for partial summary judgment re: Duty to Defend against defendant Liberty Mutual Fire Insurance Company ("Liberty") and defendant Executive Risk Specialty Insurance Company ("ERSIC") [Docket No. 29]; Liberty's and ERSIC's motions for summary judgment against LensCrafters [Docket Nos. 31, 40]; and Liberty's cross motion for summary judgment against ERSIC [Docket No. 32] and ERSIC's cross motion for summary judgment against Liberty [Docket No. 40]. Having read and considered the arguments presented by the parties in the papers submitted to the Court, and being fully informed, the Court finds this matter appropriate for resolution without a hearing. The Court hereby GRANTS LensCrafters' motion for partial summary judgment [Docket No. 29] and DENIES Liberty and ERSIC's motions for summary judgment against LensCrafters [Docket Nos. 31, 40]. The Court further hereby DENIES WITHOUT PREJUDICE Liberty's cross motion for summary judgment against ERSIC [Docket No. 32] and ERSIC's cross motion for summary judgment against Liberty [Docket No. 40].[1]

_____

     [1] As discussed, *infra*, Liberty's cross motion for summary judgment against ERSIC and ERSIC's cross motion for summary judgment against Liberty focus on many of the same issues raised in LensCrafters' motion for summary judgment and Liberty's and ERSIC's motions for summary judgment against LensCrafters. Accordingly, the Court's findings with respect to LensCrafters' motion for summary judgment and Liberty's and ERIC's motions for summary judgment thereto will obviate most of the issues advanced in both Liberty's cross

United States District Court
For the Northern District of California

# BACKGROUND

**A.    The Underlying *Snow* Action**

On March 12, 2002, Melvin Gene Snow filed a putative class action lawsuit in San Francisco Superior Court against LensCrafters, Inc., EYEXAM of California, Inc. ("Eyexam") and other entities. *See* Stipulation of Facts and Joint Appendix of Exhibits in Support of the Parties' Cross Motions for Summary Judgment ("Stipulation"), Ex. I.[2]  The allegations in the *Snow* Action arise from the relationship between LensCrafters, Inc. and Eyexam.  LensCrafters, Inc. operates retail stores that dispense prescription eyewear.  Eyexam is a health maintenance organization (HMO) with operations only in the State of California that employs optometrists to provide eye examinations.  The Eyexam optometrists have offices located next to or near LensCrafters, Inc.'s stores.

Plaintiffs in the *Snow* Action allege various unfair business practices with respect to the relationship between LensCrafters, Inc. and Eyexam.  Plaintiffs allege that having optometrists hired by Eyexam working in proximity to LensCrafters, Inc. stores violates certain California statutes that regulate the relationships between optometrists (licensed doctors of optometry) and opticians (laypersons who dispense eyeglasses).[3]  Plaintiffs also allege that these arrangements violate the confidentiality of patients.  LensCrafters has denied the allegations of the *Snow* Action.

Currently, the *Snow* Action is stayed upon the California Supreme Court granting cert. review of the decision in *People v. Cole*, 113 Cal. App. 4th 955 (2003).  *See* Stipulation ¶ 5.

_____

motion for summary judgment against ERSIC and ERSIC's cross motion for summary judgment against Liberty.

[2] A Second Amended Complaint ("SAC") was filed on or about April 15, 2003 against LensCrafters, Inc., EyeMed, Inc., EyeMed Vision Care, Inc. and other entities.  Stipulation, Ex. J.  The allegations of the original and subsequent complaints are the same with respect to the allegations at issue that give rise to the duty to defend.

[3] "To become licensed as an optometrist an individual must have at least three years of undergraduate education in a scientific field and four years of optometry school culminating in a doctor of optometry degree.  Upon admission to practice optometrists are allowed to correct refractive errors and to detect eye disease."  *California Ass'n of Dispensing Opticians v. Pearle Vision Center, Inc.*, 143 Cal. App. 3d 419, 424 (1983).  Optometrists are licensed by the Board of Optometry.  *Id.*  "In contrast, a registered dispensing optician is licensed by the Division of Allied Health Professions of the Board of Medical Quality Assurance.  Dispensing opticians fill prescriptions for glasses or contact lenses from optometrists . . . Dispensing opticians do not examine eyes and dispense ophthalmic goods only on prescription."  *Id.*

2

**United States District Court**
For the Northern District of California

1    One of the claims in the *Snow* Action is that LensCrafters disclosed private medical information of

2    the putative plaintiff class, in violation of the Confidentiality of Medical Information Act ("CMIA"), Cal. Civ.

3    Code § 56 *et seq.*, thus violating the privacy rights of the putative class members. *See* SAC ¶¶ 109-117

4    (Stipulation, Ex. J). The complaint alleges that medical information disclosed to optometrists employed by

5    Eyexam in the course of the patient/doctor relationship is improperly disclosed to employees of

6    LensCrafters, Inc., and that LensCrafters, Inc. uses this information for non-medical purposes, such as

7    marketing and sales.

8    The purported disclosures of private medical information are alleged to have occurred during the

9    period in which various insurance policies issued by Liberty and ERSIC to LensCrafters were or are in

10   effect. Given this, LensCrafters claims that both Liberty's duty to defend and ERSIC's duty to defend was

11   triggered by the *Snow* Action.

12   **B.    Insurers' Response to the Tender of the *Snow* Action**

13   ERSIC accepted the defense of the *Snow* Action shortly after it was tendered. Muntel Dec. ¶ 4.

14   According to LensCrafters, despite this acceptance, it did not pay for any defense costs for more than two

15   years after the tender. *Id.* at ¶ 5. Several months ago, however, ERSIC and LensCrafters reached an

16   agreement in principle regarding the payment of defense costs incurred through May 31, 2004. *Id.*

17   Liberty initially denied coverage for the *Snow* Action. Muntel Dec. ¶ 3. In February 2004,

18   however, it changed its position and agreed to defend under reservation of rights. *Id.* Since then, Liberty

19   and LensCrafters have reached an agreement regarding the payment of past defense expenses incurred

20   through April 30, 2004. *Id.*

21   Both Liberty and ERSIC now contend that they do not have an ongoing defense obligation for any

22   defense expenses that may be incurred after the dates specified in their respective agreements with

23   LensCrafters.

24   **C.    The Instant Litigation**

25   The present coverage litigation began when LensCrafters filed a complaint on March 11, 2004 that

26   named only Liberty. LensCrafters asserts that it did not name ERSIC in the complaint because ERSIC had

27

28                                                          3

United States District Court
For the Northern District of California

1  accepted the tender of the defense, and LensCrafters was still waiting for ERSIC to make good on its

2  promise to pay defense costs.  Muntel Dec. ¶ 5.  When ERSIC continued its refusal to pay for any of

3  LensCrafters' defense costs, however, LensCrafters amended the complaint to add ERSIC as a defendant

4  on July 26, 2004, pursuant to stipulation.

