# TAB 1

Westlaw.

21 Cal.3d 801                                                              Page 1
21 Cal.3d 801, 582 P.2d 109, 148 Cal.Rptr. 22, 7 A.L.R.4th 642
**(Cite as: 21 Cal.3d 801)**

▷

WILLIAM M. BULLIS, as Trustee, etc., et al.,
Plaintiffs and Respondents,
v.
SECURITY PACIFIC NATIONAL BANK,
Defendant and Appellant
**L.A. No. 30711.**

Supreme Court of California

August 10, 1978.

SUMMARY

In an action by a co-executor of an estate against a
bank for damages for improper withdrawal of money
from the estate checking account by the other co-
executor, the trial court awarded damages to the
estate in the amount of the unauthorized withdrawals.
The court also awarded prejudgment interest on each
unauthorized withdrawal from the date of the
withdrawal. The trial court found the bank was liable
on three separate grounds for the loss represented by
the withdrawals. The court found the failure of the
bank to require the signatures of both co-executors on
each withdrawal from the estate checking account
breached the bank's common law duty to use
reasonable care in its conduct with its depositors. The
court also found that Prob. Code, § 570, providing
that when two or more executors have been
appointed and one or more are absent from the state
or legally disqualified from serving, the act of the
other or others shall be effectual for all purposes,
required both signatures to effect withdrawals.
Finally the court found that the bank breached its
deposit contract with the estate, since the contract
incorporated all applicable banking customs and
custom required the signatures of both co-executors
for withdrawals. (Superior Court of Los Angeles
County, No. C992752, Max F. Deutz, Judge.)

The Supreme Court affirmed. The court held that,
based on the evidence of the banking industry's
custom and defendant's adopted procedures and
practice, there was substantial evidence to support the
trial court's finding that defendant's failure to require
the signatures of both co-executors on withdrawals
fell below the standard of care owed to the estate.
Also, the court held that, in light of the facts that the
estate was **\*802** deprived of the use of $250,000 for
several years due to the bank's negligence and that

the date on which the estate suffered the loss
represented by each unauthorized withdrawal was
readily ascertainable, the trial court's award of
prejudgment interest did not constitute an abuse of
discretion. (Opinion by Bird, C.J., with Tobriner,
Mosk, Clark, Richardson and Manuel, JJ.,
concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1a, 1b, 1c) Banks and Banking § 10--Withdrawals
and Payments-- Liability of Bank for Improper
Withdrawal From Estate Checking Account.
In an action by a co-executor of an estate against a
bank for damages for improper withdrawal of funds
from the estate checking account by the other co-
executor, there was substantial evidence to support
the trial court's finding that the bank's failure to
require the signatures of both co- executors on
withdrawals fell below the standard of care owed to
the estate. The record indicated that custom and
practice in the banking industry required the
signatures of both co-executors to withdraw funds
from an estate checking account. It also indicated the
bank deviated from its own written procedures and
accepted practice when it permitted the funds to be
withdrawn with only a single signature.

[See **Cal.Jur.3d, Banks and Other Financial
Institutions, § 140; Am.Jur.2d, Banks, § 521.**]

(2) Appellate Review § 129--Scope and Extent--
Findings--Substantial Evidence.
An appellate court's review is limited to determining
whether there is any substantial evidence,
contradicted or uncontradicted, which will support
the conclusion reached by the trial court.

(3) Negligence § 10--Elements of Actionable
Negligence--Duty of Care-- Standard of Care--
Custom and Practice.
The standard of care required in a particular
circumstance may be based on a statute or the custom
and practice in the relevant community. While the
custom in the community does not necessarily
establish how a reasonable person must act, it is
evidence to be considered in determining the proper
standard of care. **\*803**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.3d 801

21 Cal.3d 801, 582 P.2d 109, 148 Cal.Rptr. 22, 7 A.L.R.4th 642

**(Cite as: 21 Cal.3d 801)**

(4) Banks and Banking § 21--Actions--Standard of Care.

The failure of a bank to act in accordance with an accepted banking practice suggests the absence of due care. The term 'general banking usage' within the meaning of Cal. U. Com. Code, § 4103, subd. (3), providing that action or nonaction by a bank consistent with a general banking usage not disapproved by statute, prima facie constitutes the exercise of ordinary care, means a general usage common to banks in the area concerned. Where the adjective 'general' is used, the intention is to require a usage broader than a mere practice between two or three banks, but it is not intended to require anything as broad as a country-wide usage. A usage followed generally throughout a state, a substantial portion of a state, a metropolitan area or the like would certainly be sufficient.

(5) Decedents' Estates § 43--Joint Executors and Administrators--Powers, Duties and Liabilities--Validity of Acting Alone.

Prob. Code, § 570, providing that one of two co-executors may act alone only if the other co-executor is absent from the state or legally disqualified from acting, clearly implies that action under any other circumstance must be undertaken jointly. Also, the statute must be interpreted to mean that delegations of authority between co-executors, whether written or oral, are not permitted.

(6) Banks and Banking § 10--Withdrawals and Payments--Liability of Bank for Improper Withdrawal From Estate Checking Account--Signature Cards.

The rule that insulates a bank from liability for honoring a check drawn in breach of trust if the check is signed in conformity with the signature card did not protect a bank that permitted single signature withdrawals by one co-executor from an estate checking account in accordance with the signature cards where the bank was negligent in failing to indicate in some effective manner that withdrawals would not be honored unless signed by both co-executors.

(7) Negligence § 20--Elements of Actionable Negligence--Proximate Cause-- Intervening Causes--Intervening Wrong; Third Person's Criminal Acts.

A person is liable for any injury proximately or substantially caused by his negligent conduct, even if a third person's conduct directly precipitates the injury. If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligence, such an act, whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby. *804

(8) Banks and Banking § 21--Limitation of Actions.

On its face, Code Civ. Proc., § 348, providing there is no limitation on the time for initiating an action brought to recover money deposited in any bank, permits a person to file suit at any time to recover money deposited in a bank. Also, the statute does not limit the kinds of actions subject to its provisions, unlike many other statute of limitations. Thus, an action by a co-executor of an estate for damages against a bank, based on the bank's negligence in permitting the other co-executor to withdraw funds from the estate's checking account without the signature of both co- executors, was not barred by the statute of limitations.

(9a, 9b, 9c) Interest § 12--Computation--Time From Which Interest Runs.

In an action by the co-executor of an estate against a bank for damages for the bank's negligence in allowing the other co-executor to withdraw funds from the estate's checking account without the signature of both co- executors, the trial court's award of prejudgment interest on each unauthorized withdrawal from the date of the withdrawal did not constitute an abuse of discretion. The record indicated that the estate was deprived of the use of $250,000 for several years due to the bank's negligence. It also indicated that the date on which the estate suffered the loss represented by each unauthorized withdrawal was readily ascertainable and stipulated to by the parties.

(10) Interest § 12--Computation--Time From Which Interest Runs--Prejudgment Interest--Trial Court's Authority.

Although Civ. Code, § 3288, only grants authority to award prejudgment interest to the jury, the trial court, when acting as the trier of fact, may also award prejudgment interest under the statute.

(11) Interest § 12--Computation--Time From Which Interest Runs--Prejudgment Interest--Elements of Proof.

Under Civ. Code, § 3288, providing that the trier of fact may award prejudgment interest in an action for the breach of an obligation not arising from contract and in every case of oppression, fraud and malice, a party does not have to prove both a breach of noncontractual obligation and oppression, fraud or malice.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.3d 801

Page 3

21 Cal.3d 801, 582 P.2d 109, 148 Cal.Rptr. 22, 7 A.L.R.4th 642
**(Cite as: 21 Cal.3d 801)**

(12) Interest § 12--Computation--Time From Which Interest Runs--Prejudgment Interest--Necessity of Liquidated Damages.
Even if a plaintiff's damages are not liquidated, prejudgment **\*805** interest may be awarded. (Disapproving, to the extent they are inconsistent, _Nicholson-Brown, Inc. v. City of San Jose_ (1976) 62 Cal.App.3d 526 [133 Cal.Rptr. 159], and _Dixon Mobile Homes, Inc. v. Walters_ (1975) 48 Cal.App.3d 964 [122 Cal.Rptr.202].)

(13) Appellate Review § 142--Review--Discretion of Trial Court--Reasoned Judgment.
A trial court's exercise of discretion will be upheld on review if it is based on a reasoned judgment and complies with the legal principles and policies appropriate to the particular matter at issue.

(14) Interest § 1--Prejudgment Interest--Purpose.
Prejudgment interest is awarded to compensate a party for the loss of the use of his or her property.

COUNSEL

Sheppard, Mullin, Richter & Hampton, Pierce T. Selwood and Thomas C. Nelson for Defendant and Appellant.

Schurmer, Drane, Bullis & McCarthy, Walter H. Drane, Ellis J. Horvitz and Arthur E. Schwimmer for Plaintiff and Respondent.

**BIRD, C. J.**

Security Pacific National Bank appeals a judgment for damages in favor of respondents, heirs of the estate of Florence McNaghten. This court must decide whether a bank's failure to require the signatures of both of an estate's co-executors for withdrawals from an estate account was sufficient to hold the bank liable for misappropriations from that account by one of the executors.

I

Florence Edna Letts McNaghten died in July 1966, having named Ann McNaghten Booth, decedent's daughter, and Edward Lampe, decedent's long-time financial advisor and accountant, as co-executors to administer **\*806** her estate. Letters testamentary were subsequently issued to them by the probate court.

In August 1966, Booth and Lampe decided to open a checking account for the estate, but failed to discuss whether the signatures of one or both executors

would be required to effect withdrawals. Lampe volunteered to open the account. He went to Security Pacific National Bank and presented a certified copy of the letters testamentary appointing Booth and himself as co-executors. Lampe then signed a signature card establishing a checking account for the 'Estate of Edna L. McNaghten.' A second card was mailed to Booth for her signature. Lampe did not discuss with any bank official whether one or both signatures would be necessary to make withdrawals.

A bank official wrote on Lampe's card that he was a 'coexecutor.' Booth's name was inserted in parentheses beneath Lampe's signature, with a notation to 'see attached card.' Booth returned the completed signature card and the bank stapled it to Lampe's signature card. Both signature cards stated that '[t]his account shall be governed by applicable banking laws, customs and Clearing House regulations ....'

In its operations manual, the bank specifically required that if there were two executors for an estate, the signatures of both executors were ordinarily necessary for any withdrawal. [FN1] To implement this requirement, such accounts were to be 'flagged' by placing a stamp on each signature card indicating that more than one signature was needed. [FN2] If two signatures were not to be required, the bank's legal department was to be consulted. The manual also directed that new accounts be reviewed by a supervisory officer to assure that the correct procedure had been followed.

> FN1 'Executors, Administrators, Guardians, and Conservators - Obtain for your file a certified copy of the letters appointing an executor, administrator, guardian, or conservator, who wishes to open a new account. Ordinarily, you should not accept the appointment of an agent to act for these parties or allow two joint executors or administrators to act individually. When you think an exception would be in order, consult the Legal Department. If there are more than two executors or administrators appointed in California, a majority may act. ...'