5        Liberty answered the amended complaint on August 24, 2004 and also brought a cross-claim

6  against ERSIC in which it alleged, in part, that Liberty's policies are excess to the ERSIC policies and

7  therefore that ERSIC should (1) reimburse Liberty for the defense costs it has already paid, and (2) assume

8  the defense of the *Snow* Action.

9        ERSIC answered the complaint on October 1, 2004.  ERSIC filed a cross-complaint against

10  Liberty, which alleged that its policies are excess to Liberty's policies, that ERSIC should not pay any of the

11  defense costs, and that only Liberty should defend the *Snow* Action.

12        On November 30, 2004, LensCrafters filed the instant motion for partial summary judgment,

13  arguing that both Liberty and ERSIC have a duty to defend it in the *Snow* Action.  Liberty and ERSIC both

14  filed motions for summary judgment against LensCrafters arguing that each insurer, respectively, did not

15  have a duty to defend LensCrafters in the *Snow* Action.

16        On the same date, Liberty and ERSIC both filed cross-motions for summary judgment against each

17  other.  Each insurer argues that the other insurer's duty to defend was triggered while their own duty to

18  defend was not.  Furthermore, each insurer argues that to the extent its own duty to defend was triggered,

19  its own policy is excess to the other insurer's policy, and thus its duty to defend does not arise until the

20  exhaustion of the other insurer's coverage.[4]

21                              **LEGAL STANDARD**

22  **A.    Legal Standard For Summary Judgment**

23        Under Federal Rule of Civil Procedure 56, a court may properly grant a motion for summary

24  judgment if the pleadings and materials demonstrate that there is "no genuine issue as to any material fact

25  _____

26        [4] LensCrafters asserts that it "takes no position in this dispute between the insurers . . . however . . .
   both Liberty and ERSIC cannot be the excess insurer; one insurer, or both, must provide the primary
27  coverage." LensCrafters' M.S.J. at 2.

28                                        4

United States District Court

For the Northern District of California

1   and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317,

2   322 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could

3   return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

4   Summary judgment may be granted in favor of a defendant on an ultimate issue of fact where the defendant

5   carries its burden of "pointing out to the district court that there is an absence of evidence to support the

6   nonmoving party's case." *Celotex*, 477 U.S. at 325.

7        To withstand a motion for summary judgment, the non-movant must show that there are genuine

8   factual issues which can only be resolved by the trier of fact. *Anderson*, 477 U.S. at 250.  The nonmoving

9   party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact.

10  *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The court's

11  function, however, is not to make credibility determinations. *Anderson*, 477 U.S. at 249.  The inferences

12  to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W.*

13  *Elec. Serv.*, 809 F.2d at 631.

14  **B.**   **Duty to Defend**

15       A primary insurer has a very broad duty to defend its insured under California law.[5] *Anthem*

16  *Elecs., Inc. v. Pac. Emplrs. Ins. Co.*, 302 F.3d 1049, 1054 (9th Cir. 2002).  The California Supreme

17  Court has stated that "the insured is entitled to a defense if the underlying complaint alleges the insured's

18  liability for damages potentially covered under the policy, or if the complaint might be amended to give rise

19  to a liability that would be covered under the policy." *Montrose Chem. Corp. v. Superior Court*, 6 Cal.

20  4th 287, 299 (1993). "Once the insured has established potential liability by reference to the factual

21  allegations of the complaint, the terms of the policy, and any extrinsic evidence upon which the insured

22  intends to rely, the insurer must assume its duty to defend unless and until it can conclusively refute that

23  potential." *Id*.  To protect an insured's right to call on the insurer's "superior resources for the defense of

24  third party claims . . . California courts have been consistently solicitous of insureds' expectations on this

25  _____

26       [5] While ERSIC notes that its polices were negotiated in New York and purchased by an Ohio
     company, the parties concede that New York, Ohio and California law on the duty to defend are in accordance

27  and the Court need not resolve any choice of law questions with respect to this issue.

28                                                5

United States District Court
For the Northern District of California

1    score." *Id.* at 295-96. Any doubt as to whether the facts establish the existence of the defense duty must be

2    resolved in the insured's favor. *Id.* at 299-300.[6]

3            The determination whether the insurer owes a duty to defend is usually made in the first instance by

4    comparing the allegations of the complaint with the terms of the policy. *Anthem*, 302 F.3d at 1054.  Facts

5    extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may

6    be covered by the policy. *Id.*  Furthermore, an insurer must undertake a reasonable investigation into the

7    circumstances of the claim before denying coverage. *Id.*

8            When more than one insurer is found to cover the same risk, each insurer's duty to defend is

9    independent of whatever duty to defend the other insurer might have.  *Wausau Underwriters Ins. Co. v.*

10   *Unigard Security Ins. Co.*, 68 Cal. App. 4th 1030, 1033 (1998).  Each insurer on the risk has a duty to

11   defend the action in its entirety, and its obligation to defend is *"separate and independent from the*

12   *others."* *Aerojet-General Corp. v. Transport Indem. Co.*, 17 Cal. 4th 38, 70 (1997) (original

13   emphasis).

14           In a duty to defend situation, once the insured, i.e. LensCrafters, establishes that the damages

15   sought in the suit are potentially covered under a primary insurer's policies (sometimes referred to as

16   making a prima facie showing), that insurer must conclusively establish the absence of any potential for

17   coverage in order to prevail on the duty-to-defend issue. *Anthem*, 302 F.3d at 1055.  Thus, to support

18   summary judgment in its favor, a primary insurer must show that there is no genuine issue of material fact as

19   to the potential for coverage. *Id.*  If the insurer cannot win summary judgment, then "the duty to defend is

20   then *established*, absent additional evidence bearing on the issue." *American Cyanamid Co. v.*

21   *American Home Assur. Co.*, 30 Cal. App. 4th 969, 975 (1994) (citing *Horace Mann Ins. Co. v.*

22

23       [6]  An excess insurer's duty to defend is different.  "Unless the provisions of an excess policy provide
     otherwise, an excess insurer has no obligation to provide a defense to its insured before the primary coverage
24   is exhausted." *Community Redevelopment Agency v. Aetna Cas. & Sur. Co.*, 50 Cal. App. 4th 329, 338
     (1996), citing, *Hartford Accident & Indemnity Co. v. Superior Court* 23 Cal. App. 4th 1774, 1779-1780
25   (1994).  "The California general rule that all primary insurance must be exhausted before a secondary insurer
     will have exposure favors and results in what is called 'horizontal exhaustion.'" *Id.*  "This is contrasted with
26   'vertical exhaustion' where coverage attaches under an excess policy when the limits of a specifically scheduled
     underlying policy is exhausted and the language of the excess policy provides that it shall be excess only to that
27   specific underlying policy." *Id.* at 339-340.