> FN2 '15. NUMBER OF SIGNATURES REQUIRED
> 'Impress the stamp 'Requires _____ Signatures' on the signature cards and check file signature cards of all accounts that require more than

21 Cal.3d 801                                                                                                Page 4
21 Cal.3d 801, 582 P.2d 109, 148 Cal.Rptr. 22, 7 A.L.R.4th 642
**(Cite as: 21 Cal.3d 801)**

one signature on checks. If a specific combination of signatures is required, note it in red under the heading.'

Notwithstanding these directives, no cautionary notation was placed on the signature cards for the McNaghten estate to alert bank officials that **\*807** both signatures were necessary. Further, there was no evidence that appellant's legal department was consulted as required by the bank's operations manual.

Between August 1966 and October 1970, Lampe withdrew hundreds of thousands of dollars from the estate account with checks bearing only his signature. During this time, he misappropriated almost $250,000, personally investing it in a mining venture. An additional $34,000 was improperly distributed to one of the decedent's heirs without prior court approval.

Booth did not discover these misappropriations since the bank sent the cancelled checks and statements only to Lampe. Further, Lampe was able to manipulate the estate's financial records and successfully conceal the defalcations from the attorneys who prepared the estate's accountings. However, in October 1970 the mining venture failed and Lampe was forced to admit the unauthorized withdrawals. This action was promptly filed against the bank by co-executor Booth. [FN3]

> FN3 The assets of the McNaghten estate, including all rights in the action against the bank, were distributed after that action was initiated. Subsequently, William M. Bullis and Leroy B. Taft, Jr., as trustees of testamentary trusts, and W. H. Booth, Jr. and Malcolm Patrick Booth, as successors to Ann McNaghten Booth's distributive interest, were substituted as plaintiffs in this action.

At a court trial, the bank was found liable on three separate grounds for the loss represented by each improper withdrawal from the estate account. The court found the failure of the bank to require the signatures of both co-executors on each withdrawal from the estate checking account breached the bank's common law duty to use reasonable care in its conduct with its depositors. Probate Code section 570 was also held to require both signatures to effect withdrawals. [FN4] Finally, the court found that the bank breached its deposit contract with the estate since that contract incorporated all 'applicable

banking ... customs ...' and custom required the signatures of both co-executors for withdrawals. **\*808**

> FN4 Probate Code section 570 provides: 'When two or more executors or administrators have been appointed and one or more are absent from the state, or legally disqualified from serving, the act of the other or others shall be effectual for all purposes; if upon any hearing it shall appear that one or more of the executors or administrators were absent from the state or legally disqualified from serving, the court may so find in its order or judgment and such finding shall be conclusive of the authority of those acting. When there are more than two executors or administrators, the act of a majority is valid.'

Since respondents' suit was timely filed under Code of Civil Procedure section 348, [FN5] damages were awarded in the amount of the unauthorized withdrawals. [FN6] The court also awarded prejudgment interest under Civil Code sections 3287, subdivision (a), and 3288 on each unauthorized withdrawal from the date of the withdrawal. [FN7] The bank appeals from this judgment for $317,008.35. [FN8]

> FN5 Code of Civil Procedure section 348 provides: 'To actions brought to recover money or other property deposited with any bank ... there is no limitation.'

> FN6 The parties stipulated which withdrawals did not satisfy legitimate estate expenses.

> FN7 Civil Code section 3287, subdivision (a) provides: 'Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day ....'
> Civil Code section 3288 provides: 'In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury.'

> FN8 The bank had cross-complained against Lampe for indemnification. The bank and Lampe subsequently agreed on the extent of Lampe's liability if the bank were held

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

liable. Judgment in the amount of $280,277.93 was entered for the bank. Lampe has not appealed from that judgment.

## II

(1a) The trial court found that appellant breached its common law duty to act with reasonable care when it permitted Lampe to withdraw funds from the estate account without Booth's signature. Appellant clearly had a duty to act with reasonable care in its transactions with its depositors, including the McNaghten estate. (See, e.g., _Pac. Coast Cheese, Inc. v. Sec. First Nat. Bk._ (1955) 45 Cal.2d 75, 79 [286 P.2d 353]; _Basch v. Bank of America_ (1943) 22 Cal.2d 316, 321 [139 P.2d 1]; _Barclay Kitchen, Inc. v. California Bank_ (1962) 208 Cal.App.2d 347 [25 Cal.Rptr. 383].) This court must decide whether the trial court correctly determined that a bank acting with reasonable care would have required both signatures to effect withdrawals from the estate's account.

(2) The trial court's determination that appellant did not act in accordance with the applicable standard of care, including implicit findings on the '... questions of causality, foreseeability and reasonableness ...,' was a finding of fact. (_Ewing v. Cloverleaf Bowl_ (1978) 20 Cal.3d 389, 399 [143 Cal.Rptr. 13, 572 P.2d 1155]; _Acosta v. Southern Cal. Rapid Transit Dist._ (1970) 2 Cal.3d 19, 27 [84 Cal.Rptr. 184, 465 P.2d 72].) Consequently, this court's review is limited to determining whether 'there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the [trial court].' (*809 _Weirum v. RKO General, Inc._ (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]. See _Nestle v. City of Santa Monica_ (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; _Foreman & Clark Corp. v. Fallon_ (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

(3) The standard of care required in a particular circumstance may be based on a statute (see, e.g., Evid. Code, § 669) or the custom and practice in the relevant community. (_Perumean v. Wills_ (1937) 8 Cal.2d 578, 583 [67 P.2d 96]; see 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 498, pp. 2764-2765 and cases cited.) While the custom in the community does not necessarily establish how a reasonable person must act, it is evidence to be considered in determining the proper standard of care. (4)(See fn. 9.) (_Polk v. City of Los Angeles_ (1945) 26 Cal.2d 519, 531-532 [159 P.2d 931]; Prosser, Torts (4th ed. 1971) § 33, pp. 166-168; Rest.2d Torts, § 295A.) [FN9]

FN9 Section 4103, subdivision (3), of the California Uniform Commercial Code provides that '... action or nonaction [by a bank] consistent ... with a general banking usage not disapproved by this division, prima facie constitutes the exercise of ordinary care.' (See _Luckehe v. First Nat. Bk. of Marysville_ (1924) 193 Cal. 184, 189-190 [223 P. 547].) Conversely, the failure of a bank to act in accordance with an accepted banking practice suggests the absence of due care.

'The term 'general banking usage' is not defined but should be taken to mean a general usage common to banks in the area concerned. [See Cal. U. Com. Code, § 1205, subd. (2).] Where the adjective 'general' is used, the intention is to require a usage broader than a mere practice between two or three banks but it is not intended to require anything as broad as a country-wide usage. A usage followed generally throughout a state, a substantial portion of a state, a metropolitan area or the like would certainly be sufficient.' (Cal. U. Com. Code, § 4103, Official Coms. to U. Com. Code, com. 4.)

(1b) Evidence of the custom and practice in the banking industry of the number of signatures required for co-executors to withdraw funds from an estate checking account was presented at trial. Testimony as to the practice of some of the state's largest banks and numerous local banks in the Los Angeles area was presented. In each case, the bank required two signatures to withdraw funds.

Appellant's operations manual, which was regarded as a 'bible,' also required two signatures for withdrawals. (See fn. 1, _ante_.) To ensure that this procedure was uniformly followed, the manual required that a cautionary notation be stamped on each signature card and that each new account be reviewed by a supervisory bank officer. (See fn. 2, _ante_.) Exceptions were to be made only after consulting appellant's legal department. One of appellant's employees testified that these procedures were generally followed. *810

The letters testamentary presented to appellant by Lampe identified both Booth and Lampe as the co-executors of the McNaghten estate. Each co-executor completed a signature card, which appellant stapled together and retained. The bank's legal department

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.3d 801
21 Cal.3d 801, 582 P.2d 109, 148 Cal.Rptr. 22, 7 A.L.R.4th 642
**(Cite as: 21 Cal.3d 801)**

was not consulted about deviating from the prescribed procedure for withdrawals. Nevertheless, neither Lampe's nor Booth's signature card was stamped to alert bank personnel that both signatures were required for withdrawals. This clear deviation from appellant's own written procedures and accepted practice permitted funds to be withdrawn with a single signature.

The trial court also took judicial notice of Probate Code section 570 in determining how a reasonable bank would handle an estate account administered by two co-executors. (See fn. 4, *ante*.) (5) Probate section 570 provides that one of two co-executors may act alone *only* if the other co-executor is absent from the state or legally disqualified from acting. By expressly providing that unilateral action is effective only in those limited circumstances, the statute clearly implies that action under any other circumstance must be undertaken jointly. [FN10] This interpretation of section 570 has been implicitly assumed in a number of decisions by this court and has been approved by leading commentators. (See, e.g., *Winder v. Winder* (1941) 18 Cal.2d 123, 125 [114 P.2d 347, 144 A.L.R. 935]; *Wheeler v. Bolton* (1880) 54 Cal. 302, 306; 1 Goddard, Cal. Probate Court Practice (3d ed. 1977) § 663, p. 571; 7 Witkin, Summary of Cal. Law (8th ed. 1974) Wills and Probate, § 318, p. 5803; 2 Bancroft, Probate Practice (2d ed. 1950) § 376, p. 382.) [FN11] *811

> FN11 Appellant relies on several decisions which assume or tersely mention a co-executor's ability to act unilaterally. (E.g., *In re Osborn* (1890) 87 Cal. 1 [25 P. 157]; *California Pacific Title & Trust Co. v. Crocker First Nat. Bk.* (1933) 131 Cal.App. 487 [21 P.2d 475]; *Hewlett v. Beede* (1905) 2 Cal.App. 561 [83 P. 1086].) However, each of those decisions involved events which occurred when written delegations of authority were expressly permitted by statute (see fn. 10, *ante*; Stats. 1861, ch. 534, § 16, p. 631), prior to the enactment of Probate Code section 570. Accordingly, those decisions do not support appellant's proffered construction of section 570 with its significantly different language.
> Appellant also relies on *U-Tex Oil Co. v. Pauley* (1962) 209 Cal.App.2d 88 [25 Cal.Rptr. 790]. In discussing plaintiff's action to quiet title and for breach of lease, the Court of Appeal noted, without citation or further discussion, that a co-executor could unilaterally perform acts 'involving

protection of the estate.' (

> FN10 Appellant asserts one co-executor may nevertheless delegate authority to the other co-executor. The predecessor to section 570, former Code of Civil Procedure section 1355, permitted written delegations of authority between co-executors: '... the act of one [co-executor] alone shall be effectual, if the other has given his co-executor ... authority, in writing, to act for both ....' (Former Code Civ. Proc., § 1355, repealed Stats. 1931, ch. 281, § 1700, p. 687.) When section 570 was enacted in 1931, the Legislature struck the provision permitting written delegations of authority. (Stats. 1931, ch. 281, § 570, p. 617; see 1 Sen. J. (1931 Reg. Sess.) p. 907 (Mar. 13, 1931).) If the Legislature had sought to expand the circumstances permitting unilateral action to include oral, as well as written delegations of authority, the Legislature would have omitted only the words 'in writing,' when former section 1355 was reenacted as section 570. Since the Legislature eliminated the entire clause (see fn. 4, *ante*), the only reasonable interpretation of section 570 is that delegations of authority between co-executors - whether written or oral - are no longer permitted. *Id.*, at p. 99.) That observation, even if accurate in some contexts, is inapplicable to the present case because Lampe's dispersal of hundreds of thousands of dollars of the estate's funds was the antithesis of protective conduct. Further, the court concluded that one co-executor acted *improperly* in transferring possession of estate property without the concurrence of the other executor. ( *Id* at p. 100.)