28                                                         6

1    *Barbara B.*, 4 Cal. 4th 1076, 1085 (1993) (original emphasis)).

2    **C.**    **Insurance Policy Interpretation**

3         The rules for interpreting insurance contracts are well settled. It is fundamental that an insurance

4 policy, like any contract, is to be interpreted to effectuate the mutual intent of the parties. *Union Oil Co. v.*

5 *International Ins. Co.*, 37 Cal. App. 4th 930, 935 (1995); *Bank of the West v. Superior Court*, 2 Cal.

6 4th 1254, 1264 (1992); *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 821 (1990). Where possible,

7 the court's interpretation is governed by the clear and explicit meaning of the policy's written provisions,

8 interpreted in their ordinary and popular sense unless used by the parties in a technical sense or special

9 meaning is given to them by usage. *Union Oil Co.*, 37 Cal. App. 4th at 935); *AIU Ins. Co.*, *supra*, at p.

10 822. If, on the other hand, a policy term is ambiguous, the court must give it the meaning the insurer

11 believed the insured party understood it to have at the time of formation. *Union Oil Co.*, 37 Cal. App. 4th

12 at 935. Only then, if the ambiguity survives the application of this rule, does the court resolve it against the

13 insurer. *Id.*

14         A policy term is ambiguous only if it is susceptible to two or more interpretations that are (1)

15 reasonable and (2) not based on a strained interpretation of the policy language. *Id.* at 935-936; *Shell Oil*

16 *Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 737 (1993); *Producers Dairy Delivery Co. v.*

17 *Sentry Ins. Co.*, 41 Cal. 3d 903, 912 (1986). "[A] court that is faced with an argument for coverage based

18 on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with

19 the insured's objectively reasonable expectations. In so doing, the court must interpret the language in

20 context, with regard to its intended function in the policy. This is because 'language in a contract must be

21 construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be

22 found to be ambiguous in the abstract.'" *Union Oil Co.*, 37 Cal. App. 4th at 935-936 (citations omitted).

23 In this regard, an interpretation that gives effect to every clause is preferred over one that would render

24 other policy terms meaningless. *Id.*

25                                 **ANALYSIS**

26    **A.**    **The ERSIC Policies**

27

28                                     7

**United States District Court**
For the Northern District of California

1    ERSIC issued to EyeMed Vision Care, LLC Managed Care Organization Errors and Omissions

2 Liability policy, Policy No. 8167-2076, effective October 12, 2000 to November 12, 2001 ("2000-01

3 Policy") and renewed for November 12, 2001 to November 12, 2002 ("2001-02 Policy) (collectively, the

4 "ERSIC Policies") (Stipulation, Exs. G, H).  The ERSIC Policies provide coverage to EyeMed, Inc.,

5 EyeMed Vision Care, LLC and LensCrafters, Inc.

6    The "insuring agreement" of the ERSIC Policies provide that ERSIC "will pay on behalf of any

7 Insured [i.e., EyeMed and other of the insureds] any Loss which the Insured is legally obligated to pay as a

8 result of any Claim that is made against the Insured during the Policy Period [i.e., November 12, 2001 to

9 November 12, 2002] . . . ."  Stipulation, Ex. H at ER00064.

10    The terms "Loss" and "Claim" are defined as follows:

11    "Loss" means Defense Expenses and any monetary amount which an Insured is legally obligated to

12    pay as a result of a Claim. . . . . (Stipulation, Ex. H at ER00066.)

13    "Claim" means any written notice received by an Insured that a person or entity intends to hold an
   Insured responsible for a Wrongful Act.[7]   In clarification and not in limitation of the foregoing, such
   notice may be in the form of an arbitration, mediation, judicial, declaratory or injunctive proceeding.

14    A Claim will be deemed to be made when such written notice is first received by any Insured.
   (Stipulation, Ex. H at ER00065.)

15

16    The ERSIC Policies are claims-made policies.  Thus, the ERSIC Policies require that for any

17 "Claim" that arises during the "Policy Period," the insured must "give the Underwriter written notice of such

18 Claim as soon as practicable . . . and in no event later than . . . ninety (90) days after the end of the Policy

19 Period . . . ."  Stipulation, Ex. H at ER00073.

20    It is undisputed that the *Snow* Action was filed on March 12, 2002, and LensCrafters tendered the

21 *Snow* Action to ERSIC on June 20, 2002, during the 2001-02 Policy.  Stipulation ¶ 4.  Despite these

22 facts, ERSIC contends that the *Snow* Action is a "Related Claim" that is deemed to have been a "Claim"

23 made during the 2000-01 Policy because it purportedly relates to a letter written by Eyexam optometrists

24 _____

25    [7] The ERSIC Policy defines "wrongful act" to mean "any actual or alleged act, error or omission in the
   performance of, or any failure to perform, Medical Information Protection by any Insured Entity or by any
   Insured Person acting within the scope of his or her duties or capacity as such . . . ."  Stipulation, Ex. H at

26 ER00051. "Medical Information Protection" means maintaining the confidentiality of information regarding
   [treatment provided to any individual] and limiting the release or use of such information in conformance with

27 requirements of law."  Stipulation, Ex. H at ER00067.

28                                              8

United States District Court
For the Northern District of California

1  to the California Board of Optometry and California Department of Managed Health Care on September

2  4, 2001 ("Optometrists' Letter").