(1c) Based on the evidence of the banking industry's custom and appellant's adopted procedures and practice, there was substantial evidence to support the trial court's finding that appellant's failure to require the signatures of both co-executors on withdrawals fell below the standard of care owed to the estate.

Appellant contends that it did not act negligently since its conduct was authorized under Financial Code sections 852 and 953. [FN12] In *Blackmon v. Hale* (1970) 1 Cal.3d 548 [83 Cal.Rptr. 194, 463 P.2d 418], this court stated: 'The bank is authorized to honor withdrawals from an account on the signatures authorized by the signature card, which serves as a contract between the depositor and the bank for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.3d 801                                                                                           Page 7
21 Cal.3d 801, 582 P.2d 109, 148 Cal.Rptr. 22, 7 A.L.R.4th 642
**(Cite as: 21 Cal.3d 801)**

handling of the account. So **\*812** long as the checks drawn on the account are signed in conformity with the signature card, and absent any knowledge of a misappropriation, the bank is free from liability for honoring a check drawn in breach of trust.' (

> FN12 Section 852 of the Financial Code provides:
> 'When a deposit is made in a bank in the names of two or more persons, whether minor or adult, in such form that the moneys in the account are payable to the survivor or survivors then such deposit and all additions thereto shall be the property of such persons as joint tenants. The moneys in such account may be paid to or on the order of any one of such persons during their lifetimes or to or on the order of any one of the survivors of them after the death of any one or more of them. By written instructions given to the bank by the depositor or depositors, the signatures of more than one of such persons during their lifetimes or of more than one of the survivors after the death of any one of them may be required on any check, receipt, or withdrawal order in which case the bank shall pay the moneys in the account only in accordance with such instructions but no such instructions shall limit the right of the survivor or survivors to receive the moneys in the account.
> 'Payment of all or any of the moneys in such account as provided in the preceding paragraph of this section shall discharge the bank from liability with respect to the moneys so paid, prior to receipt by the particular office or branch office of the bank where such account is carried of a written notice from any one of them directing the bank not to permit withdrawals in accordance with the terms of the account or the instructions. After receipt of such notice, a bank may refuse, without liability, to honor any check, receipt, or withdrawal order on the account pending determination of the rights of the parties.'
> Section 953 of the Financial Code provides:
> 'When the depositor of a commercial or savings account has authorized any person to make withdrawals from the account, the bank, in the absence of written notice otherwise, may assume that any check, receipt, or order of withdrawal drawn by such person in the authorized form or manner, including checks drawn to his

personal order and withdrawal orders payable to him personally, was drawn for a purpose authorized by the depositor and within the scope of the authority conferred upon such person.' *Id.,* at p. 556.) Appellant argues it is not liable for the estate's loss since it did not know of Lampe's misappropriations and nothing prohibited single signature withdrawals.

(6) A bank is immune from liability under *Blackmon* only if it acted properly in opening the account. However, appellant was negligent in failing to indicate in some effective manner that withdrawals would not be honored unless signed by both co-executors. Therefore, permitting withdrawals in accordance with the signature cards does not free appellant from liability.

While Lampe's intentionally tortious conduct caused the estate's loss, his actions cannot insulate appellant from liability for its negligent conduct. (7) A person is liable for any injury proximately or substantially caused by his negligent conduct, even if a third person's conduct directly precipitates the injury. (*Willis v. Gordon* (1978) 20 Cal.3d 629, 635 [143 Cal.Rptr. 723, 574 P.2d 794].) 'If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, *intentionally tortious*, or *criminal* does not prevent the actor from being liable for harm caused thereby.' (Rest.2d Torts, § 449, italics added; *Landeros v. Flood* (1976) 17 Cal.3d 399, 411 [131 Cal.Rptr. 69, 551 P.2d 389]. See *Weirum v. RKO General, Inc., supra,* 15 Cal.3d at p. 47; *Haft v. Lone Palm Hotel* (1970) 3 Cal.3d 756, 769-770 [91 Cal.Rptr. 745, 478 P.2d 465].)

The risk that one co-executor would act alone and make unauthorized withdrawals was significant in establishing the standard of care. The deviation from this standard allowed that very risk to become a reality in this case. Therefore, the occurrence of this foreseeable act does not break the chain of legal causation which holds appellant liable for the estate's loss. (See *Barclay Kitchen, Inc. v. California Bank, supra,* 208 Cal.App.2d at pp. 355- 356.)

Appellant asserts that the imposition of liability would punish appellant for its failure 'to control the conduct of another,' i.e., Lampe. (See *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) This contention **\*813** overlooks the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.3d 801
21 Cal.3d 801, 582 P.2d 109, 148 Cal.Rptr. 22, 7 A.L.R.4th 642
**(Cite as: 21 Cal.3d 801)**

fact that the trial court merely reaffirmed the obvious proposition that appellant owed a duty of due care to its depositors. Appellant was held liable for the estate's loss because *its* conduct, in opening and maintaining the estate's account, did not meet the standard of reasonable care expected of a bank. Its negligent conduct resulted in a reasonably foreseeable injury. Thus, liability was based on appellant's own negligence, not on a breach of any duty to control Lampe. (Cf. *Weirum v. RKO General, Inc., supra,* 15 Cal.3d at pp. 48-49.)

(8) Next, appellant argues that respondents' suit was barred by the statute of limitations. However, Code of Civil Procedure section 348 provides there is no limitation on the time for initiating an action 'brought to recover money ... deposited with any bank ....' (See fn. 5, *ante*.) On its face, section 348 permits a person to file suit at any time to recover money deposited in a bank. (See *Union Tool Co. v. Farmers etc. Nat. Bk.* (1923) 192 Cal. 40, 52 [218 P. 424, 28 A.L.R. 1417]; *King v. Mortimer* (1948) 83 Cal.App.2d 153, 160-161 [188 P.2d 502].)

Appellant contends that section 348 applies only to actions based on a breach of a deposit contract. However, section 348 does not limit the kinds of 'actions' subject to its provisions, unlike many other statutes of limitations. (See, e.g., Code Civ. Proc., § § 337, subd. 1 and 339, subd. 1.) 'There is nothing in the language of section 348 which distinguishes between actions ex delicto and ex contractu. Indeed, it may be assumed that the majority of cases involving suits by depositors to recover from the bank or other deposit company arise by reason of some fraud or breach of duty rather than arising solely on the contract of deposit. To give a more narrow interpretation of this section would be to deprive it of most of its effect.' (*King v. Mortimer, supra,* 83 Cal.App.2d at p. 161.) [FN13] Therefore, respondents' action for damages based on appellant's negligence was not barred by the statute of limitations. *814

FN13 This construction of section 348 is reinforced by the exclusion from section 348 of actions based on the payment of a forged or raised check. (Code Civ. Proc., § 340, subd. 3.) Nearly half a century ago, the Court of Appeal held that by removing only actions based on a forged or raised check from the ambit of section 348, the Legislature had implicitly assigned all other actions for the recovery of funds deposited with a bank to the general provisions of section 348. '[T]he rule of statutory construction that an express exception is not to be extended beyond the fair import of its terms [citations], applies in considering the effect of section 340, subdivision 3, as an exception to the general rule laid down by section 348 and it must be presumed that the legislature in enacting the amendment to section 340 intended to create no exception other than that therein in terms specified [citation], since an express exception excludes all others.' (*Merchants Nat. Bk. v. Continental Nat. Bk.* (1929) 98 Cal.App. 523, 532 [277 P. 354]; see *Glassell Dev. Co. v. Citizens' Nat. Bk.* (1923) 191 Cal. 375, 386 [216 P. 1012, 28 A.L.R. 1427].) The Legislature has not amended section 348 since that judicial construction.

The cases relied upon by appellant are inapplicable because in each the suit was governed by Code of Civil Procedure section 340, subdivision 3 (see, e.g., *Union Tool Co. v. Farmers etc. Nat. Bk., supra,* 192 Cal. 40) or was not brought by a *depositor* seeking *recovery* of funds deposited with a bank (see, e.g., *La Vista Cemetery Assn. v. American Sav. & Loan Assn.* (1970) 12 Cal.App.3d 365 [90 Cal.Rptr. 722]; *Neustadt v. Skernswell* (1955) 133 Cal.App.2d 163 [283 P.2d 787]).

(9a) Next, this court must decide whether the trial court abused its discretion when it awarded prejudgment interest. Relying on Civil Code section 3288, the trial court awarded respondents prejudgment interest on each unauthorized withdrawal from the date of the withdrawal. [FN14] (See fn. 7, *ante*.) Appellant concedes respondents are entitled to prejudgment interest from the effective date of the filing of the complaint until the entry of judgment. [FN15] However, appellant challenges any award of prejudgment interest calculated from the date of withdrawal rather than from the date the complaint was filed.

FN14 The court adopted withdrawal dates based on a stipulation of the parties.

FN15 While the complaint in this action was filed on December 22, 1970, the parties stipulated that the effective date of the filing of the complaint would be November 23, 1970.

(10)(See fn. 16.) Under Civil Code section 3288, the

21 Cal.3d 801
21 Cal.3d 801, 582 P.2d 109, 148 Cal.Rptr. 22, 7 A.L.R.4th 642
**(Cite as: 21 Cal.3d 801)**

Page 9

trier of fact may award prejudgment interest '[i]n an action for the breach of an obligation not arising from contract, *and* in every case of oppression, fraud, or malice ....' (Italics added.) [FN16] (11) It is clear from this language that a party does not have to prove both a breach of a noncontractual obligation *and* oppression, fraud or malice. (See *King v. Southern Pacific Co.* (1895) 109 Cal. 96, 99 [41 P. 786]; *Nordahl v. Department of Real Estate, supra,* 48 Cal.App.3d at p. 665; *Ruth v. Lytton Sav. & Loan Assn.* (1969) 272 Cal.App.2d 24, 26 [76 Cal.Rptr. 926]; *Howe v. City Title Ins. Co.* (1967) 255 Cal.App.2d 85, 88 [63 Cal.Rptr. 119].) [FN17] (12) Even if plaintiff's damages are not liquidated, prejudgment interest may be awarded. (*Redke v. Silvertrust* (1971) 6 Cal.3d 94, 106 [*815 98 Cal.Rptr. 293, 490 P.2d 805]; *Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 587 [140 Cal.Rptr. 330].) [FN18]

FN16 While section 3288 only grants such authority to the 'jury,' the trial court, when acting as the trier of fact, may award prejudgment interest under this section. (See, e.g., *Nordahl v. Department of Real Estate* (1975) 48 Cal.App.3d 657, 665 [121 Cal.Rptr. 794]; *Nathanson v. Murphy* (1955) 132 Cal.App.2d 363, 373 [282 P.2d 174].)

FN17 If the Legislature had intended to limit section 3288 only to suits which involved a breach of a noncontractual obligation and oppression, fraud or malice, it would have adopted a provision like that found in Civil Code section 3294: 'In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice ...' exemplary damages may be awarded. Both sections were based on Field's draft of the New York Civil Code and were enacted simultaneously in 1872. (See also *Esgro Central, Inc. v. General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1064 [98 Cal.Rptr. 153]; *Nathanson v. Murphy* (1957) 147 Cal.App.2d 462, 467 [305 P.2d 710]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 881, p. 3168.)