3          ERSIC relies on the following policy language:

4          Related Claims Deemed Single Claim; Date Claim Made:

5          All Related Claims, whenever made, shall be deemed to be a single Claim and shall be deemed to
           have been first made on the earliest of the following dates:
6
           (1) the date on which the earliest Claim within such Related Claims was received by an Insured; or
7
           (2) the date on which written notice was first given to the Underwriter of a Wrongful Act which
8          subsequently gave rise to any of the Related Claims, regardless of the number and identity of
           claimants, the number and identity of Insureds involved, or the number and timing of the Related
9          Claims, even if the Related Claims comprising such single Claim were made in more than one Policy
           Period.
10
   Stipulation, Ex. H at ER00073-74.
11
           If the Optometrists' Letter constitutes a "Claim" as that term is defined in the ERSIC Policies, and if
12
   the Optometrists' Letter and the *Snow* Action constitute "Related Claims" as that term is defined in the
13
   ERSIC Policies, then the Optometrists' Letter and the *Snow* Action would constitute a single "Claim" first
14
   made in September 2001, during the 2000-01 Policy. If ERSIC is correct, then LensCrafters failed to give
15
   notice of the "Claim" within 90 days of the end of the 2000-01 Policy (which was effective through
16
   November 12, 2001).
17
           The Optometrists' Letter is not addressed to LensCrafters but to the California Board of
18
   Optometry and the California Department of Managed Health Care. Stipulation, Ex. K. The letter is
19
   written by optometrists employed by Eyexam who practice within LensCrafters stores within California.
20
   The letter states:
21
           We are concerned that [LensCrafters is] committing violations of state law and are attempting to
22         force us to take actions that violate our ethical duties. *We request your assistance in advising us
           how to proceed, or in instructing [LensCrafters] to modify these policies.*
23
   *Id.* (emphasis added).
24
           The letter further asserts that LensCrafters' policies "have reached a point where lay people are
25
   interfering so substantially with our decisions that we can no longer practice ethically under these
26
   conditions." *Id.* Among other things, the optometrists complain that:
27

28                                              9

United States District Court

For the Northern District of California

1   •      LensCrafters has created a "One Voice" program, which "deliberately combines Eyeexam and
LensCrafters into one program, with commingled employees, retail and office space, and
2         management";

3   •      LensCrafters has integrated LensCrafters employee functions and computer systems,
which "would violate patient confidentiality and statutory privacy rights";
4

5   •      LensCrafters has created the position of an "Optical Specialist," who is a lay person who "shadows
the optometrist during the examination, and then takes the prescription from the doctor so that the
prescription never enters the hands of the patients," thereby "violat[ing] the confidentiality between
6         the optometrist and patient";

7   •      LensCrafters links "LensCrafters products and Eyeexam services in advertisements in violation of
state law."
8

   *Id.*
9

      The letter concludes by stating:
10

11       We can no longer adhere to our professional ethical standards while working under these
conditions, and we have suffered significant distress as a result of working under these conditions.
12       *We request your assistance in advising us as to how we can comply with these policies
without violating our ethical duties, or alternatively in advising [LensCrafters] to cease
13       these unfair business practices.*

14  *Id.* (emphasis added).

15        It is clear that the Optometrists' Letter makes no demand on LensCrafters for damages and

16  contains no statements that show that the optometrists intended to hold LensCrafters or any other insured

17  legally responsible for any wrongful act. *Cf., e.g., Abifadel v. Cigna Ins. Co.*, 8 Cal. App. 4th 145, 160

18  (1992) ("a claim is a demand for something as a right or as due"). It does not demand that corrective

19  actions be taken by LensCrafters. In fact, the letter is not even addressed to LensCrafters.[8] Instead, the

20  optometrists seek *assistance* and *advice* from their oversight agencies regarding ethical concerns and

21  dilemmas they have. There is no indication that these optometrists intended to sue LensCrafters or to seek

22  money damages from LensCrafters. Given this, both LensCrafters and Liberty argue that the Optometrists'

23  Letter was not a "Claim." ERSIC, on the other hand, argues that the Optometrists' Letter was a "Claim"

24  because it put LensCrafters on notice of an "intent to hold [LensCrafters] responsible for the Wrongful Acts

25  specified in the letter." ERSIC's Opp. Plt'f M.S.J. at 6.

26  _____

27       [8] The letter is copied to Lenscrafters' executives.

28                    10

United States District Court

For the Northern District of California

1    "If contractual language is clear and explicit, it governs." *Bank of the West v. Superior Court*, 2

2  Cal. 4th 1254, 1264-1265 (1992) (citation omitted).  But, "[i]f the terms of a promise are in any respect

3  ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of

4  making it, that the promisee understood it." *Id.* (citation omitted).

5        The ordinary meaning of "Claim" is the assertion of a right or a demand for money.  *See* Black's

6  Law Dictionary at 240 (7th ed. 1999).  Under the ERSIC Policies, a "Claim" requires:  (a) written notice

7  (b) received by any "Insured" (c) that a person or entity intends to hold an "Insured" responsible for (d) a

8  "Wrongful Act." *See, e.g.*, Stipulation, Ex. H at ER00065.  It is clear that the Optometrists' Letter is not a

9  "Claim" under the language of the ERSIC Policies, given that it seeks assistance and advice *for the*

10  *optometrists* on how to comply with LensCrafters' policies.

11        At the very least, the definition of "Claim" provided in the ERSIC Policies is ambiguous because it is

12  unclear whether being held "responsible" encompasses legal, administrative and/or moral responsibility, or

13  whether a "Wrongful Act" includes ethically questionable acts.  Assuming, *arguendo*, that the terms are

14  ambiguous, the Court must determine whether coverage is consistent with the insured's objectively

15  reasonable expectations.

16        In *Abifadel v. Cigna Ins. Co.*, 8 Cal. App. 4th 145 (1992), the court was called upon to define

17  "claim" when the policy itself did not define the term.  The court noted:

18        In defining "claims," the law focuses on the claimant's formal demands for service or payment and
           does not recognize a request for an explanation, the expression of dissatisfaction or disappointment,
19        mere complaining, or the lodging of a grievance as a claim. In both its ordinary meaning and in the
           interpretation given to it by other courts in similar circumstances, a claim is a demand for something
20        as a right or as due. A formal lawsuit is not required before a claim is found to have been made. A
           claim is the assertion of a liability of the party, demanding that the party perform some service or
21        pay some money. A claim is a demand or challenge of something as a right and asserts the liability
           of the party from whom a service or sum of money is requested.

22

23  *Id.* at 160.[9]

24

       ─────────────────

25        [9] While ERSIC argues that *Abifadel* actually stands for the proposition that a "potential claim" is
     sufficient to trigger LensCrafters' reporting obligations, ERSIC reads the case too broadly.  The *Abifadel* court
26  noted that the policy at issue in that case did not define the term "claim" but did define the term "potential claim."
     *Id.* at 161. Given this, the court observed that "[i]t is clear, therefore, that there is some meaningful distinction
27  between a claim and a potential claim *within the meaning of the policy*." *Id.* (emphasis added). The ERSIC

28                                                                11

United States District Court
For the Northern District of California

1    Moreover, the ERSIC Policies provide within the definition of "Claim," examples of notice of an

2  "arbitration, mediation, judicial, declaratory or injunctive proceeding." These examples imply that some

3  "proceeding" must be instituted against the insured to constitute a "Claim." This further supports an

4  interpretation of "Claim" that requires a formal demand for money or service be made against the insured

5  and excludes mere requests for explanations, complaining or lodging of a grievance. *See Abifadel*, 8

6  Cal.App.4th at 160. As noted, *supra*, it is clear that the Optometrists' Letter is not "a demand or challenge

7  of something as a right" nor does it "assert[] the liability of the party from whom a service or sum of money

8  is requested." Given this, the Court finds that LensCrafters' interpretation of "Claim," which would require

9  legal responsibility, is objectively reasonable.