FN18 *Nicholson-Brown Inc. v. City of San Jose* (1976) 62 Cal.App.3d 526 [133 Cal.Rptr. 159] and *Dixon Mobile Homes, Inc. v. Walters* (1975) 48 Cal.App.3d 964 [122 Cal.Rptr. 202], are disapproved to the extent they are inconsistent with this opinion.

(9b) Respondents recovered damages because appellant breached its common law duty. Since this action was within the purview of section 3288, the decision to award prejudgment interest may not be overturned unless the trial court abused its discretion. (13) A trial court's exercise of discretion will be upheld if it is based on a 'reasoned judgment' and complies with the '... legal principles and policies appropriate to the particular matter at issue.' (*People v. Russel* (1968) 69 Cal.2d 187, 195 [70 Cal.Rptr. 210, 443 P.2d 794]; accord *Esgro Central, Inc. v. General Ins. Co., supra,* 20 Cal.App.3d at p. 1064.)

(14) Prejudgment interest is awarded to compensate a party for the loss of the use of his or her property. (*Nordahl v. Department of Real Estate, supra,* 48 Cal.App.3d at p. 665.) (9c) In the present case, the estate was deprived of the use of a quarter of a million dollars for several years due to appellant's negligence. The date on which the estate suffered the loss represented by each unauthorized withdrawal was readily ascertainable and stipulated by the parties. Under these circumstances, the trial court's award of prejudgment interest to compensate respondents for the negligent loss of funds from the estate's checking account did not constitute an abuse of discretion. (Cf. *Brunson v. Babb* (1956) 145 Cal.App.2d 214, 230 [302 P.2d 647].)

Respondents' motion to assess penalties against appellant on the ground that the appeal has been taken solely for the purpose of delay is denied. (See Cal. Rules of Court, rule 26.)

The judgment is affirmed.

Tobriner, J., Mosk, J., Clark, J., Richardson, J., and Manuel, J., concurred. *816

Cal.,1978.

Bullis v. Security Pac. Nat. Bank

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

193 Cal.App.3d 1597                                                                                 Page 1
193 Cal.App.3d 1597, 239 Cal.Rptr. 205
**(Cite as: 193 Cal.App.3d 1597)**

c

CALIFORNIA CASUALTLY INDEMNITY
EXCHANGE, Plaintiff and Respondent,
v.
LAUREN PETTIS et al., Defendants and Appellants
**No. C000188.**

Court of Appeal, Third District, California.

Aug 11, 1987.

SUMMARY

A California insurance company brought a
declaratory relief action to determine defendant
insureds' coverage under their policies. The insureds
were California residents, who were involved in a
collision while driving a rental car in Hawaii. The
trial court applied California law and found that the
insureds could not "stack" or combine uninsured
motorist coverage they had obtained for other
vehicles, and thus the stated policy limits could not
be multiplied by the number of insured cars. It also
found that the insureds could not recover more than
their stated policy limits, even though Hawaiian
insurance policies had higher limits. (Superior Court
of San Joaquin County, No. 172396, Bill L. Dozier,
Judge. [FN*])

The Court of Appeal affirmed. It held that the trial
court did not err in applying California law, which
precluded the insureds' "stacking" of uninsured
motorist coverage. The court held that California law
applied by its express terms, while Hawaii's statutes
did not apply. It also held that California had
significant contacts with the parties and issues, and
the greater interest in resolution of the matter. The
court further held that an "out-of-state" provision in
the insureds' policies did not operate to increase the
policy limits, since the provision was only applicable
when the insureds were required to maintain
insurance under the law of another state.

FN* Retired judge of the superior court
sitting under assignment by the Chairperson
of the Judicial Council.(Opinion by Sparks,
J., with Evans, Acting P. J., and Deegan, J.,
[FN*] concurring.)

FN* Retired judge of the superior court
sitting under assignment by the Chairperson

of the Judicial Council.

HEADNOTES

Classified to California Digest of Official Reports

(1a, 1b) Insurance Contracts and Coverage § 62--
Uninsured Motorist Insurance--Limitations and
Exemptions From Coverage--Multiple **\*1598**
Vehicles--Stacking.
In Hawaii, a person who insures more than one
vehicle is permitted to "stack" or combine uninsured
motorist coverage, and thus the actual policy limits
are the stated limits multiplied by the number of
insured cars; California, however, is known as a
nonstacking state. Ins. Code, § 11580.2, subds. (a),
(c)(2), (d) (uninsured motorist coverage), bar
stacking in circumstances permitted in Hawaii.

(2a, 2b, 2c, 2d) Insurance Contracts and Coverage §
62--Coverage of Contracts--Uninsured Motorist
Insurance--Liabilities and Exemptions From
Coverage--Multiple Vehicles--Choice of Laws.
In a declaratory relief action by a California insurer
to determine whether its insureds, California
residents who were injured in a rental car accident in
Hawaii, were entitled to "stack" or combine their
uninsured motorist coverage for each of their insured
vehicles, the trial court did not err in applying
California law, which does not permit stacking. The
policies were issued and delivered in California to
cover cars which were registered, used and garaged
in California, and which were not expected to be used
outside of the continental United States. Also, the
insureds were domiciliaries of California and the
insurer did no business in Hawaii. California
statutory uninsured motorist coverage applied by its
express terms (Ins. Code, § 11580.2), while Hawaii
law did not. Moreover, California had more
significant contacts with the parties and issues, and a
greater interest in resolution of the matter.

[Combining or "stacking" uninsured motorist
coverages in separate policies issued by same insurer
to different insureds, note, 23 A.L.R.4th 108. See
also Cal.Jur.3d, Insurance Contracts and Coverage,
§ 378; Am.Jur.2d, Automobile Insurance, § 329.]

(3a, 3b) Insurance Contracts and Coverage § 102--
Extent of Loss of Insured and of Liability of Insurer--
Automobile       Insurance--Uninsured       Motorist

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

193 Cal.App.3d 1597
193 Cal.App.3d 1597, 239 Cal.Rptr. 205
**(Cite as: 193 Cal.App.3d 1597)**

Page 2

Insurance--Policy Limit.
 California motorists insured by a California insurance company were not entitled to uninsured motorist coverage in excess of their policies' limits after they were involved in a collision while driving a rented car in Hawaii. Even though a Hawaiian policy would have afforded higher limits, Hawaiian law did not apply to the motorists or their policy. Moreover, the out-of-state provision in their California policies, which provided that if another state required compulsory insurance in excess of that provided by the policy, the policy limits would be as set forth in the other state's law, did not apply. This provision was applicable only if the motorists were required to maintain insurance under the other state's law, but they were not required to be insured under Hawaiian law. *1599

 (4) Insurance Contracts and Coverage § 12-- Interpretation as Affected by Statutes and Judicial Decisions.
 In the absence of some overarching statutory provision, the rights and liabilities under an insurance policy spring from the contractual relationship of the parties. In order to determine the effect of a state's law on a contract of insurance, it is necessary to consider the wording of the state statutes, the reasoning employed by that state's courts, and the circumstances of the case.

 (5) Conflict of Laws § 1--Public Policy--Significant Contacts.
 The Legislature establishes public policy of this state through its statutory enactments and when the Legislature has spoken courts are not free to ignore it. Before a state court should consider rejecting its own statutory law in favor of another jurisdiction's policy, it must appear that the other state has significant contacts with the case and an interest in its resolution that outweighs the interest of the forum state.

 (6) Insurance Contracts and Coverage § 62-- Uninsured Motorist Insurance-- Limitations and Exemptions From Coverage--Multiple Vehicles-- Policy.
 California's rule prohibiting "stacking" or combining of uninsured motorist coverage reflects a policy choice by our Legislature that, unless expressly rejected, all persons insured under a California policy should have a minimum level of uninsured motorist coverage. Insureds are not precluded from purchasing, and paying for, additional insurance should they choose to do so.

 (7) Conflict of Laws § 5--Contracts--Insurance

Contracts.
 In contracts of casualty insurance, the principal location of the insured risk is given particular emphasis in determining the choice of the applicable law. This is so because location has an intimate bearing upon the nature of the risk and the parties would naturally expect the local law of the state where the risk is to be principally located to apply. Moreover, the state where the insured risk will be principally located during the term of the policy has an interest in the determination of issues arising under the insurance contract.

COUNSEL

 Ian L. Mattoch, Richard F. Kelley and Dennis K. Ferm for Defendants and Appellants.

 Kroloff, Belcher, Smart, Perry & Christopherson and Orlie L. Curtis for Plaintiff and Respondent. *1600

**SPARKS, J.**

 The question in this case is whether uninsured motorist benefits may be combined or "stacked" to satisfy the total damages alleged to have been incurred by the insureds. We are called upon to resolve a conflict of laws question and to construe out-of-state insurance clauses of California automobile liability policies for an accident in Hawaii. We conclude that California law governs and that the insureds are not entitled under their policies to stack the uninsured motorists coverage.

 Plaintiff California Casualty Indemnity Exchange (California Casualty) is a California corporation engaged in the business of insuring automobiles. Defendants Lauren and Patricia Pettis and Charles and Linda Swimley are California residents who separately purchased policies of automobile insurance from California Casualty. While driving a rental car in Hawaii on a joint vacation the defendants were all involved in a collision with an uninsured motorist. Defendants seek to apply Hawaiian law in order to make claims against their uninsured motorist coverage in excess of the policy limits stated in their policies and approved by California law. In this declaratory relief action the trial court applied California law to the insurance policies and found in favor of California Casualty. Defendants appeal asserting that they should be permitted to "stack" their uninsured motorist coverage which is permitted in Hawaii but precluded in California. Defendants Swimley also assert they are entitled to $25,000 per person limits rather than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

193 Cal.App.3d 1597
193 Cal.App.3d 1597, 239 Cal.Rptr. 205
**(Cite as: 193 Cal.App.3d 1597)**

the $15,000 limits stated in their insurance policy. Because we agree with the trial court, we shall affirm the judgment.

### Factual and Procedural Background

The relevant facts are not in dispute. California Casualty is an insurance company that insures many of the school teachers in the Stockton area. Defendants are teachers who purchased automobile insurance from California Casualty. The policy which was issued to Charles and Linda Swimley provided uninsured motorist coverage in the amount of $15,000 per injury and $30,000 maximum per incident. The policy issued to Lauren and Patricia Pettis provided uninsured motorist benefits in the amount of $25,000 per injury and $50,000 maximum per incident. Each of the defendant couples insures more than one vehicle under their policy of insurance.

In June 1982, the defendants vacationed together in Hawaii. They rented a car which was covered, pursuant to Hawaiian law, by a policy of no-fault insurance issued by Liberty Mutual Insurance Company. The policy provided maximum no-fault benefits of $15,000 per person. The defendants were involved in a collision with an uninsured driver. All of the defendants **\*1601** recovered payments under the no-fault insurance provided by Liberty Mutual, and three of the defendants recovered the policy limits under that insurance. The defendants returned to California where they seek additional compensation under the uninsured motorist coverages of their insurance policies with California Casualty. Each policy issued to defendants by California Casualty contained this provision governing out-of-state insurance: "If, under the provisions of the motor vehicle financial responsibility law or the motor vehicle compulsory insurance law or any similar law of any state or province, a nonresident is required to maintain insurance with respect to the operation or use of a motor vehicle in such state or province and such insurance requirements are greater than the insurance provided by the policy, the limits of the [California Casualty's] liability and the kinds of coverage afforded by the policy shall be as set forth in such law, in lieu of the insurance otherwise provided by the policy, but only to the extent required by such law and only with respect to the operation or use of a motor vehicle in such state or province; provided that the insurance under this provision shall be reduced to the extent that there is other valid and collectible insurance under this or any other motor vehicle insurance policy. In no event shall any person be entitled to receive duplicate

payments for the same elements of loss."