10    Finally, even assuming that the ambiguity could not be resolved by examining the insured's

11  objectively reasonable expectations, the ambiguity is to be resolved against the insurer. *Abifadel*, 8 Cal.

12  App. 4th at 159-60.

13    Given this, the Court finds that the Optometrists' Letter was not a "Claim" as defined by the ERSIC

14  Policies. Accordingly, the Court finds that ERSIC has a duty to defend LensCrafters under the 2001-02

15  Policy because LensCrafters provided notice of the *Snow* Action before the expiration of the 2001-02

16  Policy, as required by the policy's terms.

17  **B.**    **The Liberty Policies**

18    Liberty issued six general liability policies to LensCrafters for the period February 1, 1998 to

19  February 1, 2004 (the "Liberty Policies") (Stipulation, Exs. A-F). Although the exact language of the

20  policies changed throughout this time period, each of the Liberty Policies provides coverage for "personal

21  injury."

22    The insuring agreement for the "personal injury" coverage states:

23    [Liberty] will pay those sums that the insured becomes legally obligated to pay as damages because

24    of "personal injury" . . . to which this insurance applies. We will have the right and duty to defend
      any "suit" seeking those damages.

25

26  Policies at issue in this case do not mention "potential claim" at all. Accordingly, the *Abifadel* court's discussion

27  regarding the distinction between a "claim" and a "potential claim" is inapposite. The Court need only determine
    whether coverage under the policies at issue is consistent with the insured's objectively reasonable expectations.

28                                    12

United States District Court
For the Northern District of California

1    *E.g.*, Stipulation, Ex. A at LC00015; Ex. F at LC00257 (as modified by LC00277).

2    The personal injury coverage in the Liberty Policies covers "'Personal injury' caused by an offense

3    arising out of [LensCrafters'] business, excluding advertising, publishing, broadcasting or telecasting done

4    by you or for you." *See, e.g.*, Stipulation, Ex. A at LC00015.   To provide coverage, the "offense" must

5    take place during the policy period. *E.g.*, Stipulation, Ex. A at LC00015, Ex. C at LC00116.  "Personal

6    Injury" specifically includes:  "Oral or written publication of material that violates a person's right of

7    privacy." *See, e.g.*, Stipulation, Ex. A at LC00017; Ex. B at LC00041.

8    **1.    Publication of material that violates a person's right of privacy**

9    Liberty argues that its duty to defend was not triggered by the *Snow* Action because the complaint

10    does not allege a "publication" that "violates a person's right of privacy."

11    The *Snow* complaint alleges that LensCrafters created the position of "optical specialists" who are

12    laypersons which are styled such that "from the patients' perspective they appear to be part of the

13    optometrists' medical staff." SAC ¶ 61.  According to the complaint, LensCrafters instructs the optical

14    specialists to tell the patients that they are assisting the optometrists and to solicit and record the patients'

15    medical history and "lifestyle" information. *Id.* ¶ 62.  The optical specialists escort the patients to the

16    optometrists' examination rooms, attend the optometric examinations and "transcribe" for the optometrists

17    during the examinations. *Id.* ¶ 63.  The complaint alleges that "[t]o the patients, it appears that the optical

18    specialists are assisting the optometrists and taking down medical information." *Id.*  The optical specialists

19    then sell LensCrafters products to patients using the "lifestyle information" that the optical specialists learned

20    or overheard when taking the patients' medical history and sitting in on the examinations. *Id.* ¶ 65.  The

21    complaint further alleges that LensCrafters transfer to a database the information they elicit from the patients

22    during the medical history interviews and optometric examinations, and use this information and database to

23    conduct a direct mail program to those patients for the purpose of encouraging those patients to purchase

24    additional products from LensCrafters. *Id.* ¶ 66.

25    Based on these, and other, allegations, the *Snow* Action asserts five causes of action.  The one that

26    is relevant to this motion is the fifth cause of action, brought under the California Confidentiality of Medical

27

28                                                    13

United States District Court
For the Northern District of California

Information Act ("CMIA"), Cal. Civ. Code § 56, *et seq.* The CMIA "protects medical patients' right to privacy in their personal medical information, and specifically sets out a cause of action for compensatory and punitive damages for patients whose medical information has been improperly disclosed." *Jennifer M. v. Redwood Women's Health Center*, 88 Cal. App. 4th 81, 92 (2001); *see Gross v. Recabaren*, 206 Cal. App. 3d 771, 782 (1988) (noting that "the significance of a patient's personal privacy rights with respect to medical matters is accorded special protection by the Legislature" through the CMIA).

Section 56.10 of the CMIA states that "[n]o provider of health care, health care service plan, or contractor shall disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization," except under certain circumstances enumerated in the provision. *Id.*; *see Garrett v. Young*, 109 Cal. App. 4th 1393, 1401 (2003). In support of the CMIA claim, the *Snow* Action makes the following allegations:

- Defendants[10] cause patients and members of the Class to disclose confidential medical information to in [sic] the presence of persons who are not under the direct supervision and control of optometrists;

- Defendants cause the confidential medical information they obtain from patients and the members of the Class to be disclosed to LensCrafters for marketing and sales purposes;

- Defendants cause and allow medical records of the Class to [sic] accessed and reviewed by their employees who are not under the direct supervision and control of an optometrist;

- Defendants cause and allow the medical records of the members of the Class to be accessed and reviewed for non-medical reasons;

- By causing the disclosure and use of the medical information of plaintiffs and the Class, defendants violated the [CMIA] and are therefore liable for compensatory and punitive damages, in addition to attorney's fees and costs of suit.

SAC ¶¶ 112-16.

Liberty contends that the SAC does not allege that LensCrafters published any confidential medical information to any third parties. Rather, according to Liberty, the SAC merely describes "LensCrafters' pattern and practice of accessing and invading the optometrists' realm, and ultimately obtaining access to patient information." Liberty Opp. to Plt'f M.S.J. Liberty argues that there is no allegation indicating that

---

[10] As used in this section, the term "Defendants" refers to the defendants in the *Snow* Action, not the defendants in the instant action.