California Casualty brought an action for declaratory relief seeking a determination of the parties' rights and liabilities. Although the parties do not agree whether, and the extent to which, defendants have suffered compensable injuries, that is not a question which is presented in this case. [FN1] There were three primary issues presented to the trial court for resolution. The first related to defendants' claimed right to "stack" the California and Hawaiian policies. (1a) In Hawaii a person is permitted to stack uninsured motorist coverage where he insures more than one vehicle. Thus the actual policy limits under Hawaiian law are the stated limits multiplied by the number of insured cars. (*Allstate Ins. Co. v. Morgan* (1978) 59 Hawaii 44 [575 P.2d 477].) California is what has been called a nonstacking state. (*Rudder v. Farmers Ins. Exchange* (1980) 107 Cal.App.3d 158, 162 [165 Cal.Rptr 562, 21 A.L.R.4th 205]; *Allstate Ins. Co. v. Shmitka* (1970) 12 Cal.App.3d 59, 68-69 [90 Cal.Rptr. 399].) (2a) Defendants contend that since their accident occurred on Hawaii they are entitled to the benefit of Hawaiian law and may stack their uninsured motorist benefits. (3a) The second issue concerned the limits of the policy issued to the Swimleys. **\*1602** Under Hawaiian insurance law, any liability policy delivered, issued for delivery, or renewed in Hawaii with respect to any motor vehicle registered or principally garaged in Hawaii must include uninsured motorist coverage to the extent of the Hawaiian minimum bodily injury or death liability limits unless the insured rejects such coverage in writing. (Hawaii Rev. Stats. § 431-448, now § 431-448, subd. (a).) At the time in question the Hawaiian minimum liability limits for a no-fault policy were $25,000 (they are now $35,000). (Hawaii Rev. Stats. §§ 287-7, 294.10, subd. (a); but see §§ 287-25, 287.26 [limits of $10,000/person, $20,000/accident for owners and drivers].) The Swimleys contend that pursuant to this provision their uninsured motorist limits must be deemed to be $25,000 rather than the $15,000 limits of their policy. The third question presented to the trial court was whether California Casualty should be allowed to set off defendants' no-fault recoveries against its uninsured motorist coverage.

FN1 California Casualty characterizes this as "a minor accident with minor injuries," and states that this was "an accident with almost no visible injury." However, California Casualty does not seek a determination of the compensability of defendants' injuries; that is a matter which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

193 Cal.App.3d 1597

Page 4

193 Cal.App.3d 1597, 239 Cal.Rptr. 205
**(Cite as: 193 Cal.App.3d 1597)**

will be settled through settlement or arbitration. The purpose of this litigation was to determine the amount of uninsured motorist coverage available to the defendants under which they make their claims.

The trial court determined that California law applies in determining the rights of the parties. It held that defendants may not stack their uninsured motorist limits. It further determined that the Swimleys are limited to the $15,000 limits of their policy. Finally, the court determined that California Casualty may not set off the no-fault benefits against its liability. Defendants appeal. California Casualty has not appealed from the judgment insofar as it denies the set off.

Discussion
I. *Stacking of Benefits.*

The question whether uninsured motorist benefits may be stacked has frequently arisen in this country. (See, e.g., Annot., Combining or "Stacking" Uninsured Motorist Coverages Provided in Single Policy Applicable to Different Vehicles of Individual Insured (1983) 23 A.L.R.4th 12; Annot., Combining or "Stacking" Uninsured Motorist Coverages Provided in Separate Policies Issued by Same Insurer to Different Insureds (1983) 23 A.L.R.4th 108; Annot., Combining or "Stacking" Uninsured Motorist Coverages Provided in Policies Issued by Different Insurers to Same Insured (1983) 21 A.L.R.4th 211.) Not infrequently the question has surfaced in choice-of-law situations, and has even reached the United States Supreme Court in that context. (*Allstate Ins. Co. v. Hague* (1981) 449 U.S. 302 [66 L.Ed.2d 521, 101 S.Ct. 633].) [FN2] In these cases different states are generally **\*1603** said to be either stacking or nonstacking jurisdictions, and the parties, and even some courts, have assumed that resolution of the conflict of laws question necessarily resolves the issue. The characterization of the issue as a pure conflict of laws question is not entirely accurate. (4) In the absence of some overarching statutory provision, the rights and liabilities under an insurance policy spring from the contractual relationship of the parties. (*Johansen v. California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 18 [123 Cal.Rptr. 288, 538 P.2d 744].) A primary task in any insurance coverage case is to determine the validity and meaning of the particular policy provisions at issue. The choice of law may affect this determination because either statutorily or judicially the states may have imposed certain obligations, invalidated certain provisions, or interpreted certain

language in a policy to have a certain meaning. The choice of law determines the jurisdiction whose laws will be looked to in considering the validity and meaning of the policy at issue, but the particular policy must still be considered to determine the contractual rights of the parties.

FN2 In *Hague*, the United States Supreme Court did not consider the soundness of the state court's choice-of-law decision. Instead, it addressed only the question of whether the full faith and credit or the due process clause of the federal Constitution precluded the choice-of-law decision made in the court below. (449 U.S. at p. 307 [66 L.Ed.2d at p. 525].) The United States Constitution provides a minimal standard in choice-of-law matters. (*Ibid.*) In this case we are not concerned with whether California has a sufficient contact to the case that its law may be applied, for it clearly does. We are concerned with whether a California court should yield to and apply the law of another state in these circumstances. The decision in *Hague* is of no assistance in resolving this question.

In this sense it is not accurate to label a state as a stacking or nonstacking jurisdiction simply because in some cases the state has permitted or precluded stacking. A state which has permitted or precluded stacking in certain circumstances under particular policy provisions will not necessarily reach the same result in different circumstances or with different policy language. In order to determine the effect of a state's law on the validity and meaning of a contract of insurance it is necessary to consider the wording of the state statutes, the reasoning employed by that state's courts and the circumstances of the particular case. It would serve no purpose here to attempt to recount all of the different reasons state courts have permitted or precluded stacking of insurance benefits. There are only two states whose laws might apply to this case and we will limit our consideration to the laws of those states.

We turn first to the law of Hawaii. The stacking issue reached the Hawaiian Supreme Court in *Walton v. State Farm Mutual Automobile Ins. Co.* (1974) 55 Hawaii 326 [518 P.2d 1399]. In that case the plaintiff was injured by an uninsured motorist while he was a passenger in a nonowned car. The plaintiff recovered uninsured motorist benefits from the driver's insurer, and then sought additional recovery under his own policy. The insurer contended that an "other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

insurance" clause in the policy precluded such recovery. The court concluded that under Hawaii's statutory law the other insurance *1604 clause was invalid, and the plaintiff was entitled to recovery under his policy.

The issue arose in a different context in *Allstate Ins. Co. v. Morgan, supra,* 59 Hawaii 44 [575 P.2d 477]. There the defendant had a policy of insurance under which he insured three vehicles and for which he paid three separate premiums. When he was injured by an uninsured motorist the defendant wished to stack his coverage. The Hawaii court concluded that he could do so because, unless rejected in writing, insurance "with respect to any motor vehicle registered or principally garaged" in Hawaii was required to provide uninsured motorist coverage. The Hawaiian court concluded that this meant that each insured vehicle carried coverage which could be stacked. This conclusion was thus a matter of interpreting a particular Hawaiian insurance policy in light of Hawaiian statutory requirements. [FN3]

> FN3 The decision in the *Morgan* case is believed to place Hawaii in the list of stacking states. However, under Hawaiian law an insured may reject uninsured motorist coverage in writing. (Hawaii Rev. Stats. § 431-448, subd. (a).) Presumably an insured could accept uninsured motorist coverage for one car, but reject it in writing with respect to other cars in exchange for a lower premium. Nothing in the decision would compel the conclusion that the insured had benefits which could be stacked in such a case.

(1b) The California Legislature has provided that California insurance policies upon any motor vehicle principally used or principally garaged in this state must provide uninsured motorist coverage unless agreed otherwise in writing. (Ins. Code, § 11580.2, subd. (a).) However, our Legislature has provided that California uninsured motorist coverage does not apply where the insured is injured "while in or upon or while entering into or alighting from a motor vehicle other than the described motor vehicle if the owner thereof has insurance similar to that provided in this section." (Ins. Code, § 11580.2, subd. (c)(2).) The Legislature has also provided that, subject to subdivision (c)(2) of that section, the policy "may provide that if the insured has insurance available to the insured under more than one uninsured motorist coverage provision, any damages shall not be deemed to exceed the higher of the applicable limits of the

respective coverages, and such damages shall be prorated between the applicable coverages as the limits of each coverage bear to the total of such limits." (Ins. Code, § 11580.2, subd. (d).) Conjoined, these statutory provisions authorize the barring of stacking in circumstances permitted in Hawaii. Thus, Insurance Code section 11580.2, subdivision (c)(2) specifically precludes the stacking of benefits in the situation presented in *Walton v. State Farm Mutual Automobile Ins. Co., supra,* 55 Hawaii 326 [518 P.2d 1399]. Subdivision (d) of that section permits and validates an "other insurance" clause to be included in a California policy to preclude stacking of benefits in the situation represented in *Allstate Ins. Co. v. Morgan, supra,* 59 Hawaii 44 [575 P.2d 477]. Pursuant to these *1605 provisions stacking of uninsured motorist benefits is not permitted in California. ( *Rudder v. Farmers Ins. Exchange, supra,* 107 Cal.App.3d at p. 161; *Allstate Ins. Co. v. Shmitka, supra,* 12 Cal.App.3d at pp. 68-69.)

(2b) A comparison of the California and Hawaii statutes involved reveals that unquestionably it is California and not Hawaiian law which applies to the policies of insurance involved here. The policies were issued and delivered in this state by an insurer incorporated and licensed in this state that does no business in Hawaii, to cover cars which are registered, principally used, and principally garaged in this state, and which could not reasonably have been expected to be used in a place outside of the continental United States such as Hawaii. And as the final frosting on the California cake, the insureds were domiciliaries of this state who reside and work here. Under these circumstances the provisions of Insurance Code section 11580.2 are expressly applicable to the policies in question. In contrast, Hawaiian law applies only to insurance policies "delivered, issued for delivery, or renewed in [Hawaii], with respect to any motor vehicle registered or principally garaged in [Hawaii] ..." (Hawaii Rev. Stats. § § 431-448, subd. (a).) Hawaiian law, by its express terms, does not apply to the policies in question.