14

1    any information obtained from any patient during any examination was communicated to a third party.

2    Instead, the SAC merely alleges that LensCrafters improperly leads patients to believe that optical

3    specialists are employees of Eyexam, and that this misrepresentation creates a false sense of confidentiality,

4    causing patients to *disclose* private information in the presence of LensCrafters. Therefore, Liberty claims,

5    the *Snow* Action does not allege a "publication" that "violates a person's right of privacy;" given this, Liberty

6    argues that it has no duty to defend.

7         "Publication" is not defined in the Liberty Policies. Black's Law Dictionary defines "publication" as

8    "[g]enerally, the act of declaring or announcing to the public." *Id.* at 1242 (7th Ed. 1999). However, under

9    certain legal doctrines, "publication" does not require that the information-at-issue be widely disseminated.

10   For example, for purposes of defamation law, "the definition of 'publication' is not restricted to widely

11   disseminated materials such as magazines and newspapers." *Brown v. Kelly Broadcasting Co.*, 48 Cal.

12   3d 711, 723 n. 6 (1989). "It is not necessary that the defamatory matter be communicated to a large or

13   even a substantial group of persons. It is enough that it is communicated to a single individual other than the

14   one defamed." *Id.*, *citing*, Rest.2d Torts, § 577, com. b, p. 202.

15        Reading the term in context, as the law requires,[11] supports a finding that "publication of material

16   that violates a person's right of privacy" does not require widespread disclosure. Although Liberty is

17   correct that common law invasion of privacy by public disclosure of private facts requires that the

18   actionable disclosure be widely published and not confined to a few persons or limited circumstances,

19   nothing in the Liberty Policies limits "right of privacy" to common law right of privacy. *See Park Univ.*

20   *Enters. v. Am. Cas. Co. of Reading*, 314 F. Supp. 2d 1094, 1109 (D. Kan. 2004) (noting that if insurer

21   wanted the term "right of privacy" to be defined by importing Illinois tort standards, "it should have indicated

22   as much in the policy"). The California constitutional right to privacy, "particularly when professional or

23   fiduciary relationships premised on confidentiality are at issue (such as doctor and patient or

24   psychotherapist and client)," may be invaded by a less-than-public dissemination of information. *Hill v.*

25

26
_____

27   [11] *See Union Oil Co. v. International Ins. Co.*, 37 Cal. App. 4th 930, 935-36 (1995).

28                                                         15

1  *National Collegiate Athletic Assn.*, 7 Cal. 4th 1, 27 & 27 n.7 (1994).[12]  Since doctor-patient

2  relationships are clearly at issue in the *Snow* Action, a less-than-public dissemination of information, such as

3  that alleged in the complaint, could constitute a "publication" that "violates a person's [California

4  constitutional] right of privacy."[13]  The CMIA provides yet another statutory right to privacy in medical

5  patients' personal medical information.  *See Garrett*, 109 Cal. App. 4th at 1410 (CMIA provides

6  protection of private information in addition to other remedies available at law); *Jennifer M.*, 88 Cal. App.

7  4th at 92; *Gross*, 206 Cal. App. 3d at 782 (acknowledging that the CMIA protects "patient's personal

8  privacy rights with respect to medical matters").  And under the CMIA, mere unauthorized disclosure of

9  medical information may be sufficient to establish a violation.  Given the many ways that publication of

10  material can violate a person's right of privacy, and the fact that the clear language of the Liberty Policies

11  does not limit "right to privacy" to just one type of right, it is not clear that the term should be limited as

12  Liberty suggests.

13      The SAC alleges that Defendants "cause" members of the class to disclose confidential medical

14  information to persons who are not under the direct supervision and control of optometrists (i.e. the optical

15  specialists).  SAC ¶ 112.  Defendants then "disclose[]" this confidential medical information to LensCrafters

16  for marketing and sales purposes.  *Id.* ¶ 113.  Defendants further "cause and allow" medical records to be

17  "accessed and reviewed" by employees who are not under the direct supervision and control of an

18  optometrist and for non-medical reasons.  *Id.* ¶ 114-15.  Given that the SAC alleges a publication of

19  confidential medical information from medical personnel to non-medical personnel for non-medical reasons,

20  the allegations potentially implicate both the California constitutional right of privacy and the right of privacy

21

22  _____

23  [12] While the *Snow* Action did not specifically allege a cause of action under California's constitutional right of privacy, "[t]he scope of the duty does not depend on the labels given to the causes of action in the third party complaint; instead it rests on whether the *alleged facts* or *known extrinsic facts* reveal a possibility that the claim may be covered by the policy." *Cunningham v. Universal Underwriters*, 98 Cal. App. 4th 1141, 1148 (2002) (emphasis original).

25

26  [13] "[A] plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy."  *Garrett v. Young*, 109 Cal. App. 4th 1393, 1410 (2003) (citation omitted).

28                                                        16

1  protected by the CMIA.  Accordingly, the Court finds that the SAC alleges "publication of material that

2  violates a person's right of privacy."

3        The case that Liberty relies on, *Duff Supply Co. v. Crum & Forster Ins. Co.*, 1997 WL 255483,

4  1997 U.S. Dist. LEXIS 6383 (E.D.Pa. 1997) is distinguishable.  In that case, the plaintiff stated a claim for

5  invasion of privacy based on allegations that other employees monitored her phone calls.  1997 WL

6  255483 at *3.  The court noted that there was no allegation in the complaint indicating "that the information

7  obtained during the monitoring of these calls was provided to anyone else."  *Id.* at *8.  In analyzing whether

8  plaintiff's right of privacy claim fell within the scope of the definition of "[o]ral or written publication of

9  material that violates a person's right of privacy," the court held that there was no coverage because there

10  was no publication of the matters discussed during the phone conversations.  In contrast to *Duff Supply*,

11  the *Snow* Action clearly alleges a publication of confidential medical information by the insureds and not

12  mere eavesdropping on telephone conversations.  More critically, *Duff Supply* only analyzed the common

13  law right of privacy.  The allegations of the *Snow* Action may trigger both California's constitutional right of

14  privacy as well as the right of privacy protected by the CMIA.  Neither of these rights are completely co-

15  extensive with the common law right of privacy.