Despite the fact that Hawaiian law does not by its terms apply to the insurance policies in question, the defendants would have us look behind the Hawaiian statute to divine a Hawaiian public policy and then apply it in derogation of our own governing statutory law. This we may not do. (5) The Legislature establishes public policy of this state through its statutory enactments and when the Legislature has spoken we are not free to ignore it by speaking with a discordant tongue. (See *Safeway Stores v. Retail*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

193 Cal.App.3d 1597
193 Cal.App.3d 1597, 239 Cal.Rptr. 205
**(Cite as: 193 Cal.App.3d 1597)**

Page 6

*Clerks etc. Assn.* (1953) 41 Cal.2d 567, 574 [261 P.2d 721].) [FN4] It would be anomolous, if not outright ludicrous, for a forum court to refuse to apply its state's expressly applicable statutory law and thereby thwart the public policy established by its Legislature in order to fulfill the policy of another jurisdiction derived from statutes which are inapplicable by their terms to the case in question, especially where the second jurisdiction's interest in the case is less significant than that of the forum state. Before a state court should consider rejecting its own statutory law in favor of another jurisdiction's policy, it must appear that the other state has significant contacts *1606 with the case and an interest in its resolution that outweighs the interest of the forum state. (2c) When the interests of California are weighed against those of Hawaii in this case, the balance overwhelmingly tilts in favor of California.

> FN4 Lest there be any doubt concerning California's public policy in that area, in 1984 the Legislature added subdivision (q) to Insurance Code section 11580.2 to provide: "Regardless of the number of vehicles involved whether insured or not, persons covered, claims made, premiums paid or the number of premiums shown on the policy, in no event shall the limit of liability for two or more motor vehicles or two or more policies be added together, combined, or stacked to determine the limit of insurance coverage available to injured persons." (Stats. 1984, ch. 1493, § 2.) This pronouncement reaffirms and reinforces our traditional nonstacking rule.

The defendants were occupying a Hawaiian vehicle when the accident occurred in Hawaii. Hawaii, like California, has a significant interest in regulating motor vehicle insurance within its boundaries. The Hawaii Legislature has provided the means by which Hawaii's interest in such matters may be protected. Under Hawaiian law every motor vehicle registered or principally garaged in that state must carry a policy of no-fault insurance. Unless rejected in writing, a Hawaiian no-fault insurance policy must provide uninsured motorist coverage. (Hawaii Rev. Stats. § 431-448, subd. (a).) The car in which defendants were riding at the time of their accident was covered by a policy of Hawaiian no-fault insurance and the owner of the car had declined uninsured motorist coverage. Hawaiian law and the policy expressed in that law were fully satisfied by the Liberty Mutual insurance policy in effect at the time of the accident. The fact that defendants had

additional insurance, whether vehicular or otherwise, was fortuitous for them but is extraneous to the calculus of Hawaii's interest. Hawaii's interest centers on compliance with its own statutory requirements. [FN5] Once those have been satisfied, Hawaii has little, if any, other interest in this case.

> FN5 This conclusion may be demonstrated by reference to Hawaiian statutory law. Under Hawaiian no-fault provisions the obligation is upon the owner of a motor vehicle used on Hawaiian public streets to obtain a policy of no-fault insurance. (Hawaii Rev. Stats. § 294-8, subd. (a)(1).) Under Hawaiian financial responsibility law the driver of a vehicle is specifically exempt if the owner of the vehicle has insurance coverage. (Hawaii Rev. Stats., § 287-7, subd. (1).) Another provision in the financial responsibility law states: "Any policy which grants the coverage required for a motor vehicle liability policy may also grant any lawful coverage in excess of or in addition to the coverage specified for a motor vehicle liability policy and the excess or additional coverage shall not be subject to this chapter. With respect to a policy which grants such excess or additional coverage the term 'motor vehicle liability policy' shall apply only to that part of the coverage which is required by this chapter." (Hawaii Rev. Stats. § 287-30.) Read together these provisions clearly indicate that the Hawaii Legislature regards its public policy to have been satisfied where the owner of a vehicle obtains the minimum insurance required by its statutory law.

California has the most significant contacts with the case. As we have noted, California Casualty is a California corporation licensed and doing business in California, which conducts no business in Hawaii. The defendants are California domiciliaries who reside and work here and were in Hawaii only temporarily. The vehicles for which defendants purchased insurance are registered, garaged, and principally used in California. The insurance policies at issue were purchased to fulfill California's financial responsibility law. (6)(See fn. 6.) California's more significant contacts to the case and the fact that the insurance policies were purchased in *1607 fulfillment of our law rather than Hawaiian law necessarily gives California the greater interest in the resolution of the case. [FN6]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

193 Cal.App.3d 1597                                                                          Page 7
193 Cal.App.3d 1597, 239 Cal.Rptr. 205
**(Cite as: 193 Cal.App.3d 1597)**

FN6 California's nonstacking rule is not simply a stingy refusal to permit insureds to obtain full recovery. It reflects a policy choice by our Legislature that, unless expressly rejected, all persons insured under a California policy should have a *minimum* level of uninsured motorist coverage. Insureds are not precluded from purchasing, and paying for, additional insurance should they choose to do so. If they do not purchase additional insurance then their premiums will represent the reduced risk attributable to California's nonstacking rule, as in this case with the multivehicle discounts the defendants received when they insured more than one car. In this manner our Legislature has acted to keep down the cost of compliance with our financial responsibility law while guaranteeing that all persons will be offered the minimum appropriate level of uninsured motorist protection. The realization of this legislative purpose would be thwarted if, based upon some minimal and fortuitous contact with another state, insureds are allowed to reap an unexpected and unpaid for windfall in the level of their insurance coverage.

The conclusion that California law is applicable to the insurance policies involved here comports with the general rule in such matters. The Restatement Second of Conflict of Laws section 193 states: "The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship ..." As the court explained in *Cunninghame v. Equitable Life Assur. Soc. of U.S.* (2d Cir. 1981) 652 F.2d 306: (7) "In contracts of casualty insurance, ... the principal location of the insured risk is given particular emphasis in determining the choice of the applicable law. [Citation.] This is so because location has an intimate bearing upon the nature of the risk and the parties would naturally expect the local law of the state where the risk is to be principally located to apply. [Citations.] Moreover, the state where the insured risk will be principally located during the term of the policy has an interest in the determination of issues arising under the insurance contract." (*Id.,* at p. 308, fn. 1.)

A few examples of the application of the rule should

suffice. In *Blue Bird Body Co. v. Ryder Truck Rental* (5th Cir. 1978) 583 F.2d 717, the plaintiff rented a vehicle from the defendant. The parties were Georgia residents who were insured by Georgia insurers. The vehicle was expected to be used only in Georgia but for unknown reasons the driver of the vehicle drove into Mississippi where he was involved in a collision. The Georgia insurers settled with the Mississippi residents who were injured and then brought an indemnity action to determine which insurer would bear primary responsibility. Under Mississippi law one of the insurers could be held primarily responsible, while under Georgia law they would be required to prorate the loss. The court noted that since the Mississippi residents had been paid for their losses Mississippi had no real concern in the indemnity action. Since *1608 the contracts were executed in Georgia by Georgia residents that state had the most significant interest in the action and its law was applied. (583 F.2d at p. 723.) In *Tholen v. Carney* (5th Cir. 1977) 555 F.2d 479, at page 481, footnote 5, California residents sought to stack their uninsured motorist coverage under Alabama law because the accident occurred there. The court applied California's nonstacking rule because "[t]he plaintiffs are residents of California and the contract of insurance was made in California, with uninsured motorist coverage being afforded to comport with section 11580.2 of California's Insurance Code." In *State Farm Mut. Auto. Ins. Co. v. Crockett* (1980) 103 Cal.App.3d 652, at page 655 [163 Cal.Rptr. 206], the court resolved the parties' choice of law dispute by saying: "Appellants' contract with State Farm was executed in California by California residents, and must be interpreted in accordance with the law of this state, ..." [FN7]

FN7 The *Crockett* case involved an uninsured motorist claim by a California resident after a Hawaiian collision. The Hawaiian driver was fully insured under Hawaiian law but he could not be sued because Hawaii's no-fault law abolished tort liability where medical expenses are less than $1,500. The California resident sought to recover uninsured motorist benefits under a California policy issued on his own car. In a declaratory relief action, the trial court held that no uninsured motorist coverage existed under the California policy. Affirming, the Court of Appeal looked to California law to interpret the insurance policy, but looked to Hawaiian law to determine whether the Hawaiian driver could be legally liable to the California

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

193 Cal.App.3d 1597
193 Cal.App.3d 1597, 239 Cal.Rptr. 205
**(Cite as: 193 Cal.App.3d 1597)**

resident, which is a prerequisite to recovery under California's uninsured motorist coverage. (103 Cal.App.3d at p. 658.)

The decisional law relied upon by defendants is inapposite. In *Stickney v. Smith* (5th Cir. 1982) 693 F.2d 563, an insurance policy was purchased in Michigan by a Michigan domiciliary. However, the insured lived and worked in Louisiana and garaged his vehicle there, since he was on indefinite military assignment in that state. Since it was clearly anticipated that the risk would be located in Louisiana it would follow under the rules we have cited that Louisiana law should apply, and the court so held. (See also *Bell v. State Farm Mut. Auto. Ins. Co.* (5th Cir. 1982) 680 F.2d 435, 436, which reached the same conclusion on almost identical facts.) In *Parker v. State Farm Ins. Co.* (E.D. Pa. 1982) 543 F.Supp. 806, at page 810, the insured purchased his insurance in Maryland, but at the time of the accident in Pennsylvania he was living and garaging his vehicle in Pennsylvania. The court held that since the plaintiff was a Pennsylvania citizen and the risk was principally located in Pennsylvania, that state had a sufficiently strong interest that its law should apply. [FN8] In each of these cases the state *1609 whose law was found to be applicable had significant contacts with the case and substantial interest in resolution of the issues. That is not the case here. Defendants' transitory visit to Hawaii, and the fact that the accident occurred there, are simply not sufficient to outweigh California's compelling interest in this case.

> FN8 The decision in *National Farmers Union v. Nodak Mut. Ins.* (N.D. 1981) 528 F.Supp. 1093, at page 1095, upon which defendants place reliance, is actually authority contrary to their position. There the insureds were North Dakota residents who registered their car and purchased their insurance in North Dakota. The accident was in Minnesota. The court held that the insurance policy provided Minnesota no-fault coverage, but that was because of a specific policy provision by which the insurer agreed to provide no-fault coverage if the insured was driving in a state which required it. In determining the validity and effect of the policy the court applied North Dakota law because of that state's more significant relationship to the case.

The California appellate court decision upon which defendants place their primary reliance, *California*

*Casualty Indemnity Exchange v. Deardorff* (1984) 157 Cal.App.3d 548 [203 Cal.Rptr. 725], is neither controlling nor persuasive. In that case California residents purchased insurance in California, and were injured in an accident in Minnesota. Minnesota law was applied. However, this was not simply a choice of law decision; it was a matter of enforcing the contractual relationships of the parties. First, the insurer had agreed with the insureds that when they were driving in a state which required insurance different from that in the policy, then the policy would be deemed to provide such insurance. Second, the insurer had agreed with the State of Minnesota, as a condition of providing coverage there, that any policy issued which provided insurance required by Minnesota law would be deemed to provide the required insurance. Minnesota required no-fault insurance for cars driven there and permitted stacking of benefits for both residents and nonresidents when the insurer was licensed to do business in Minnesota. Pursuant to its contractual agreements with the insureds and with Minnesota, the insurer was required to permit the stacking of benefits. The California Court of Appeal simply refused to apply California law in the guise of a choice of law decision to nullify the insurer's contractual obligations. (157 Cal.App.3d at p. 552.)