16        Given the foregoing, the Court finds that all of these alleged disclosures of private medical

17  information are "publication[s] of material that violate[] a person's right of privacy" as that term is defined in

18  the Liberty Policies.  At the very least, the Court finds that the term is ambiguous.  *See Park University*,

19  314 F. Supp. 2d at 1107 (finding the term "publication of material that violates a person's right of privacy,"

20  where that term was not defined in the policy, to be ambiguous and that such "publication" could include the

21  transmittal of material, regardless of whether such transmittal is to a third party).  Assuming that the term is

22  ambiguous, based on the foregoing discussion, it is objectively reasonable that the term "publication of

23  material that violates a person's right of privacy" encompass the types of disclosures alleged in the *Snow*

24  Action.  Finally, assuming that an examination of the insured's objectively reasonable expectation does not

25  resolve the ambiguity, the ambiguity is resolved against the insurer.  *See generally Bank of the West v.*

26  *Superior Court*, 2 Cal. 4th 1254, 1264-1265 (1992).  Accordingly, the Court finds that the *Snow* Action

27

28                                                    17

United States District Court

For the Northern District of California

1   triggered Liberty's duty to defend.[14]

2       **2.    Criminal Act Exclusion**

3       Liberty also asserts that coverage for the *Snow* Action is barred by operation of the "criminal acts"

4   exclusion in one of its policies.   Once an insured has established that the occurrence forming the basis of its

5   claim is within the basic scope of insurance coverage, "the burden is on the insurer to prove the claim is

6   specifically excluded." *Dart Industries, Inc. v. Commercial Union Ins. Co.*, 28 Cal. 4th 1059, 1071

7   (2002); *see Olympic Club v. Those Interested Underwriters at Lloyd's London*, 991 F.2d 497, 502

8   (9th Cir. 1993).

9       Here, four of the six Liberty Policies exclude coverage for personal injury "arising out of a criminal

10  act committed by or at the direction of the insured" (the "Criminal Acts Exclusion").  Stipulation, Ex. C at

11  LC00116; Ex. D at LC00174; Ex. E at LC 00227; Ex. F at LC00279.  Liberty argues that to the extent

12  the *Snow* Action alleges violations of the CMIA that resulted in economic loss or personal injury to the

13  class, such violations are covered by the Criminal Acts Exclusion.  The Court finds that the Criminal Acts

14  Exclusion does not relieve Liberty of the duty to defend the *Snow* Action.

15      The CMIA provides:

16      Any violation of the [CMIA] that results in economic loss or personal injury to a patient is
        punishable as a misdemeanor.
17

    Cal Civ Code § 56.36.
18

19      First, the exclusion does not even appear in two of the six policies triggered by the *Snow* Action,[15]

20  _____

21      [14] While Liberty also argues that its own investigation determined that no publication of confidential
    information actually took place, it does not matter whether the allegations of disclosures of private information
22  are true.  *See Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1086 (1993) ("An insured buys liability
    insurance in large part to secure a defense against all claims potentially within policy coverage, even frivolous
23  claims unjustly brought.").  Moreover, the duty to defend is based upon the allegations of the complaint, and
    not on what the insured contends or what the insurer believes the facts will eventually show.  *See Waller v.*
24  *Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 19 (1995) (duty to defend applies even to claims that are
    "groundless, false, or fraudulent").

25      [15] Although the SAC alleges violations of patient privacy from March 1998 to the present, SAC ¶ 13,
    Liberty contends that only one Liberty Mutual Policy is potentially triggered because the class in the *Snow*
26  Action has not yet been certified.  As noted, *supra*, the duty to defend is broad and "the insured is entitled to
    a defense if the underlying complaint alleges the insured's liability for damages *potentially covered under the*
27  *policy*, or if *the complaint might be amended to give rise to a liability that would be covered under the*

28                                          18

United States District Court

For the Northern District of California

1    and so it cannot be the basis to deny a duty to defend as to those policies.  The 1998-99 Liberty Mutual

2    Policy does not include any criminal acts exclusion, or similar exclusion.  Stipulation, Ex. A.  With respect

3    to the 1999-00 Liberty Mutual Policy, it excludes coverage under the personal injury party only for a

4    "willful violation of a penal statute or ordinance."  Stipulation, Ex. A at LC00070.  This exclusion is clearly

5    inapplicable because the *Snow* Action does not allege any "violation of a penal statute or ordinance" as the

6    CMIA is a civil statute.

7         Second, even if the Criminal Acts Exclusion appeared in all six Liberty Policies, which it does not,

8    the exclusion would still not relieve Liberty of its duty to defend the *Snow* Action.  The statute clearly states

9    that any violation of the CMIA that results in economic loss or personal injury to a patient *is punishable as*

10   *a misdemeanor*, not that any such violation *is a misdemeanor*.

11        In *Park Univ. Enters. v. Am. Cas. Co. of Reading*, 314 F. Supp. 2d 1094 (D. Kan. 2004), the

12   plaintiff claimed that defendant insurer had a duty to defend it in an underlying state court action brought

13   pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.[16]  The insurer argued

14   that it did not have a duty to defend, because, *inter alia*, the alleged violations of the TCPA also violated

15   720 ILCS § 5/26-3, which makes criminal the knowing use of a facsimile machine to transmit unsolicited

16   _____

17   policy." *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 299 (1993).  Here, the *Snow* Action
     clearly alleges personal injury offenses committed against both the named plaintiffs and the putative class

18   members from March 1998 to the present.  It is an unremarkable proposition that many class actions remain
     uncertified until a settlement is reached.  *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003)

19   (reviewing a class action settlement agreement that the parties entered into before the court certified the class).
     Liberty fails to cite any case that holds that the mere fact that a class action complaint has yet to be

20   certified renders such claims "too speculative" to trigger the insurer's duty to defend.  The case that Liberty
     cites, *Low v. Golden Eagle Ins. Co.*, 99 Cal. App. 4th 109 (2002), does not so hold.  In *Low*, the insurer

21   denied coverage because the complaint, which was styled as a class action complaint, did not allege bodily
     injury.  *Id.* at 111.  The insured alleged that the complaint could be amended to allege bodily injury, thereby

22   giving rise to the duty to defend.  *Id.* at 112-13.  The court found such a possibility was too speculative to
     trigger the duty to defend because the complaint was "not only couched overwhelmingly in class action terms,

23   but the named plaintiff expressly disclaim[ed] any interest in seeking recovery of damages for her alleged
     personal injuries, despite that fact that such an allegation is required to trigger coverage and a related duty to

24   defend under the policy." *Id.* at 113-14.  Given this, "revisions to that pleading to eliminate the class action
     allegations and revoke the plaintiff's disclaimer of any interest in seeking damages for personal injury would in

25   effect substitute one cause of action for another." *Id.* at 114.

26        [16] The TCPA provides that "it shall be unlawful for any person within the United States . . . to use any
     telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone

27   facsimile machine. . . ." 47 U.S.C. § 227(b).