The circumstances present in *Deardorff* are obviously not present in this case. California Casualty does not conduct any business in Hawaii, and has not entered into any contractual agreement with that state as a condition of issuing insurance there. The Hawaii Legislature has extended the provisions of its law only to insurance policies delivered, issued for delivery, or renewed in Hawaii, and with respect to motor vehicles registered or principally garaged in Hawaii. (Hawaii Rev. Stats. § 431-448, subd. (a).) The policies in question here were not delivered, issued for delivery, or renewed in Hawaii, and were not issued with respect to vehicles registered or principally garaged in Hawaii (or for that matter, even expected to be used or operated in that state). It is thus clear that Hawaii has not attempted to impose duties upon California Casualty or to regulate the policies in question either by statute or by agreement with California Casualty.

The policies at issue here contained an out-of-state insurance provision identical to that involved in *Deardorff*, which is hardly surprising since *1610 California Casualty was the plaintiff in that case as well. As we have recounted, that provision states in relevant part that if a nonresident is required by law to maintain vehicle insurance for the operation of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

vehicle in that state and "such insurance requirements are greater than the insurance provided by the policy, the limits of [California Casualty's] liability and the kinds of coverage afforded by the policy shall be as set forth in such law, in lieu of the insurance otherwise provided by the policy, *but only to the extent required by such law* and only with respect to the operation and use of a motor vehicle in such state or province ...." (Italics added.) Under Hawaiian law the owner of a vehicle is required to obtain and maintain a policy of no-fault insurance, which must include liability coverage. (Hawaii Rev. Stats., § § 294-8, subd. (a)(1), 294-9, subd. (a), 294-10.) Under Hawaiian financial responsibility law the driver of a vehicle is exempt if the owner of the vehicle maintains insurance on the vehicle. (Hawaii Rev. Stats. § 287-7, subd. (1).) The owner of the vehicle in which defendants were riding at the time of their accident maintained a policy of Hawaiian no-fault insurance on the vehicle and defendants were therefore not required by Hawaiian law to maintain insurance with respect to their operation and use of the vehicle. The quoted policy provision, by its clear and unambiguous terms, did not operate to give defendants greater insurance coverage than the policy otherwise provided.

(2d) In summary, California's statutory law is expressly applicable to the policies in question while Hawaii's statutory law is by its terms inapplicable. California has the more significant contacts with the parties and the issues and the greater interest in resolution of the matter. Application of California law will satisfy our law and public policy, and will not violate Hawaiian law or do damage to Hawaii's interest in the matter. Additionally, since these policies represent contracts between California residents pursuant to California law concerning risks that were to be principally located in California, the application of California law will fulfill the legitimate expectations of the parties. Under these circumstances the trial court did not err in applying California law to the issues in question. Under our law the other insurance clauses in defendants' policies are valid and enforceable. Consequently, defendants may not stack their uninsured motorist coverage.

## II. *The Swimleys' Policy Limits.*
The Swimleys' policy provided uninsured motorist coverage with limits of $15,000 per person and $30,000 per incident. (3b) They contend they should be afforded coverage in the amount of $25,000 per person, which are the limits which would have been afforded by a Hawaiian insurance policy. In view of our discussion this contention need only be briefly

addressed. In a nut shell, the Swimleys are not entitled to the higher limits pursuant to *1611 Hawaiian law. As we have noted, Hawaiian law does not by its terms apply to either the Swimleys or to the policy issued to them by California Casualty. (Hawaii Rev. Stats. § § 287-7, subd. (1), 431-448, subd. (a).) We decline to derive a policy from the inapplicable Hawaiian statutes which would then be applied in derogation of our applicable statutory law. Moreover, the out-of-state provision of the Swimleys' policy does not operate to increase the limits of their coverage because that clause only applies where the insureds are required to maintain insurance under the laws of another state and the Swimleys were not required to be insured under Hawaiian law. For these reasons the Swimleys are not entitled to make uninsured motorist claims in excess of the limits stated in their policy.

The judgment is affirmed.

Evans, Acting P. J., and Deegan, J., [FN*] concurred. *1612

        FN* Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

Cal.App.3.Dist.,1987.

California Cas. Indem. Exchange v. Pettis

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Westlaw.

Not Reported in F.Supp.2d                                                                                              Page 1
Not Reported in F.Supp.2d, 2006 WL 3050863 (N.D.Cal.)
**(Cite as: 2006 WL 3050863 (N.D.Cal.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
The CHARTER OAK FIRE INSURANCE
COMPANY, Plaintiff,
v.
AMERICAN HOME ASSURANCE COMPANY, a
New York corporation; National Union Fire
Insurance Company of Pittsburgh; and Does 1-100,
inclusive, Defendants.
No. C-06-2779 MMC.

Oct. 25, 2006.
Robert A. Steller, Selman-Breitman LLP, San Diego,
CA, for Plaintiff.

Annette Amilia Ballatore-Williamson, Jory,
Peterson, Watkins & Smith, Leif E. Knutson, Patrick
Fredette, Mccormick Barstow Sheppard Wayte &
Carruth LLP, Fresno, CA, for Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION
TO REMAND; VACATING HEARING**

MAXINE M. CHESNEY, District Judge.

*1 Before the Court is the motion filed August 4,
2006 by plaintiff The Charter Oak Fire Insurance
Company ("Charter Oak") to remand the instant
action to state court. Defendants American Home
Assurance Company ("American") and National
Union Fire Insurance Company of Pittsburgh
("National") have filed joint opposition, to which
Charter Oak has replied. Having considered the
papers filed in support of and in opposition to the
motion, the Court finds the matter appropriate for
decision on the papers, VACATES the September 8,
2006 hearing, and rules as follows.

**BACKGROUND**

Charter Oak alleges that in November 2001, Pauley
Construction, Inc.    ("Pauley") entered into a
subcontract with S.G. Barber Construction, Inc.
("Barber") to perform "various aerial work in
connection with rebuild construction for Century
Mendocino Cable TV." (See Compl. ¶ 10.) Charter
Oak further alleges Barber agreed, in the subcontract,
to be responsible for the safety of Barber's employees
and subcontractors, and to indemnify and hold Pauley

harmless for any injury, damage or loss to persons,
including   Barber's   employees,   occurring   in
connection with Barber's work under the subcontract.
(See id.)

Charter Oak afforded Pauley liability insurance
coverage under a policy effective during the relevant
period. (See id. ¶ 6.) Charter Oak alleges American
and National issued liability insurance to Barber,
which "provided coverage for defense and indemnity
for claims or suits involving bodily injury" during the
relevant period. (See id. ¶ ¶ 7-8.) Charter Oak
contends   that   Pauley,   as   well   as   Adelphia
Communications Corporation ("Adelphia") and any
of its subsidiary or affiliated companies, qualified as
insureds under the American and National insurance
policies issued to Barber. (See id. ¶¶ 7-8.)

On June 23, 2004, Sifa Tuiaki filed a personal injury
lawsuit in the California Superior Court for the City
and County of San Francisco ("Tuiaki action"),
seeking damages for injuries he assertedly suffered
on May 1, 2002 while working for Barber installing
fiber optic cable on a construction project in
Mendocino County. (See Defendants' Request for
Judicial Notice ("RJN") Ex. B.) The defendants to the
Tuiaki action include Pauley and Adelphia. [FN1]
(See id. Exs. B and C.) On February 24, 2006, Pauley
filed its First Amended Cross-Complaint in the
Tuiaki action, asserting claims against Barber for
comparative   negligence,   express   contractual
indemnity and breach of contract. (See id. Ex. C.)
According to Charter Oak, the Tuiaki action is
currently pending. (See Compl. ¶ 9.) Charter Oak,
American and National are not parties to the Tuiaki
action. When Pauley notified Charter Oak of the
Tuiaki action, Charter Oak agreed to defend Pauley
and certain Adelphia companies under a reservation
of rights. (See id. ¶ 15.) Charter Oak alleges it has
incurred and paid, and continues to incur and pay,
substantial costs and expenses for its defense of
Pauley and Adelphia in the Tuiaki action. (See id.)

> FN1. According to Tuiaki, Adelphia
> supervised the work performed by Pauley
> and Barber on the Mendocino County
> project. (See id. Ex. B at 5.)

*2 Charter Oak further alleges it tendered the
defense and indemnity of Pauley and Adelphia in the
Tuiaki action to American and that American

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3050863 (N.D.Cal.)
(Cite as: 2006 WL 3050863 (N.D.Cal.))

"accepted plaintiff's tender, but thereafter failed and refused to contribute to costs of defense." (*See id.* ¶¶ 16-17.) According to Charter Oak, American and National are affiliated insurers, and notice to American was sufficient to provide notice of the Tuiaki action to National. (*See id.* ¶ 16 .)

On February 7, 2006, Charter Oak filed the instant action in the California Superior Court for the County of San Diego, asserting claims against American and National for declaratory relief, as well as for equitable subrogation, contribution, and indemnification. On March 10, 2006, defendants removed the action to the United States District Court for the Southern District of California, on the basis of diversity jurisdiction. On March 15, 2006, defendants filed a motion to transfer venue to this District. (*See* RJN Ex. A at 3.) Charter Oak opposed the motion and filed a motion to remand. (*See id.* Ex. A at 9.) On April 18, 2006, defendants' motion to transfer venue was granted, pursuant to 28 U.S.C. § 1404(a), and the hearing on the motion to remand was vacated. (*See id.* Ex. A at 9.)

Charter Oak now moves to remand the case to the California Superior Court for the County of San Diego on the ground this Court should decline to exercise jurisdiction over the instant action under the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

## LEGAL STANDARD

The Declaratory Judgment Act, codified at 28 U.S.C. § 2201, provides in pertinent part:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). Under the Declaratory Judgment Act, a federal court has "substantial discretion" to decline to exercise jurisdiction over an action for declaratory relief. *See Wilton v. Seven Falls Co.,* 515 U.S. 277, 286- 287 (1995). In determining whether to exercise such discretion when a related proceeding is pending in state court, the district court should consider "whether the questions in controversy between the parties to the federal suit, and which are not foreclosed under the applicable substantive law, can better be settled in the proceeding pending in the state court." *See Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491, 495

(1942).

## DISCUSSION

As an initial matter, the Court must determine whether it has discretion to decline to entertain the instant action, since the action includes not only a claim for declaratory relief, but also three state law claims for monetary relief. Specifically, Charter Oak asserts claims for equitable subrogation, contribution, and indemnification. "[W]hen other claims are joined with an action for declaratory relief (e.g., bad faith, breach of contract, breach of fiduciary duty, rescission, or claims for other monetary relief), the district court should not, as a general rule, remand or decline to entertain the claim for declaratory relief." *Gov't Employees Ins. Co. v. Dizol,* 133 F.3d 1220, 1225 (9th Cir.1998) (en banc).

*3 Relying on *Golden Eagle Ins. Co. v. Travelers Companies,* 103 F.3d 750, 755 (9th Cir.1996), overruled on other grounds by *Dizol,* 133 F.3d 1220, and *Employers Reinsurance Corp. v. Karussos,* 65 F.3d 796, 801 (9th Cir.1995), overruled on other grounds by *Dizol,* 133 F.3d 1220,* Charter Oak argues that the instant action falls within an exception to the general rule. In *Golden Eagle,* the plaintiff filed suit for declaratory relief, indemnity, and contribution; the Ninth Circuit held the plaintiff's "request for monetary relief is wholly dependent upon a favorable decision on its claim for declaratory relief," and, thus, the entire action "is plainly one for declaratory relief." *See id.* at 755; *see also United Nat'l Ins. Co. v. R & D Latex Corp.,* 242 F.3d 1102, 1112 (9th Cir.2001) (noting "proper analysis" is "whether the claim for monetary relief is independent in the sense that it could be litigated in federal court even if no declaratory claim had been filed").