28                                                                  19

advertising, and therefore its criminal act exclusion applied. *Id.* at 1110. The state statute at issue in *Park University* provides:

> (b) No person shall knowingly use a facsimile machine to send or cause to be sent to another person a facsimile of a document containing unsolicited advertising or fund-raising material, except to a person which the sender knows or under all of the circumstances reasonably believes has given the sender permission, either on a case by case or continuing basis, for the sending of such material.
> . . . .
>
> (c) Sentence. Any person who violates subsection (b) is guilty of a petty offense and shall be fined an amount not to exceed $ 500.

720 ILCS § 5/26-3(b) & (c).

The *Park University* court found that the criminal act exclusion was inapplicable, in part because the complaint did not allege a criminal act under the relevant statute. *Id.* at 1110.

Similarly, in this case, it is undisputed that LensCrafters has not been charged with a crime in connection with the events recited in the *Snow* Action. The *Snow* Action also does not allege a criminal act under the CMIA or seek criminal sanctions under § 56.36 or otherwise. Liberty has failed to provide any authority to suggest that the criminal act exclusion applies where an insured is alleged to have violated a statute that provides for both civil and criminal penalties, but where the insured has not been charged with any criminal violation.[17] Furthermore, in contrast to the statute evaluated by the *Park University* court, the language of the CMIA itself is discretionary; it does not categorically deem a violation of the CMIA that results in economic loss or personal injury to a patient a misdemeanor. Given this, it is clear that the criminal act exclusion is inapplicable. Even if the Court were to conclude that the Criminal Act Exclusion is ambiguous, and thereby reach the issue of the reasonable expectation of coverage of the insured, it is objectively reasonable for LensCrafters to expect that the Criminal Act Exclusion would require, at the very

---

[17] The cases that Liberty relies on are inapposite because in those cases, courts found that the criminal act exclusion is a bar to *indemnity* where the insured had been convicted of a serious crime. *See 20th Century Ins. Co. v. Schurtz*, 92 Cal. App. 4th 1188, 1196 (2001) (criminal act exclusion applied because evidence was "undisputed"that insured was convicted of a felony); *20th Century Ins. Co. v. Stewart*, 63 Cal. App. 4th 1333, 1338 (1998) (exclusion applied where insured "was prosecuted for a criminal offense; was convicted of a criminal offense based on a plea of guilty and not on a determination of guilt made by [insurer]; pleaded guilty, making irrelevant the burden of proof; and was sentenced to a 10-year prison term"). Liberty has cited no case that applies the criminal act exclusion to deny the insured a *defense* where the insured has not been charged, much less convicted, of any crime, or where the complaint does not allege a criminal act.

1   least, some allegation of criminal conduct. And as noted, *supra*, any ambiguity is resolved against the

2   insurer. Accordingly, the Court finds that the Criminal Act Exclusion is inapplicable.

3   **C.**    **Summary**

4          In light of the foregoing discussion, the Court finds that (1) ERSIC has a duty to defend

5   LensCrafters with respect to the *Snow* Action under the 2001-2002 ERSIC Policy and (2) Liberty has a

6   duty to defend LensCrafters with respect to the *Snow* Action under all six policies issued by Liberty.

7   Accordingly, the Court GRANTS LensCrafters' motion for partial summary judgment re: duty to defend

8   and DENIES both ERSIC's and Liberty's motions for summary judgment against LensCrafters.

9   **D.**    **Excess Insurer**

10          Both Liberty and ERSIC have filed cross motions for summary judgment against each other.

11   ERSIC claims that to the extent its duty to defend was triggered by the *Snow* Action, its policies are excess

12   to the Liberty Policies and so it has no obligation to defend until the applicable limits of liability of the

13   Liberty Policies are exhausted. Liberty, on the other hand, argues that its policies are excess to ERSIC's

14   policy and therefore its duty to defend does not arise until after ERSIC's policy is exhausted. The insurers,

15   however, did not adequately brief these issues. To the extent they are briefed, they are completely

16   intertwined with the issues addressed, *supra*, and so it is quite likely that the parameters of each respective

17   insurer's argument will change given the Court's findings with respect to LensCrafters' motion for partial

18   summary judgment. Given this, the Court DENIES WITHOUT PREJUDICE both ERSIC's cross motion

19   for summary judgment against Liberty and Liberty's cross motion for summary judgment against ERSIC.[18]

20   Both ERSIC and Liberty are granted leave to file additional summary judgment motions that address which

21   policy is excess to which, unencumbered by, and taking into account, the LensCrafters-related issues which

22   the Court has resolved.

**CONCLUSION**

23

24          Good cause appearing,

25

26          [18] ERSIC filed an evidentiary objection to the declaration of Hee Young Lee which was filed in support
    of Liberty's opposition to ERSIC's cross motion for summary judgment. The Court did not consider the
27   portions of the declaration which were objected to and so the objections are OVERRULED AS MOOT.

28                                                        21

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1       IT IS HEREBY ORDERED THAT LensCrafters' motion for partial summary judgment [Docket

2   No. 29] is GRANTED.  Liberty's motion for summary judgment against LensCrafters [Docket No. 31] is

3   DENIED.  ERSIC's motion for summary judgment against LensCrafters [Docket No. 40] is DENIED.

4       IT IS FURTHER ORDERED THAT Liberty's cross motion for summary judgment against ERSIC

5   [Docket No. 32] and ERSIC's cross motion for summary judgment against Liberty [Docket No. 40] are

6   both DENIED WITHOUT PREJUDICE.  Liberty and ERSIC are granted leave to file additional summary

7   judgment motions that address which policy is excess to which, consistent with the Court's rulings in this

8   Order.  Any such motions must be noticed in accordance with

9   Civil L.R. 7-2.

10      IT IS FURTHER ORDERED THAT the case management conference scheduled for January 25,

11  2005 is VACATED.  The parties shall appear for a telephonic Case Management Conference on

12  **Thursday, March 17, 2005 at 3:00 p.m.** The parties shall **meet and confer** prior to the conference and

13  shall prepare a joint Case Management Conference Statement which shall be filed no later than ten (10)

14  days prior to the Case Management Conference.  Plaintiff shall be responsible for filing the statement as

15  well as for arranging the conference call.  All parties shall be on the line and shall call (510) 637-3559 at the

16  above indicated date and time.

17      IT IS SO ORDERED.

18

19                                   /s/ Saundra Brown Armstrong

20  Dated: 1-20-05                     SAUNDRA BROWN ARMSTRONG
                                    United States District Judge

21

22

23

24

25

26

27

28