Charter Oak argues that its claims for equitable subrogation, contribution, and indemnification, like the claims for contribution and indemnity at issue in *Golden Eagle,* are dependent on its claim for declaratory relief, and, consequently, the existence of such additional claims does not deprive the Court of its discretion to decline to hear the entire action under the Declaratory Judgment Act. American and National do not argue to the contrary. The Court agrees that the instant action falls within the above-stated exception to *Dizol's* general rule, and, accordingly, will consider whether to exercise its discretion to hear the instant action, or, instead, to remand the case to state court.

In *Brillhart,* 316 U.S. 491, the Supreme Court set forth the primary factors to be considered by a district

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2006 WL 3050863 (N.D.Cal.)
**(Cite as: 2006 WL 3050863 (N.D.Cal.))**

court in determining whether to exercise jurisdiction under the Declaratory Judgment Act. *See Huth v. Hartford Ins. Co. of the Midwest, 298 F.3d 800, 803 (9th Cir.2002).* Under *Brillhart,* a district court should (1) "avoid needless determination of state law issues"; (2) "discourage litigants from filing declaratory relief actions as a means of forum shopping"; and (3) "avoid duplicative litigation". *See id.* The Ninth Circuit has held that "[t]he *Brillhart* factors are not exhaustive" and that the district court also may consider:

whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory action will result in entanglement between the federal and state court systems. In addition, the district court might also consider the convenience of the parties, and the availability and relative convenience of other remedies.

*See Dizol,* 133 F.3d at 1225 n. 5.

**\*4** "If there are parallel state proceedings involving the same issues and parties pending at the time the federal declaratory action is filed, there is a presumption that the entire suit should be heard in state court." *See id.* "The pendency of a state court action does not, of itself, require a district court to refuse federal declaratory relief," however. *See id.* "[T]here is no presumption in favor of abstention in declaratory actions generally, nor in insurance coverage cases specifically." *See id.* at 1225-1226. Ultimately, the district courts are in "the best position to assess how judicial economy, comity and federalism are affected in a given case." *See id.*

Here, although none of the parties to the instant action is a party to the Tuiaki action, plaintiff, relying on pre-*Dizol* authority, contends the above-referenced presumption nonetheless is applicable. Prior to its en banc decision in *Dizol,* the Ninth Circuit had repeatedly held that district courts generally should decline to exercise jurisdiction over insurance declaratory relief actions where a related action was pending in state court, even if the parties to the federal action were not parties to the state action and the insurance issues raised in the federal action were not at issue in the state action; "[i]t [was] enough that the state proceedings [arose] from the same factual circumstances" and that the insurer could have brought suit in state court. *See, e.g., Golden Eagle,* 103 F.3d at 755; *see also Polido v.*

*State Farm Mutual Auto. Ins. Co.,* 110 F.3d 1418, 1423 (9th Cir.1997), *Am. Nat'l Fire Ins. Co. v. Hungerford,* 53 F.3d 1012, 1017-18 (9th Cir.1995), *Karussos,* 65 F.3d at 800-01. Such decisions are inconsistent with the later en banc opinion in *Dizol,* however, in which, as noted, the Ninth Circuit held "there is no presumption in favor of abstention in declaratory actions generally, nor in insurance coverage cases specifically," but only where "there are parallel state proceedings involving the same issues and parties." *See Dizol,* 133 F.3d at 1225. Accordingly, the Court next turns to a consideration of the *Brillhart* factors.

A. First *Brillhart* Factor: Needless Determination of State Law Issues

With respect to the first *Brillhart* factor, avoiding needless determination of state law issues, Charter Oak takes the position that, generally, "[s]tate law issues are best left to be determined by the state courts," (*see* Motion at 11), while defendants contend "[t]his factor is implicated" only "when there are parallel proceedings which will determine the same state-law issues," (*see* Opposition at 9). The Court finds neither argument compelling.

As noted above, district courts ordinarily have an obligation to adjudicate state law issues properly presented to them. On the other hand, although the two actions herein relevant are not fully parallel, a substantial overlap of issues nonetheless exists, thus raising the potential for "needless determination," *Huth,* 298 F.3d at 803, of those issues by this Court. *See State Auto Ins. Co. v. Summy,* 234 F.3d 131, 134 (3d Cir.2001) (suggesting district courts in declaratory judgment actions employ "[a] general policy of restraint when the same issues are pending in a state court"). The issue presented by Charter Oak's complaint is whether defendant's policies provide primary coverage and Charter Oak's policy secondary coverage, thus relieving Charter Oak of its obligation to defend and indemnify Pauley with respect to the injuries claimed in the Tuiaki action. Unlike the cases cited by American and National, however, a resolution of the instant insurance coverage dispute is not based primarily on the language of the relevant policies, but rather on the contractual relationship between and relative fault of Pauley and Barber, the parties to the state action.

**\*5** In particular, Charter Oak alleges that "Barber promised to indemnify and hold Pauley ... harmless," (*see* Complaint ¶ 10), "the incident would not have occurred but for the negligence and fault of Barber,"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3050863 (N.D.Cal.)
**(Cite as: 2006 WL 3050863 (N.D.Cal.))**

(see Complaint ¶ 11), and *"based on the facts and circumstances of the incident and the construction contract,* [American's general liability policy] is primary to any insurance afforded by [Charter Oak]," (see Complaint ¶ 14 (emphasis added)), after which "National Union's umbrella insurance is triggered," (see id.). Indeed, in describing Charter Oak's claims in the instant action, American and National effectively concede the existence of a substantial overlap of issues with the Tuiaki action. (See Opposition at 2:22-23 ("Charter Oak contends its superior priority position is supported by 'the facts and circumstances of the incident and the construction contract ....' ") (citing Complaint) (ellipses in original).)

In contrast to the cases on which they rely, nowhere in their opposition do American and National identify coverage issues unrelated to the issues in the underlying action. See, e.g., *American Cas. Co. v. Krieger, 181 F.3d 1113, 1115 (9th Cir.1999)* (noting insurer denied coverage in letter stating policy contained endorsement "specifically excluding coverage" for injuries incurred in "athletic event"); *Allstate Ins. Co. v. Green, 825 F.2d 1061, 1062 (6th Cir.1987)* ("It was Allstate's belief, communicated to the [insureds] in a reservation of rights letter, that the policy did not cover their potential liability because of the ... exclusion."); *AcandS, Inc. v. Aetna Casualty and Sur. Co., 666 F.2d 819, 821 (3rd. Cir.1981)* (noting parties' respective contentions as to trigger of coverage under policy language and state law); *Sears, Roebuck & Co. v. American Mut. Liability Ins. Co., 372 F.2ds 435, 439- 440 (7th Cir.1967)* (finding coverage and liability issues "independent" where insurer raised issues of timely notice "pursuant to the terms and conditions of the insurance policy" and lack of coverage under "exclusionary provisions"); *Stout v. Grain Dealers Mut. Ins. Co., 307 F.2d 521, 524 (4th Cir.1962)* (noting need for separate adjudication of "conflict of interest" between insured and insurance company); *American States Ins. Co. v. D'Atri, 375 F.2d 761, 763 (6th Cir.1967)* (finding coverage disputes based on policy's exclusionary and notice provisions "have little to do with any claim of lack of due care"; noting "declaratory judgment proceeding which involves only the extent of the coverage of an insurance policy and not the liability of the insured to the persons injured in the accident, will be entertained in the Federal Court") (internal quotation and citation omitted).

As the Supreme Court has observed, "[g]ratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided." See *Brillhart,* 491 U.S. at 495; *see also Huth, 298 F.3d at 804* (affirming remand of declaratory action involving only state law claims; holding no presumption exists in favor of retaining jurisdiction). Accordingly, the Court finds the first *Brillhart* factor weighs in favor of abstention.

B. Second *Brillhart* Factor: Forum Shopping

*6 The second *Brillhart* factor, the avoidance of forum shopping, weighs in favor of neither abstention nor the exercise of jurisdiction, as there is no evidence that any party herein has engaged in such conduct. See *Huth, 298 F.3d at 804* (finding second factor favored neither party where no evidence of forum shopping). Although Charter Oak originally brought the instant action in state court, the removal of the action by National and American is not, of itself, forum shopping. See *Huth, 298 F.3d at 804* (finding no forum shopping where state declaratory action filed shortly after federal declaratory action or where state action thereafter removed to federal court; noting one party "merely preferred state resolution" and other "preferred federal resolution"); *see also First State Ins. Co. v. Callan, 113 F.3d 161, 162 (9th Cir.1997)* ( "Although occasionally stigmatized as 'forum shopping,' the desire for a federal forum is assured by the constitutional provision for diversity jurisdiction and the congressional statute implementing ArticleIII.").

C. Third *Brillhart* Factor: Duplicative Litigation

The third *Brillhart* factor, avoiding duplicative litigation, ordinarily would favor neither abstention nor the exercise of jurisdiction because the instant declaratory action is before this Court by way of removal; consequently, "the case will be disposed of entirely either in state or federal court, depending upon the outcome of this [motion]." See *Huth, 298 F.3d at 803-04* (holding where declaratory judgment actions filed in both federal and state court, with latter thereafter removed to federal court, second *Brillhart* factor "favored neither party"). In this instance, however, because the issues herein, as discussed, overlap with those in the Tuiaki action, there is a likelihood of duplicative and piecemeal litigation if this Court were to retain jurisdiction over the instant action. Accordingly, this factor weighs in favor of remand.

D. Additional Factors

Of the various additional factors identified in *Dizol,* the majority weigh against this Court's exercise of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3050863 (N.D.Cal.)
**(Cite as: 2006 WL 3050863 (N.D.Cal.))**

jurisdiction. *See Dizol,* 133 F.3d at 1225 n. 5. Although there is no evidence that defendants removed" Charter Oak's complaint merely "for the purposes of procedural fencing or to obtain a 'res judicata' advantage," *see id.,* the instant action will not settle "all aspects of the controversy" or "serve a useful purpose in clarifying the legal relations at issue," *see id.,* without, as discussed, "gratuitous interference with" the Tuiaki action. *See Brillhart,* 491 U.S. at 495. The presence of overlapping issues likewise creates a disfavored "entanglement," *see id.,* between the federal and state court systems. With respect to the "convenience of the parties," *see id.,* although the Northern District has been determined to be a more convenient venue than the Southern District, American and National, upon remand, may seek a change of venue to the San Francisco Superior Court, a forum within the Northern District and wherein the Tuiaki action is pending. Finally, because the identical action will go forward on remand, the "availability and relative convenience" of remedies, *see id.,* will remain the same.

**\*7** In sum, having considered the *Brillhart* and *Dizol* factors, the Court finds it appropriate to decline jurisdiction over the instant declaratory action and allow the action to proceed in state court.

### CONCLUSION

For the reasons set forth above, Charter Oak's motion to remand is hereby GRANTED and the instant action is hereby REMANDED to the Superior Court of California in and for the County of San Diego.

**IT IS SO ORDERED.**

Not Reported in F.Supp.2d, 2006 WL 3050863 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.