# TAB 4

Westlaw.

48 Cal.App.3d 964

48 Cal.App.3d 964, 122 Cal.Rptr. 202

**(Cite as: 48 Cal.App.3d 964)**

Page 1

▶

DIXON MOBILE HOMES, INC., Plaintiff, Cross-
defendant and Appellant,
v.
HAROLD L. WALTERS, Defendant, Cross-
complainant and Appellant
**Civ. No. 14434.**

Court of Appeal, Third District, California.

June 6, 1975.

SUMMARY

In litigation arising out of a Nevada seller's attempt to repossess a mobile home in California, the court, without a jury, decided that California law, particularly Civ. Code, §§ 2981-2984.4, the Automobile Sales Finance Act, rather than Nevada law, applied. Thereafter, a jury heard evidence on the seller's complaint for recovery of personal property and damages, and also, on the buyer's cross-complaint seeking rescission, restitution, and damages. On the rescission claim, the court awarded the buyer a money judgment, attorney fees and court costs, and awarded possession of the mobile home to the seller. The jury awarded the buyer compensatory and punitive damages in specified amounts. (Superior Court of Plumas County, No. 7686, Stanley C. Young, Jr., Judge.)

On an appeal taken on only the clerk's transcript, the Court of Appeal affirmed and remanded with directions that interest consistent with its opinion be made a part of the judgment. Contentions as to novation and damages were rejected as requiring evidentiary review such as is not available in a judgment roll appeal. It was pointed out, however, that the record included all factors required to resolve choice of law issues and, after reviewing them, the court held that California, rather than Nevada, law was applicable to the case. In view of the buyer's failure to specifically request an instruction on interest which Civ. Code, § 3288, authorizes the jury to award in its discretion, his attack on the judgment for its failure to include such interest was rejected. The court held, however, that the judgment was incomplete in not providing for interest for the period between verdict and judgment and thereafter until satisfaction of judgment. (Opinion by Evans, J., with Regan, Acting P. J., and Paras, J., concurring.) *965

HEADNOTES

Classified to California Digest of Official Reports

(1) Appellate Review § 89--Record--Clerk's Transcript--Matters Reviewable.
On appeal on only the clerk's transcript, the findings are not subject to challenge and it is presumed that the evidence supports the findings. Thus, on such an appeal, the reviewing court would reject appellant's contentions as to novation and damages, where resolution of the contentions would require evidentiary review.

[See Cal.Jur.3d, Appellate Review, § 496; Am.Jur.2d, Appeal and Error, § 840.]

(2) Appellate Review § 99--Record--Appeal on Judgment Roll--Matters Reviewable--Conflict of Law Issues.
The fact that an appeal was taken on only the judgment roll did not preclude the appellate court from resolving conflict of law issues, where the clerk's transcript contained the findings of fact and included all the factors and contacts governing the determination of such issues.

(3) Conflict of Laws § 1--"Governmental Interest" Approach.
In resolving conflict of law problems, California takes the "governmental interest" approach under which the forum court's determination of the applicable law is based on the interests of the litigants and of the involved states. The relevant contacts stressed by Rest. 2d Conflict of Laws are examined in connection with the analysis of the interests of the involved states in the issues, in the character of the contract, and in the relevant purposes of the contract law under consideration. In determining the applicable rule, the forum court must consider all the foreign and domestic elements and interests which are involved.

(4a, 4b) Mobile Homes, Trailers, and Parks § 1--Sale of Mobile Homes-- Conflict of Laws.
In litigation arising out of a Nevada seller's attempt to repossess a mobile home in California, the court properly applied California, rather than Nevada, law, where California was the buyer's residence, he initiated his payments in California, the seller

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

48 Cal.App.3d 964
48 Cal.App.3d 964, 122 Cal.Rptr. 202
**(Cite as: 48 Cal.App.3d 964)**

Page 2

delivered and installed the home in California, the loan was secured by California property, all the acts relating to breach occurred in California, and Nevada had no interest in having its laws applied. *966

(5) Conflict of Laws § 1--General Applicability of Law of Forum.
In a conflict of laws situation, the law of the forum will ordinarily be displaced only if there is a compelling reason for doing so and will be applied unless one of the parties has been forced into a forum devoid of such contact as would justify application of its own law.

(6) Interest § 16--Recovery--Appeal.
A party who had won a damage award in a jury trial could not properly attack the award for its failure to include interest which Civ. Code, § 3288, authorizes the jury to award in its discretion under certain circumstances, where he had not specifically requested an instruction on such interest and none had been given.

(7) Interest § 2--When Recoverable or Allowable--Conflict of Laws.
In choice of law cases, liability for interest is to be determined by the law of the forum.

(8) Interest § 11--Computation.
Regardless of whether interest is included in a damage award, it must, pursuant to the interest provisions of Code Civ. Proc., § 1033, and Civ. Code, § 3287, bear interest at the legal rate during the period following rendition of the decision and until entry of judgment. Thereafter, any final judgment for money bears interest at the legal rate from the date of entry, regardless of whether the original claim was liquidated or unliquidated, or in contract or in tort. Interest also continues during appeal.

COUNSEL

Baird B. McKnight for Plaintiff, Cross-defendant and Appellant.

Dennis B. Kavanagh for Defendant, Cross-complainant and Appellant.

**EVANS, J.**

Plaintiff and cross-defendant (hereafter appellant) appeals from an adverse judgment in favor of defendant and cross-complainant (hereafter respondent). The trial of the action was bifurcated;

the court *967 without a jury considered the question of whether to apply Nevada or California law, and a jury thereafter heard evidence and rendered a verdict on appellant's complaint for recovery of personal property and damages and respondent's cross-complaint seeking rescission, restitution, and compensatory and exemplary damages. The trial court ruled that California law, specifically sections 2981 to 2984.4 of the Civil Code and the Rees-Levering Act, was applicable to the disputed transaction. After applying the Rees-Levering Act, the court, on respondent's claim for rescission, awarded judgment for him in the amount of $7,339.70, attorney's fees in the sum of $750, court costs of $595.50, and possession of the mobile home to appellant.

The jury thereafter awarded respondent $2,320 compensatory damages and $2,500 punitive damages.

The trial court made appropriate findings of fact and conclusions of law, and entered judgment against appellant accordingly. (1) The appeal comes to us on the clerk's transcript only. On such an appeal, the findings are not subject to challenge, and it must be presumed that the evidence supports the findings. (*Associated Creditors' Agency v. Dunning Floor Covering, Inc.* (1968) 265 Cal.App.2d 558, 559 [71 Cal.Rptr. 494]; *Globe Indem. Co. v. State of California* (1974) 43 Cal.App.3d 745 [118 Cal.Rptr. 75].) We are thus limited to a review of the judgment, the findings of fact and conclusions of law, and the pleadings. (*Millbrae Assn. for Residential Survival v. City of Millbrae* (1968) 262 Cal.App.2d 222, 226 [69 Cal.Rptr. 251].)

The undisputed facts as disclosed by the clerk's transcript indicate that respondent was a resident of California, and appellant corporation was a mobile home dealer with its principal place of business in the State of Nevada. In March of 1967, in Nevada, respondent entered into a purchase order agreement with appellant for the purchase of a mobile home. The agreement provided for payment of California sales tax, licensing and registration fees. The financing provisions of the purchase order document were left blank, and failed to contain the warnings and statement of buyer's rights and liabilities required by subsection 10 of subdivision (a) of section 2982 of the California Civil Code. [FN1] *968

FN1 The Rees-Levering Act reads in part (Civ. Code, § 2982, subd. (a), subsec. 10): "(a) Every conditional sale contract for the sale of a motor vehicle, with or without

48 Cal.App.3d 964

48 Cal.App.3d 964, 122 Cal.Rptr. 202

**(Cite as: 48 Cal.App.3d 964)**

accessories, shall be in writing and, if printed, shall be printed in type no smaller than six point, and shall contain in a single document all of the agreements of the buyer and seller with respect to the total cost and the terms of payment for the motor vehicle, including any promissory notes or any other evidences of indebtedness. The conditional sale contract or a purchase order shall be signed by the buyer or his authorized representative and by the seller or its authorized representative, and an exact copy thereof shall be furnished the buyer by the seller at the time the buyer and the seller have signed the contract or purchase order. No motor vehicle shall be delivered under this chapter until the seller delivers to the buyer a fully executed copy of the conditional sale contract or purchase order and any vehicle purchase proposal and any credit statement which the seller has required or requested the buyer to sign, and which he has signed, during the contract negotiations. The *seller shall not obtain the signature of the buyer to a contract when it contains blank spaces to be filled in after it has been signed.* Every conditional sale contract shall contain, although not necessarily in the sequence or order set forth below, the following separate items:
"
. . . .
"7. The amount of the finance charge.
"
. . . . .
"10. A notice, in at least eight-point bold type if the contract is printed, reading as follows: 'Notice to the buyer: (1) Do not sign this agreement before you read it or if it contains any blank space to be filled in. (2) You are entitled to a completely filled-in copy of this agreement. (3) Under the law, you have the right to pay off in advance the full amount due and under certain conditions to obtain a partial refund of the finance charge. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.'" (Italics added.)

In May 1967, respondent and appellant executed a conditional sales contract for the actual purchase of the mobile home. The contract form was signed in

blank by respondent, and he did not receive a copy of the document. The conditional sales contract failed to contain the warning language required by subsection 10 of subdivision (a) of section 2982 of the Civil Code. Appellant agreed to deliver and place the mobile home on respondent's property in Blairsden, California. The delivery and installation were accomplished. Respondent thereafter made payments on the contract by mail from California. A number of the payments were late but accepted until March 1971. At that time agents and employees of appellant, without permission of respondent, entered on respondent's property in California, intending to repossess the mobile home. They made forcible entry into the home, split it, and in the process drove trucks and other heavy vehicles upon the respondent's property, causing substantial damage. Respondent arrived at his home during the attempted repossession process and ordered the appellant's employees and agents to leave without the mobile home. They complied. Appellant thereafter filed a complaint for claim and delivery in Plumas County to recover possession of the mobile home and for a deficiency judgment. Respondent answered and cross-complained for trespass to chattel and real property, forcible entry and detainer, conversion, misrepresentation, fraud, and violation of the California Rees-Levering Act requiring rescission and restitution. (Fn. 1, *ante*, pp. 967- 968.)

On appeal, appellant contends (1) the court erred in applying California law to the disputed contract; (2) the conditional sales contract *969 executed in May 1967 was, in fact, a novation of the earlier March purchase agreement; (3) punitive damages were improperly awarded; (4) the record does not support the award of compensatory damages; and (5) attorney's fees were erroneously awarded.

Inasmuch as this is an appeal taken on the clerk's transcript, we may dispose of appellant's novation, punitive damage, and compensatory damage contentions summarily. Each of those asserted grounds for reversal involves issues requiring evidentiary review. It is elemental that on a judgment roll appeal, the appellate court must conclusively presume that the evidence is sufficient to sustain the findings, and that the only questions presented are as to the sufficiency of the pleadings and whether the findings support the judgment. (*Millbrae Assn. for Residential Survival v. City of Millbrae, supra,* 262 Cal.App.2d 222; *City of Los Angeles v. Ricards* (1973) 10 Cal.3d 385, 390 [110 Cal.Rptr. 489, 515 P.2d 585]; *Bristow v. Morelli* (1969) 270 Cal.App.2d 894, 898 [76 Cal.Rptr. 203].) The court in *Kompf v.*

48 Cal.App.3d 964
48 Cal.App.3d 964, 122 Cal.Rptr. 202
**(Cite as: 48 Cal.App.3d 964)**

_Morrison_ (1946) 73 Cal.App.2d 284, 288 [166 P.2d 350], on a judgment roll appeal dealing with similar contentions stated, "Grave miscarriages of justice would result if an appellant was permitted to argue factual questions on such an appeal." Each of the mentioned contentions requires a review of the facts presented if a determination contrary to the trial court's is to be made. The contentions accordingly are rejected.

Attorney's fees were awarded respondent pursuant to the provisions of the California Rees-Levering Act. (Fn. 1, _ante,_ pp. 967-968.) Their propriety is dependent upon the resolution of plaintiff's principal contention that the court erred in applying California law to the contract.

### Choice of Law

(2) Respondent argues that inasmuch as we are considering a judgment roll appeal, we are precluded from deciding the conflict of law issue as well as the others. The argument is without merit. Choice of law cases must be decided by considering factors or contacts with the states involved; in this case, all of those factors or contacts are a part of the clerk's transcript which contains the findings of fact. [FN2] (_Bernkrant v. Fowler_ (1961) 55 Cal.2d 588 [12 Cal.Rptr. 266, 360 P.2d 906].) *970

FN2

### Findings of Facts

"I
"That the law of the State of California applies in the case, and in particular, that Civil Code sections 2981 through 2984.4 are applicable to the transactions in issue involving the sale and purchase of a mobile home.

"II
"That on March 4, 1967 Harold Walters and Dixon Mobile Homes, Inc. (hereinafter referred to as Walters and Dixon) entered into a 'purchase order' agreement for the purchase of a mobile home. Said document is ' Walter's Exhibit C in evidence'. That the 'purchase order' under section 2981 (K) and 2982 (a) failed to comply in the following respects:

"(1) The finance charge box on the 'purchase order' document was blank. The finance charge was $5322.00. This is a violation of section 2982.(a)(7).

"(2) The language required by section 2982(a)(10) was missing from the document. Said language reads as follows: [¶ ] A notice, in at least eight-point bold type if the contract is printed, reading as follows:

'Notice to the buyer:

"(1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) Your [sic] are entitled to a completely filled-in copy of this agreement.

"(3) Under the law, you have the right to pay off in advance the full amount due and under certain conditions to obtain a partial refund of the finance charge. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.'

"III
"That on May 4, 1967 Walters and Dixon entered into a conditional sales contract for the purchase of the mobile home in issue. This document, as an original and three copies, is in evidence as 'plaintiff's exhibit one' and as 'Walters exhibits A and B', and the copy entitled 'customer copy' is part of the Court file as 'Exhibit A' of the original complaint.

"The May 4, 1967 document failed to comply with section 2982 (a) in the following respects:

"(1) Walters did not receive a copy of the contract at the time it was signed by him.

"(2) The contract was signed by Walters in blank.

"(3) The language required by section 2982 (a)(10) was missing from the document. The text of the language as set forth in Finding II (2) is herein incorporated by reference.

"IV
"That Dixon under the provisions of section 2984 never corrected either the March 4, 1967 or May 4, 1967 documents.

"V
"That all violations of section 2982 as set forth in Findings II and III in relation to the March 4, 1967 and May 4, 1967 documents by Dixon were wilful.

"VI
"That Walters is entitled to relief under section 2983 or 2983.1, or both, in the following respects:

"(1) That as set forth in Findings II and III Dixon has violated section 2982 (a).

"(2) That the conditional sale contract between Dixon and Walters is not enforceable as per sections 2983 or 2983.1, or both, and that Walters is entitled to restitution of the total amount he has paid. To wit: $7339.70 plus attorneys fees of $750.00.

"VII
"That Dixon take nothing on its complaint and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

48 Cal.App.3d 964                                                                                  Page 5
48 Cal.App.3d 964, 122 Cal.Rptr. 202
**(Cite as: 48 Cal.App.3d 964)**

action against Walters."

Respondent at all times pertinent was a resident of California; appellant was incorporated in and had its principal place of business in Nevada; the contracts were signed in Nevada; respondent made payments by mail from California to Nevada; and the appellant delivered the mobile home to respondent in California. The court, after considering these factors, applied the California Rees-Levering Act to the sale of the mobile home. **\*971**

Section 97.175 et seq., of the Nevada Revised Statutes [FN3] are also regulatory of transactions of the type involved. However, they do not provide the specific remedies of the Rees-Levering Act. The Rees-Levering Act, designed to protect buyers from abusive and unethical practices of motor vehicle sellers and dealers, goes further and provides the relief of restitution and rescission to the purchaser.

> FN3 Nevada Revised Statute reads as follows:
> "97.175 Seller to deliver, mail copy of contract to buyer; buyer's acknowledgment of delivery. *The retail seller shall deliver to the retail buyer, or mail to him at his address shown on the retail installment contract, a copy of the contract as accepted by the seller, prior to the due date of the first installment.* Until the seller does so the buyer shall be obligated to pay only the cash sales price. Any acknowledgment by the buyer of delivery of a copy of the contract shall be in a size equal to at least 10-point bold type and, if contained in the contract, shall appear directly above the buyer's signature.
> "(Added to NRS by 1965, 659) "97.185 Contents of contract.
> "1. The retail installment contract shall contain the names of the seller and the buyer, the place of business of the seller, the residence or other address of the buyer as specified by the buyer and a description or identification of the goods sold or to be sold, or services furnished or rendered or to be furnished or rendered. *The contract also shall contain* the following items, which shall be set forth substantially in the sequence appearing below:
> "(a) The cash sale price of each item of goods or services.
> "(b) The amount of the buyer's down payment, identifying the amounts paid in

money and allowed for goods traded in.
> "(c) The difference between paragraphs (a) and (b).
> "(d) The aggregate amount, if any, included for insurance, specifying the type or types of insurance and the terms of coverage.
> "(e) The aggregate amount of official fees.
> "(f) The initial balance, which is the sum of paragraphs (c), (d) and (e).
> "(g) *The amount of the time price differential.*
> "(h) *The amount of the time balance owed by the buyer to the seller, which is the sum of paragraphs (f) and (g).*
> "(i) The number of installments required to pay the time balance, the amount of each installment, and the date for payment of the installments. If the final payment substantially exceeds the other scheduled installments, it shall be set forth separately.
> "2. Additional items may be included in the contract to explain the calculations involved in determining the amount to be paid by the buyer.
> "(Added to NRS by 1965, 659)
> "
> . . . . .
> "97.215 *Blank spaces in contracts. The seller shall not obtain the signature of the buyer to any contract when it contains blank spaces of items which are essential provisions of the transaction* except as provided in NRS 97.205 and 97.235, and except that if delivery of the goods is not made at the time of the execution of the contract, the identifying numbers or marks of the goods or similar information and the due date of the first installment may be inserted by the seller in the seller's counterpart of the contract after it has been signed by the buyer.
> "(Added to NRS by 1965, 660)" (Italics added.)

The Legislature is ordinarily concerned with enacting laws to govern purely local transactions. In this instance it has not defined the extent to which the Rees-Levering Act is to apply to contracts having substantial contacts with other states. Accordingly, the scope of the act must be **\*972** determined in the light of applicable principles of conflict of law decisions. ( *Bernkrant v. Fowler, supra,* 55 Cal.2d 588, 594.) The factual situation presented is complex, involving multi-state contacts. In such situations, no single state alone can be deemed to have the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

48 Cal.App.3d 964

48 Cal.App.3d 964, 122 Cal.Rptr. 202

**(Cite as: 48 Cal.App.3d 964)**

exclusive governing rights. (*Reich v. Purcell* (1967) 67 Cal.2d 551, 553 [63 Cal.Rptr. 31, 432 P.2d 727].) (3) In recognition of this principle, California now follows a methodology characterized as the "governmental interest" approach to choice of law problems. (*Kasel v. Remington Arms Co.* (1972) 24 Cal.App.3d 711, 730 [101 Cal.Rptr. 314].) Applying this method, the forum must search to find the proper law to apply based upon the interests of the litigants and the involved states. ( *Reich v. Purcell, supra,* at p. 553.) With the governmental interest approach, "relevant contacts" stressed by the Restatement Second of Conflict of Laws [FN4] are not disregarded, but are examined in connection with the analysis of the interest of the involved state in the issues, the character of the contract and the relevant purposes of the contract law under consideration. (*Kasel v. Remington Arms Co., supra,* 24 Cal.App.3d at p. 731.) The forum must consider all the foreign and domestic elements and interests involved in the case to determine the applicable rule. (

FN4 Section 188 of Restatement Second of Conflict of Laws reads as follows:
"(1)
. . . . .
"(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
"(a) the place of contracting,
"(b) the place of negotiation of the contract,
"(c) the place of performance,
"(d) the location of the subject matter of the contract, and
"(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
"These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Reich v. Purcell, supra,* 67 Cal.2d at p. 555.) (4a) As we view the application of the foregoing guidelines to the issues presented, it is clear the trial court correctly applied California rather than Nevada law. The protection of California consumers from abusive and deceptive sellers, whether local or foreign, is an important subject for protection by California. The California consumer is harmed as much by either one. California has expressed this interest through the adoption of the Rees-Levering Act to specifically prevent fraudulent and deceptive

practices in the conditional sales of motor vehicles.

California, as the forum, has a special interest in having its own law apply. (5) The law of the forum will be displaced only if there is a compelling reason for doing so. It is applicable unless either the *973 appellant or respondent has been forced into a forum devoid of such contact as would justify application of its own law. (*Kasel v. Remington Arms Co., supra,* 24 Cal.App.3d at p. 731.) (4b) Here, in addition to being the residence of the buyer, the following additional California contacts are present: the buyer initiated his payments in California; the seller delivered and installed the mobile home in California; the loan was secured by California property; and all acts relating to breach (attempted repossession and collection) occurred in California. It is apparent from the findings that California had substantial contacts totally justifying the application of California law.

It is equally clear that Nevada does not have an interest in having its law applied. It may be assumed that Nevada could have a policy of protecting its sellers from having contracts invalidated by the various laws of the several states. However, as indicated, Nevada and California policies are not in conflict. (Fn. 1, *ante, pp.* 967-968 and fn. 3, *ante, p.* 971.) Nevada's interest is similar to California's. The practices utilized by appellant are controlled and penalized by both states. The contract involved did not meet the requirements of either Nevada or California law. The court in *Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 580 [114 Cal.Rptr. 106, 522 P.2d 666] commented as follows: "Although the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied. [Citations.] 'When one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, then there is no real problem; clearly the law of the interested state should be applied.' [Citation.]"

We find no interest needing the protection of the Nevada laws and conclude the court properly made a choice of law in applying the Rees-Levering Act.

Having so concluded, we can dispose of appellant's contention that attorney's fees were erroneously awarded. The Rees-Levering Act specifically provides for the award of reasonable attorney's fees and costs to the prevailing party in any action on a conditional sales contract subject to provisions of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

48 Cal.App.3d 964
48 Cal.App.3d 964, 122 Cal.Rptr. 202
**(Cite as: 48 Cal.App.3d 964)**

act. [FN5] *974

    FN5 Section 2983.4 of the Civil Code provides in pertinent part: "Reasonable attorney's fees and costs shall be awarded to the prevailing party in any action on a conditional sale contract subject to the provisions of this chapter regardless of whether the action is instituted by the seller, holder or buyer."

### Interest

Respondent has cross-appealed from the trial court's failure to award any interest on the judgment. (6) The cross-complaint sought interest generally, and respondent now seeks interest on payments made on the mobile home from the date of each payment pursuant to section 3288 of the Civil Code. [FN6] By its terms, section 3288 limits the award of interest to cases of fraud, oppression, or malice and vests the discretion for such award in the jury. The court failed to instruct the jury on its ability to award interest on the compensatory damage award. However, in the absence of a specific request from a party, the court is under no duty to give such instructions. (*Gagosian v. Burdick's Television & Appliances* (1967) 254 Cal.App.2d 316, 318 [62 Cal.Rptr. 70]; 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 195, p. 3014.) We find no such request by the respondent on the question of discretionary interest. Respondent's contention made under the color of section 3288 of the Civil Code is therefore rejected.

    FN6 Section 3288 of the Civil Code provides: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."

(7) With respect to general interest on the damage award, liability for interest is to be determined by the law of the forum. (*Perkins v. Benguet Cons. Min. Co.* (1942) 55 Cal.App.2d 720 [132 P.2d 70].)

Section 1033 of the Code of Civil Procedure provides in relevant part: "The clerk or judge shall include in the judgment, or any part of a judgment, entered up by him based upon a cause of action in contract where the claim was unliquidated, interest on the verdict or decision of the court from the date prior to the entry of judgment as may have been fixed by the court pursuant to subdivision (b) of Section 3287 of the Civil Code, and the costs, if the same have been taxed or ascertained. In any other case, and where the court determines that interest should not be recovered from a date prior to the entry of judgment under subdivision (b) of Section 3287 of the Civil Code, the clerk or judge shall include in the judgment entered up by him, any interest on the verdict or decision of the court, from the time it is rendered or made, and the costs, if the same have been taxed or ascertained."

Section 3287 of the Civil Code provides:

"(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover *975 which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any such debtor, ...

"(b) Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

(8) Applying these sections, whether or not interest is included in the damage award (either by the court or by the jury), the award must bear interest at the legal rate during the period following rendition of the verdict or decision and until entry of judgment. (*Espinoza v. Rossini* (1967) 257 Cal.App.2d 567, 569 [65 Cal.Rptr. 110]; 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, § 136, p. 3284.) Thereafter, any final judgment for money bears interest at the legal rate from the date of entry. This is so regardless of whether or not the original claim was liquidated or unliquidated, in contract or in tort. (*County of Los Angeles v. Lorbeer* (1958) 158 Cal.App.2d 804, 809 [323 P.2d 542]; 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, § 137, p. 3285.) Interest also continues during an appeal. (*Espinoza v. Rossini, supra,* 257 Cal.App.2d at p. 569.)

Respondent is entitled to have interest for the seven-month period between verdict and judgment, and interest thereafter until satisfaction of the judgment.

The judgment is affirmed and remanded with the direction that interest consistent with this opinion be made a part of the judgment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

48 Cal.App.3d 964
48 Cal.App.3d 964, 122 Cal.Rptr. 202
**(Cite as: 48 Cal.App.3d 964)**

 Regan, Acting P. J., and Paras, J., concurred. **\*976**

Cal.App.3.Dist.,1975.

Dixon Mobile Homes, Inc. v. Walters

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Westlaw.

63 Cal.Rptr.3d 816                                                      Page 1
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 63 Cal.Rptr.3d 816)**

c

Court of Appeal, Second District, Division 3,
California.
FRONTIER OIL CORPORATION et al., Plaintiffs
and Appellants,
v.
RLI INSURANCE COMPANY, Defendant and
Respondent.
**No. B189158.**

Aug. 6, 2007.

**Background:** Oil company and wholly-owned
subsidiary brought action against their liability
insurer, seeking declaration that insurer was obligated
to defend them in personal injury actions arising out
of the operation of an oil and gas production facility.
The Superior Court of Los Angeles County, No.
BC311259, Richard L. Fruin, J., granted insurer
summary judgment. Company and subsidiary
appealed.

**Holdings:** The Court of Appeal, Croskey, J., held
that:
(1) intended place of performance, for purposes of
choice-of-law statute applicable to contracts, could be
gleaned from a contract's nature and surrounding
circumstance;
(2) governmental interest choice-of-law analysis did
not supplant choice-of-law statute which provided
that contracts were to be interpreted according to the
law of the intended place of performance;
(3) California was the intended place of
performance of insurance policy issued to oil
company;
(4) insurer had a duty to defend oil company from
pollution claims arising from sudden and accidental
releases from oil and gas production facility;
(5) under either California or Texas law, insurer had
a duty to defend oil company in the underlying
personal injury actions; and
(6) insurer failed to satisfy on summary judgment
motion its burden to present evidence that subsidiary
was not an insured with respect to underlying
personal injury actions.
Reversed and remanded.

West Headnotes

**[1] Statutes** ⚖️➜**181(1)**
361k181(1) Most Cited Cases

**[1] Statutes** ⚖️➜**184**
361k184 Most Cited Cases
A court's fundamental task in construing a statute is
to ascertain the legislative intent so as to effectuate
the purpose of the law.

**[2] Statutes** ⚖️➜**188**
361k188 Most Cited Cases
Because the statutory language ordinarily is the most
reliable indicator of legislative intent, when
interpreting a statute courts begin by examining the
words of the statute.

**[3] Statutes** ⚖️➜**188**
361k188 Most Cited Cases

**[3] Statutes** ⚖️➜**208**
361k208 Most Cited Cases

**[3] Statutes** ⚖️➜**223.1**
361k223.1 Most Cited Cases
When interpreting a statute, courts give the words of
the statute their ordinary and usual meaning and
construe them in the context of the statute as a whole
and the entire scheme of law of which it is a part.

**[4] Statutes** ⚖️➜**188**
361k188 Most Cited Cases

**[4] Statutes** ⚖️➜**189**
361k189 Most Cited Cases

**[4] Statutes** ⚖️➜**190**
361k190 Most Cited Cases

**[4] Statutes** ⚖️➜**212.7**
361k212.7 Most Cited Cases
If the language of a statute is clear and a literal
construction would not result in absurd consequences
that the Legislature did not intend, when interpreting
statutes courts presume that the Legislature meant
what it said and the plain meaning governs.

**[5] Statutes** ⚖️➜**184**
361k184 Most Cited Cases

**[5] Statutes** ⚖️➜**217.4**
361k217.4 Most Cited Cases
If the language of a statute is ambiguous, courts may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816                                                                                   Page 2
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 63 Cal.Rptr.3d 816)**

consider a variety of extrinsic aids, including the purpose of the statute, legislative history, and public policy.

**[6] Contracts** ☞144
95k144 Most Cited Cases
Statute, providing that a contract is to be interpreted according to the law and usage of the place where it is to be performed if the contract indicates a place of performance, is intended to give effect to the parties' presumed intention that the law of the place a contract is to be performed should govern its interpretation. West's Ann.Cal.Civ.Code § 1646.

**[7] Contracts** ☞129(1)
95k129(1) Most Cited Cases
If the parties to a contract state their intention regarding contract interpretation in an express choice-of-law clause, courts ordinarily will enforce the parties' stated intention unless: (1) the chosen state has no substantial relationship to the parties or their transaction, and there is no other reasonable basis for the parties' choice, or (2) the chosen state's law is contrary to a fundamental policy of the state whose law otherwise would apply, and the latter state has a materially greater interest in the matter than does the chosen state.

**[8] Contracts** ☞144
95k144 Most Cited Cases
The parties' intention as to the place of performance, for purposes of statute providing that a contract is to be interpreted according to the law of the place where it is to be performed, can be gleaned from the nature of the contract and the surrounding circumstances, even if the contract does not expressly specify a place of performance. West's Ann.Cal.Civ.Code § 1646.

**[9] Contracts** ☞144
95k144 Most Cited Cases
The intended place of performance is a question of contract interpretation for the court to decide, for purposes of statute providing that a contract is to be interpreted according to the law of the place where it is to be performed, except to the extent the answer may depend on the credibility of extrinsic evidence. West's Ann.Cal.Civ.Code § 1646.

**[10] Contracts** ☞144
95k144 Most Cited Cases
Governmental interest analysis choice-of-law rule, under which a court applies the law of the jurisdiction whose interest would be more significantly impaired if its law was not applied, does not supplant statute

which provides that a contract is to be interpreted according to the law of the place in which it is to be performed. West's Ann.Cal.Civ.Code § 1646.

**[11] Insurance** ☞2268
217k2268 Most Cited Cases

**[11] Insurance** ☞2911
217k2911 Most Cited Cases
An indemnity obligation in an insurance policy entails the payment of money in order to resolve liability, while a defense obligation, in contrast, entails the rendering of a service, the mounting and funding of a defense.

**[12] Insurance** ☞1091(4)
217k1091(4) Most Cited Cases

**[12] Insurance** ☞1091(5)
217k1091(5) Most Cited Cases
California was the intended place of performance of commercial general liability insurance policy issued in Texas by Texas insurer to Texas-based oil company, and thus California rather than Texas law governed interpretation of the policy pursuant to California statute that provided that a contract was to be interpreted according to the law of the place in which it was to be performed, as policy specifically referred to claims from oil and gas operations at a drill site in California, endorsements named California city and department of transportation of another California city as additional insureds, and in a third endorsement insurer waived its right of recovery against a California city for certain payments made with respect to the specified claims. West's Ann.Cal.Civ.Code § 1646.

**[13] Insurance** ☞1806
217k1806 Most Cited Cases
Courts interpret an insurance policy under California law using the same rules of interpretation applicable to other contracts.

**[14] Insurance** ☞2097
217k2097 Most Cited Cases
Courts interpret an insuring clause broadly consistent with the reasonable expectations of the insured.

**[15] Insurance** ☞2098
217k2098 Most Cited Cases
An exclusion from coverage otherwise within the scope of an insuring clause must be clear and unmistakable to be given effect.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816                                                                Page 3
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
(Cite as: 63 Cal.Rptr.3d 816)

**[16] Insurance** 🔑 **2098**
217k2098 Most Cited Cases
An exclusionary clause in an insurance policy must be conspicuous, plain and clear.

**[17] Insurance** 🔑 **2098**
217k2098 Most Cited Cases
An exception to an exclusion in an insurance policy is treated in the same manner as a coverage provision and therefore is interpreted broadly consistent with the insured's reasonable expectations.

**[18] Insurance** 🔑 **1845(1)**
217k1845(1) Most Cited Cases

**[18] Insurance** 🔑 **1874**
217k1874 Most Cited Cases
An endorsement in an insurance policy modifies the basic insuring forms of the policy and is an integral part of the policy.

**[19] Insurance** 🔑 **1845(1)**
217k1845(1) Most Cited Cases
Standing alone, an endorsement in an insurance policy means nothing; an endorsement forms a part of the insurance contract, and the policy of insurance with the endorsements and riders thereon must be construed together as a whole.

**[20] Insurance** 🔑 **1874**
217k1874 Most Cited Cases
An endorsement can expand or restrict the coverage otherwise provided by an insurance policy.

**[21] Insurance** 🔑 **1845(2)**
217k1845(2) Most Cited Cases
If there is any conflict between an endorsement and the body of an insurance policy, the endorsement controls, provided that any reduction in coverage reasonably expected under the body of a policy must be conspicuous, plain and clear.

**[22] Insurance** 🔑 **2325**
217k2325 Most Cited Cases

**[22] Insurance** 🔑 **2911**
217k2911 Most Cited Cases
General liability insurer had a duty to defend oil company from pollution claims arising from sudden and accidental releases from company's oil and gas production facility, though pollution liability endorsement which provided the coverage for sudden and accidental releases did not mention a duty to defend, where the body of general liability policy to which the endorsement was attached expressly promised both indemnity and a defense, and pollution endorsement, which deleted pollution exclusion, provided indemnity and did not clearly and unmistakably exclude pollution claims from the duty to defend stated in the body of the policy.

**[23] Action** 🔑 **17**
13k17 Most Cited Cases
The first step in the governmental interest choice-of-law analysis is to determine whether the applicable rules of law of the potentially concerned jurisdictions materially differ; if there is no material difference, there is no choice-of-law problem and the court may proceed to apply California law.

**[24] Action** 🔑 **17**
13k17 Most Cited Cases
The party arguing that foreign law governs, under the governmental interest choice-of-law analysis, has the burden to identify the applicable foreign law, show that it materially differs from California law, and show that the foreign law furthers an interest of the foreign state.

**[25] Insurance** 🔑 **2914**
217k2914 Most Cited Cases

**[25] Insurance** 🔑 **2915**
217k2915 Most Cited Cases
A liability insurer has a duty to defend its insured if facts alleged in the complaint, or other facts known to the insurer, potentially could give rise to coverage under the policy.

**[26] Insurance** 🔑 **2913**
217k2913 Most Cited Cases
The facts need only raise the possibility that the insured will be held liable for covered damages in order for the insurer to have a duty to defend.

**[27] Insurance** 🔑 **2913**
217k2913 Most Cited Cases
An insurer has a duty to defend, if the facts raise the possibility that the insured will be held liable for covered damages, even if the claims against the insured are groundless, false, or fraudulent.

**[28] Insurance** 🔑 **2913**
217k2913 Most Cited Cases
Any doubt as to whether the facts establish the existence of a defense duty under an insurance policy must be resolved in the insured's favor.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816

Page 4

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031

**(Cite as: 63 Cal.Rptr.3d 816)**

**[29] Insurance** 🔑**2919**
217k2919 Most Cited Cases

**[29] Insurance** 🔑**2930**
217k2930 Most Cited Cases
A duty to defend arises upon the tender to the insurer of a potentially covered claim and continues until the lawsuit is concluded or until the insurer shows that facts extrinsic to the third party complaint conclusively negate the potential for coverage.

**[30] Insurance** 🔑**2922(1)**
217k2922(1) Most Cited Cases
If a duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered.

**[31] Insurance** 🔑**2930**
217k2930 Most Cited Cases
If a duty of an insurer to defend has arisen by virtue of the existence of a potential for coverage but is later extinguished, it is extinguished prospectively only, and not retroactively.

**[32] Insurance** 🔑**2914**
217k2914 Most Cited Cases
A liability insurer has a duty to defend its insured under Texas law if facts alleged in the complaint potentially could give rise to coverage under the policy.

**[33] Insurance** 🔑**2914**
217k2914 Most Cited Cases
Under Texas law, a plaintiff's factual allegations that potentially support a covered claim is all that is needed to invoke the insurer's duty to defend.

**[34] Insurance** 🔑**2914**
217k2914 Most Cited Cases
Under Texas law, where a complaint against the insured does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy.

**[35] Insurance** 🔑**2914**
217k2914 Most Cited Cases
Under Texas law, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in

insured's favor.

**[36] Insurance** 🔑**2914**
217k2914 Most Cited Cases

**[36] Insurance** 🔑**2915**
217k2915 Most Cited Cases
Under Texas law, the duty to defend is determined based on the policy terms and the allegations of the complaint, without regard to the truth or falsity of those allegations and without regard to extrinsic evidence.

**[37] Insurance** 🔑**2914**
217k2914 Most Cited Cases
Under Texas law, any doubt as to whether a complaint alleges facts that give rise to a duty to defend under an insurance policy must be resolved in favor of the insured.

**[38] Insurance** 🔑**2922(1)**
217k2922(1) Most Cited Cases
Under Texas law, if the duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered.

**[39] Insurance** 🔑**2325**
217k2325 Most Cited Cases
Under both California and Texas law, Texas insurer that issued commercial general liability policy covering Texas-based oil company's oil and gas production facility in California had a duty to defend company in California personal injury actions arising out of the operation of the facility, based on complaints asserting that company's operations resulted in releases, discharges, emissions, leaks and spills; such allegations did not foreclose the possibility that plaintiffs' alleged damages were caused by a sudden and accidental release, which were potentially covered by policy's pollution endorsement. West's Ann.Cal.Civ.Code § 1646.

**[40] Judgment** 🔑**185.3(12)**
228k185.3(12) Most Cited Cases
Insurer, which had issued general liability policy to oil and gas company that named joint venture of company's subsidiary as an additional insured, failed to satisfy on summary judgment motion its burden to present evidence that subsidiary was not an insured with respect to underlying personal injury actions arising out of subsidiary's operation of oil and gas production facility, as policy specifically identified the facility and raised inference that the parties intended policy to provide coverage for subsidiary's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 63 Cal.Rptr.3d 816)**

Page 5

operations at the facility, nothing in either the policy or the complaints in the underlying actions foreclosed the possibility that subsidiary's operations at the facility pertained to its joint venture, and insurer cited no evidence, apart from the policy and the complaints, supporting its argument that conduct alleged in the personal injury complaints did not pertain to subsidiary's joint venture activities.

*820 Dickstein Shapiro Morin & Oshinsky, Kirk A. Pasich, Clyde M. Hettrick and Daniel H. Rylaarsdam, Los Angeles, for Plaintiffs and Appellants.

*821 Morison-Knox Holden & Prough, William C. Morison, Michael D. Prough, Walnut Creek, and Richard A. Eggerth for Defendant and Respondent.

CROSKEY, J.

Frontier Oil Corporation (Frontier) and its wholly-owned subsidiary, Wainoco Oil & Gas Company (Wainoco), appeal a summary judgment in favor of RLI Insurance Company (RLI). Frontier and Wainoco contend RLI has a duty to defend them in several personal injury actions arising from the operation of an oil and gas production facility adjacent to Beverly Hills High School in Beverly Hills, California. Frontier's predecessor and RLI's predecessor had entered into a liability insurance policy in Texas. The parties dispute whether RLI agreed under the terms of the policy to defend pollution claims and whether a duty to defend the underlying actions has arisen. Each of these questions presents a choice-of-law issue concerning the law governing our determination. Each choice-of-law issue in turn presents the threshold question of the applicable choice-of-law rule.

We conclude that notwithstanding the application of the governmental interest analysis to *other* choice-of-law issues, Civil Code section 1646 is the choice-of-law rule that determines the law governing the *interpretation* of a contract. Section 1646 states that a contract is to be interpreted according to the law and usage of the place it is to be performed if the contract "indicate[s] a place of performance" and according to the law and usage of the place it was made if the contract "does not indicate a place of performance." [FN1] A contract "indicate[s] a place of performance" within the meaning of section 1646 if the contract expressly specifies a place of performance or if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances. California, as the location of the risk insured under the policy, was the state where RLI would be obligated to perform its

defense obligations under the policy, and the contracting parties knew this at the time the policy was issued. Indeed, the policy included several endorsements reflecting the existence of a covered risk located in California. The law of California therefore governs the interpretation of the policy. Interpreting the policy under California law, we will hold that it includes a contractual duty to defend and that the facts alleged in the underlying complaints were sufficient to create a potential for coverage giving rise to a duty to defend. We will therefore reverse the judgment.

> FN1. Civil Code section 1646 provides: "A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."

## *FACTUAL AND PROCEDURAL BACKGROUND*

### 1. *The Insurance Policy*

Underwriters Indemnity Company, RLI's predecessor in interest, issued a commercial general liability insurance policy to Wainoco Oil Corporation, Frontier's predecessor in interest, in January 1988. Wainoco Oil Corporation, acting through an insurance brokerage, and Underwriters Indemnity Company entered into the insurance contract in Texas. The policy was effective from October 1, 1987, to October 1, 1988.

The policy's liability insuring clause states: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.... The 'bodily injury' or 'property *822 damage' must be caused by an 'occurrence'.... *We will have the right and duty to defend any 'suit' seeking those damages.*" (Italics added.) Exclusion f, in the same coverage form, provided for an "absolute" pollution exclusion: "This insurance does not apply to: [¶] ... [¶] ... 'Bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants...."

The policy includes several contemporaneously issued endorsements, including one entitled "Oil and Gas Lease Operators' Pollution Liability Coverage" (the pollution liability endorsement), which states at the top of its first page, "This endorsement forms a part of the policy to which attached, effective on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816                                                                              Page 6
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
(Cite as: 63 Cal.Rptr.3d 816)

inception date of the policy unless otherwise stated herein." The pollution liability endorsement *deletes* exclusion f from the policy and states: "We will pay those sums that the 'insured' becomes legally obligated to pay as compensatory damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by a 'pollution incident'." The endorsement defines "pollution incident" as "the sudden and accidental emission, discharge, release or escape of pollutants into or upon land or the atmosphere, provided that such emission, discharge, release or escape emanates from operations conducted on land and results in 'environmental damage'." [FN2] "Environmental damage" is defined as "the injurious presence in or upon land or the atmosphere of solid, liquid, gaseous or thermal contaminants, irritants or pollutants." The endorsement, however, does not mention a duty to defend.

> FN2. The effect of this endorsement was to remove the *absolute* pollution exclusion from the original policy and provide in its place a limited promise of coverage for claims arising from any "sudden and accidental emission, discharge, release or escape of pollutants."

The policy also includes three additional endorsements relating specifically to the oil and gas operations in Beverly Hills, California. One adds the City of Beverly Hills as an additional insured ("with respect to claims arising out of the following project: Oil and Gas Operations at 9865 Olympic Blvd., City of Beverly Hill[s], CA"), apparently as a public entity that had issued a permit to conduct oil and gas operations at the site; the second adds the Department of Transportation of the City of Los Angeles as an additional insured, also apparently as a public entity that had issued a permit; and the third is a "Waiver of Transfer Rights of Recovery Against Others" made out in favor of the City of Beverly Hills with respect to claims arising from the same project.

Finally, an endorsement for certain "Texas Changes" apparently conforms this policy issued in Texas with Texas law with respect to three specific areas, none of which is relevant to the issues raised in this appeal: (1) the "notice prejudice" rule, (2) policy cancellation, and (3) policy renewal. That endorsement also states that the insured may complain to the Texas State Board of Insurance if any dispute concerning the premium or a claim is not resolved.

*2. Underlying Actions and Tender of Defense*

Lori Lynn Moss and numerous other plaintiffs filed a complaint against Frontier, Wainoco, and other oil and gas industry defendants in June 2003 (*Moss v. Venoco, Inc.* (Super.Ct.L.A.County, No. BC297083)). The plaintiffs alleged that the defendants' oil and gas operations at "Drill-Site # 1" and other locations at the Beverly Hills site caused releases of toxic chemicals into the environment resulting in personal injuries and deaths. Other **\*823** plaintiffs filed similar complaints against Frontier, Wainoco, and others alleging the same operative facts in six additional actions filed from July 2003 to May 2005. Frontier and Wainoco tendered defense of all of these actions to several primary liability insurers, including RLI. RLI responded that it would investigate the matter.

In January 2004, Frontier and Wainoco made a written demand on numerous insurers, including RLI, to provide a defense in the underlying actions. On February 12, 2004, RLI filed a complaint in the United States District Court for the Southern District of Texas seeking a declaratory judgment that it had no duty to defend or indemnify Frontier or Wainoco in the underlying actions (*RLI Insurance Co. v. Wainoco Oil & Gas Co.* (S.D.Tex., No. H-04-0553)). RLI sent a letter to Frontier and Wainoco the next day denying coverage and a defense.

*3. Trial Court Proceedings*

Frontier and Wainoco filed their complaint in this action against RLI and other insurers in February 2004, alleging counts for (1) declaratory relief, (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing, all relating to the insurers' refusal to defend the underlying actions. The Texas federal district court stayed RLI's declaratory relief action in April 2004 under its broad discretionary authority to abstain from ruling on a declaratory relief action where there is a pending state court action in which the matters in controversy might be fully resolved. Frontier and Wainoco later resolved this action with respect to all of the insurer defendants except RLI.

RLI moved for summary judgment against Frontier in November 2005, arguing that it had no duty to defend Frontier in the underlying actions. RLI argued that Texas law governed the dispute pursuant to Civil Code section 1646 and Code of Civil Procedure section 1857 and that under Texas law,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816                                                                                                   Page 7
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 63 Cal.Rptr.3d 816)**

RLI had no duty to indemnify or defend Frontier. Specifically, RLI argued that under Texas law (1) the pollution liability endorsement does not promise a defense of pollution claims, so the policy provides for indemnity of pollution claims but not a defense; and, in any event (2) the allegations in the underlying complaints do not create a potential for coverage. RLI moved for summary judgment against Wainoco on the same grounds, and also argued that Wainoco was entitled to no relief because it was not a named insured under the policy.

The trial court concluded that Civil Code section 1646 determined whether the law of California or Texas governed the dispute. [FN3] Noting the "Texas Changes" endorsement, the court stated, "The insurance policy as a whole shows the intent of the parties at the time the insurance contract was made was that Texas law would apply to any disputes arising out of the contract." The court concluded, "the insurance contract was made and accepted between a Texas insurer and a Texas-based insured in Texas and was to be performed under Texas law." The court therefore held that Texas law governed this dispute. The court acknowledged that "[t]he major risk identified by the parties in their contract was the insured's petroleum drilling operation in California," but stated that such circumstance alone did not compel the conclusion that California law governed.

> FN3. The trial court also apparently relied on Code of Civil Procedure section 1857 (see fn. 4, *post*).

**\*824** The trial court concluded that, under Texas law, the policy did not include a duty to defend pollution claims because the pollution liability endorsement did not expressly promise a defense. The court therefore held that RLI had no duty to defend Frontier or Wainoco regardless of the allegations in the underlying actions. The court granted the summary judgment motions against both Frontier and Wainoco and entered a judgment in favor of RLI. Frontier and Wainoco filed a timely appeal.

### CONTENTIONS

Frontier and Wainoco contend (1) the governmental interest analysis is the choice-of-law rule that determines whether California law or Texas law governs the parties' rights under the policy, and under that analysis California law applies; (2) even under Civil Code section 1646 and Code of Civil Procedure section 1857, the contemplated place of performance was California, so California law applies; (3)

interpreted in accordance with California law, the policy includes a contractual duty to defend that extends to claims arising from pollution incidents; (4) the allegations of the third party complaints establish a potential for coverage under the policy and therefore create a duty to defend; and (5) RLI has a duty to defend under Texas law, even if it applies.

RLI disputes these contentions and argues that (1) Civil Code section 1646 and Code of Civil Procedure section 1857 establish the choice-of-law rule that determines whether California law or Texas law governs the interpretation of the policy and, under that analysis, Texas law applies because the policy does not expressly specify a place of performance and the contract was made in Texas; (2) even under the governmental interest analysis, Texas law applies; (3) interpreted in accordance with Texas law, the policy does not include a duty to defend pollution claims; (4) the allegations of the third party complaints do not establish a potential for coverage under the policy and therefore cannot support a duty to defend under Texas law; (5) if California law applies, the matter should be remanded to the superior court to consider extrinsic evidence that was not considered in ruling on the prior summary judgment motion; and (6) Wainoco is not an insured under the policy, so the judgment should be affirmed as to Wainoco.

### DISCUSSION
1. *Standard of Review*

A party is entitled to summary judgment only if there is no triable issue of material fact and the party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense. (*Id.*, subd. (p)(2).) A defendant can satisfy its burden by presenting evidence that negates an element of the cause of action or evidence that the plaintiff cannot reasonably obtain needed evidence. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003, 4 Cal.Rptr.3d 103, 75 P.3d 30.) If the defendant meets this burden, the burden shifts to the plaintiff to set forth "specific facts" showing that a triable issue of material fact exists. (Code Civ. Proc., § 437c, subd. (p)(2).) We review the trial court's ruling de novo, liberally construe the evidence in favor of the opposing party, and resolve all doubts concerning the evidence in favor of the opposing party. (*Miller v. Department of Corrections* (2005) 36

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816                                                                                                                    Page 8
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 63 Cal.Rptr.3d 816)**

Cal.4th 446, 460, 30 Cal.Rptr.3d 797, 115 P.3d 77.)

**\*825 2. *Choice-of-Law Doctrine***

 Choice of law refers to the determination of which state's or other jurisdiction's law applies to a particular issue. Choice of law is one branch of the larger doctrine of conflicts of laws, which also includes the questions in which jurisdiction a suit can be brought and the effect of a foreign judgment. (See Weintraub, Commentary on the Conflict of Laws (5th ed.2006) § 1.1, p. 1; Rest.2d Conflict of Laws, § 2, com. a, pp. 2-3.) Choice-of-law rules can be statutory or based on common law. (See Rest.2d Conflict of Laws, § 5, coms. b, c, p. 9; Leflar, *Choice-of-Law Statutes* (1977) 44 Tenn. L.Rev. 951.) Courts and commentators have long struggled with differing approaches to challenging choice-of-law problems.

 The determination whether RLI has a duty to defend under the policy presents two principal issues. The first is whether the policy includes a duty to defend pollution claims. This is a question of contract interpretation. The second is whether the underlying personal injury actions trigger the duty to defend. Each of these questions presents a choice-of-law issue as to whether the law of California or another state governs. Each choice-of-law issue in turn presents the threshold question of which choice-of-law rule properly applies.

 We first will decide that Civil Code section 1646 is the choice-of-law rule that determines the law governing the interpretation of the policy. We then will apply section 1646, conclude that California law governs, and interpret the policy under California law. Such interpretation will require us to conclude that the policy includes a duty to defend pollution claims. Next, we will consider the choice of law with respect to whether the underlying actions trigger the duty to defend. We will hold that California law governs under either section 1646 or the governmental interest analysis. Applying California law, we will conclude that RLI has a duty to defend Frontier and Wainoco in the underlying actions.

 *3. Civil Code Section 1646 Is California's Choice-of-Law Rule that Determines the Law Governing the Interpretation of a Contract*

 Civil Code section 1646 (see fn. 1, *ante* ) [FN4] was first enacted in 1872 based on an identical provision in the Field Code (Field's Draft N.Y. Civ.Code (1865) § 811) and remains unchanged today.

Published opinions by California courts have applied the statute as a choice-of-law rule determining the law governing the interpretation of a contract very infrequently, and those opinions (discussed *post* ) provide little guidance as to the meaning of the critical phrase "indicate a place of performance" (Civ.Code, § 1646).

>        FN4. Code of Civil Procedure section 1857 states, in terms somewhat similar to Civil Code section 1646: "The language of a writing is to be interpreted according to the meaning it bears in the place of its execution, unless the parties have reference to a different place." In light of our conclusion that Civil Code section 1646 determines the law governing the interpretation of a contract and the apparent similarities between the two statutes, we need not decide whether Code of Civil Procedure section 1857 also states a choice-of-law rule or only an interpretive rule concerning usage.

 [1][2][3][4][5] Our fundamental task in construing a statute is to ascertain the legislative intent so as to effectuate the purpose of the law. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715, 3 Cal.Rptr.3d 623, 74 P.3d 726.) Because the statutory language ordinarily is the most reliable indicator of legislative intent, we begin by examining the words of the statute. (*Ibid.*) We give the words of the statute their ordinary and usual meaning **\*826** and construe them in the context of the statute as a whole and the entire scheme of law of which it is a part. (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043, 12 Cal.Rptr.3d 343, 88 P.3d 71.) If the language is clear and a literal construction would not result in absurd consequences that the Legislature did not intend, we presume that the Legislature meant what it said and the plain meaning governs. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737, 21 Cal.Rptr.3d 676, 101 P.3d 563.) If the language is ambiguous, we may consider a variety of extrinsic aids, including the purpose of the statute, legislative history, and public policy. (*Ibid.*)

 Civil Code section 1646, by its express terms, prescribes a choice-of-law rule concerning the interpretation of contracts. It states that a contract is to be interpreted according to the law and usage of the place where it is to be performed, but only if the contract "indicate[s] a place of performance," and is to be interpreted according to the law and usage of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816
Page 9
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
(Cite as: 63 Cal.Rptr.3d 816)

the place where it was made if the contract "does not indicate a place of performance." [FN5] Frontier and Wainoco construe the quoted language to mean that a contract must be interpreted according to the law of the place where it is to be performed if the contract *contemplates* performance in a particular place, while RLI construes the same language to mean that the law of the place where the contract is to be performed governs only if the contract *expressly specifies* a place of performance.

> FN5. Civil Code section 1646 prescribes both a choice-of-law rule concerning the interpretation of contracts and a rule of interpretation regarding word usage. The California Supreme Court has cited section 1646 in several opinions to support the admissibility of evidence of usage for the purpose of interpreting a contract. (*Callahan v. Stanley* (1881) 57 Cal. 476, 479; *Burns v. Sennett & Miller* (1893) 99 Cal. 363, 371- 372, 33 P. 916; *Law v. Northern Assurance Co.* (1913) 165 Cal. 394, 407, 132 P. 590; *Alta Planing Mill Co. v. Garland* (1914) 167 Cal. 179, 183, 138 P. 738; *Buckner v. A. Leon & Co.* (1928) 204 Cal. 225, 227, 267 P. 693; *Alamitos Land Co. v. Shell Oil Co.* (1935) 3 Cal.2d 396, 404, 44 P.2d 573; *Ermolieff v. R.K.O. Radio Pictures* (1942) 19 Cal.2d 543, 550, 122 P.2d 3; *Beneficial Fire & Cas. Ins. Co. v. Kurt Hitke & Co.* (1956) 46 Cal.2d 517, 525-526, 297 P.2d 428.) Those opinions typically cited section 1646 together with other statutes stating that the words of a contract or writing are to be interpreted in accordance with any special meaning intended by the parties (e.g., Civ.Code, §§ 1644, 1645; Code Civ. Proc., § 1861), and did not discuss the meaning of "indicate a place of performance" in section 1646. The California Supreme Court has never cited section 1646 as a choice-of-law rule.

The apparent purpose of Civil Code section 1646 is to determine the choice of law with respect to the interpretation of a contract in accordance with the parties' presumed intention at the time they entered into the contract. This was the explanation given by courts and commentators for the former common law rule on which section 1646 apparently was based. Judge Joseph Story, in his highly regarded treatise on conflict of laws, described an exception to the general rule that the law of the place of making governed the validity and interpretation of a contract: "[W]here the contract is, either expressly or tacitly, to be performed in any other place, there the general rule is in conformity to the presumed intention of the parties that the contract as to its validity, nature, obligation, and interpretation is to be governed by the law of the place of performance." (Story, Conflict of Laws (7th ed. 1872) § 280, p. 325.) Similarly, Kent's Commentaries explained that the law of the place a contract is to be performed should govern because, "The rights of the parties are to be judged of by that law by which they intended, or rather by which *827 they may justly be presumed to have bound themselves. [Citations.]." [FN6] (2 Kent, Commentaries on American Law (12th ed. 1873) p. 622(459) fn. 1.) Numerous contemporary judicial opinions followed this rule based on the parties' presumed intention. (See e.g., *Vanzant, Jones & Co. v. Arnold, Hamilton & Johnson* (1860) 31 Ga. 210; *McDaniel v. Chicago & Northwestern R. Co.* (1868) 24 Iowa 412, *Dyke v. Erie R. Co.* (1871) 45 N.Y. 113, 116-117; *First Nat. Bank of Waverly v. Hall* (1892) 150 Pa. 466, 472-473, 24 A. 665.)

> FN6. The former common law rule described by these commentators was not limited to the choice-of-law issue of *contract interpretation,* as is Civil Code section 1646.

[6][7][8][9] In our view, Civil Code section 1646 was intended to give effect to the parties' presumed intention that the law of the place a contract is to be performed should govern its interpretation. [FN7] The parties' intention as to the place of performance sometimes can be gleaned from the nature of the contract and the surrounding circumstances, even if the contract does not expressly specify a place of performance. This was Story's view. (Story, Conflict of Laws, *supra,* § 280, p. 325 ["where the contract is, *either expressly or tacitly,* to be performed in any other place, ..." (italics added) ]; see also *Pomeroy v. Ainsworth* (N.Y.Sup.1856) 22 Barb. 118, 128 ["If no place of performance is expressly stated, *or implied from the terms of the contract,* the law of the place where it was made will govern" (italics added) ].) [FN8] Moreover, the use of the word "indicate" in section 1646 in lieu of a more restrictive word such as "specify" or "state" suggests that the Legislature intended a less restrictive meaning. Accordingly, we conclude that a contract "indicate[s]" a place of performance within the meaning of section 1646 if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances. The intended place of performance is a question of contract interpretation for the court to

63 Cal.Rptr.3d 816

Page 10

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031

(Cite as: 63 Cal.Rptr.3d 816)

decide, except to the extent the answer may depend on the credibility of extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865, 44 Cal.Rptr. 767, 402 P.2d 839; *American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1245, 37 Cal.Rptr.3d 918.)

FN7. If the parties state their intention in an express choice-of-law clause, California courts ordinarily will enforce the parties' stated intention unless (1) the chosen state has no substantial relationship to the parties or their transaction, and there is no other reasonable basis for the parties' choice, or (2) the chosen state's law is contrary to a fundamental policy of the state whose law otherwise would apply, and the latter state has a materially greater interest in the matter than does the chosen state. (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 464-466, 11 Cal.Rptr.2d 330, 834 P.2d 1148 & fns. 5 & 6.)

FN8. Both of these authorities were among the references cited in the notes to section 811 of the Field's Draft New York Civil Code, which was the source for the identical language in Civil Code section 1646.

4. *Prior California Opinions Offer Little Guidance on the Application of* Civil Code Section 1646 *as a Choice-of-Law Rule*

The California Courts of Appeal have cited Civil Code section 1646 in several opinions involving choice-of-law issues, but those opinions offer little or no meaningful guidance as to the meaning of "indicate a place of performance."

*Blochman etc. Bank v. Ketcham* (1918) 36 Cal.App. 284, 171 P. 1084 (*Blochman* ) was the first opinion by a California court to expressly invoke Civil Code section 1646 as a choice-of-law rule. *Blochman* involved **828 a promissory note executed and delivered in Mexico, with the place of payment left blank. The plaintiff later inserted in the blank a location in California. (*Blochman, supra,* at p. 285, 171 P. 1084.) *Blochman* concluded that the parties intended to allow the holder to designate a place for payment. The court stated that this was the law of California when a blank was left in a note for the holder to fill in, stated that there was nothing in the record to indicate that Mexican law was to the contrary, and therefore presumed that Mexican law was the same. (*Id.* at pp. 286-287, 171 P. 1084.)

Although this discussion concerned the choice of law with respect to the interpretation of the contract, *Blochman* did not cite section 1646 in this context. Instead, *Blochman* cited section 1646 in support of its conclusion that California law, rather than the law of Mexico, governed the validity and enforceability of the note because the note was payable in California. [FN9] (*Id., supra,* at p. 287, 171 P. 1084.) *Blochman* did not discuss whether there was any indication that the contracting parties anticipated that the note would be made payable in California.

FN9. Civil Code section 1646 states that a contract is to be interpreted according to the law and usage of the place it is to be performed if the contract indicates a place of performance, but does not state that the validity and enforceability of a contract are to be determined according to the law of the intended place of performance.

*Blair v. New York Life Ins. Co.* (1940) 40 Cal.App.2d 494, 104 P.2d 1075 (*Blair* ) was an action by an insured for payment of disability insurance benefits. The defendant executed and issued the policy in New York, and delivered it to the insured in the State of Washington. The insured moved to California several years later. The insured received disability benefits in Washington and California before the defendant discontinued the payment of benefits based on the insured's failure to disclose material facts concerning her physical condition. (*Id.* at p. 496, 104 P.2d 1075.) The choice-of-law issue concerned the interpretation of an incontestability clause. (*Id.* at p. 500, 104 P.2d 1075.) *Blair* quoted Civil Code section 1646 and stated that the statute "means that the place where the contract is made is of importance when the contract does not indicate a specific place of performance." (*Blair, supra,* at p. 498, 104 P.2d 1075.) After an intervening discussion, *Blair* stated, "The law of the place of performance of an insurance contract controls as to its legal construction and effect, but that of the place where made governs on all questions of execution and validity (*Flittner v. Equitable Life Assur. Soc.* [ (1916) ] 30 Cal.App. 209 [157 Pac. 630] ), unless the terms of the contract provide otherwise or the circumstances indicate a different intention." [FN10] **829(*Id.* at p. 499, 104 P.2d 1075.) *Blair* did not cite section 1646 with regard to this last quoted statement.

FN10. *Flittner v. Equitable Life Assur. Soc., supra,* 30 Cal.App. 209, 157 P. 630 held that a minor could rescind a life insurance policy

63 Cal.Rptr.3d 816                                                                                          Page 11
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 63 Cal.Rptr.3d 816)**

and recover the premiums paid, applying California law. (*Id.* at pp. 215- 216, 157 P. 630.) The choice-of-law issue was whether the law of California or New York governed the minor's right to rescind the contract. The contract was made in California, and *Flittner* concluded that the contract contemplated performance in New York. (*Id.* at p. 213, 157 P. 630.) *Flittner* stated: "All matters connected with the performance of a contract are regulated by the law of the place where the contract by its terms is to be performed. All matters bearing upon the execution, the *interpretation,* and the validity of contracts including the capacity of the parties to contract, are *determined by the law where the contract is made.* (*Union Nat. Bank v. Chapman,* 169 N.Y. 538, [88 Am. St. Rep. 614, 57 L.R.A. 513, 62 N.E. 672]; *Phoenix Mut. Life Ins. Co. v. Simons,* 52 Mo.App. 357; 2 Wharton on Conflict of Laws, sec. 401; note in *Mayer v. Roche,* 26 L.R.A. (N.S.) 767; *Hauck Clo. Co. v. Sharpe,* 83 Mo.App. 385)." (*Id.* at p. 215, 157 P. 630, italics added.) *Flittner* did not cite *Civil Code section 1646* with respect to the law governing the interpretation of a contract and cited no California authority in support of the quoted statement.

   The terms of the insurance policy in *Blair* provided for payment of premiums at the defendant's home office in New York or to an authorized agent elsewhere. (*Blair, supra,* 40 Cal.App.2d at p. 498, 104 P.2d 1075.) *Blair* concluded, "[u]nder this provision, the contract was to be performed partly in New York and partly in any other place where the premiums were paid or other necessary business could be transacted." (*Id.* at p. 499, 104 P.2d 1075; but see *Flittner v. Equitable Life Assur. Soc., supra,* 30 Cal.App. at p. 213, 157 P. 630, reaching a different conclusion on similar facts.) *Blair* stated that the contract was performed partly in New York and partly in Washington, that the defendant waived the right to apply Washington law by paying benefits to the plaintiff in California, and that the law of California governed because the breach occurred in California. [FN11] (*Id.* at p. 499, 104 P.2d 1075; see also *Braun v. New York Life Ins. Co.* (1941) 46 Cal.App.2d 335, 344-346, 115 P.2d 880 [followed *Blair* and declined to discuss the argument that *Blair* failed to give effect to *Civ.Code, § 1646*].) The holding in *Blair* apparently was based on the stated choice-of-law rule that in the circumstances of that case, liability for breach of contract was governed by

the laws of the state where the breach occurred; the holding apparently was not based on *section 1646*.

>      FN11. *Blair, supra,* 40 Cal.App.2d at page 499, 104 P.2d 1075 stated: "In recognizing California as the place for the payment of benefits by delivery thereof in this state, defendant waived any right to insist that the Washington law governed. The waiver is not one of jurisdiction, but of the right to apply the Washington law to an action tried in California. The intention of the parties, as gathered from attending circumstances, is controlling in determining the place of trial and the governing laws. Liability for the breach of a contract partly performed in one state, and made and partly performed in another, is fixed by the laws of the state wherein the breach occurred. (17 C.J.S., p. 343.) The breach in this case was defendant's refusal to pay further disability income benefits to plaintiff in California."

   *Shippers Dev. Co. v. General Ins. Co.* (1969) 274 Cal.App.2d 661, 79 Cal.Rptr. 388 (*Shippers* ) involved the interpretation of an insurance policy exclusion. (*Id.* at pp. 673-674, 79 Cal.Rptr. 388.) *Shippers* stated that the insurer relied on *Civil Code section 1646,* quoted the statute, and then stated: "The insurer's argument fails to consider the following rule: 'The law of the place of performance of an insurance contract controls as to its legal construction and effect, but that of the place where made governs on all questions of execution and validity [citation], unless the terms of the contract provide otherwise or the circumstances indicate a different intention. In this case, the circumstances do not indicate that in the matter of the interpretation of the contract, the parties intended to be restricted to the laws of the State of Washington, where the contract was consummated by the delivery of the policy.' (*Blair v. New York Life Ins. Co.* (1940) 40 Cal.App.2d 494, 499 [104 P.2d 1075].) It was contemplated that the policy would be effective and might have to be performed outside the State of Washington. The law of this state in interpreting the policy will govern the extent of the coverage with respect to losses occurring within this state. [Citation.]" (*Shippers, supra,* at p. 674, 79 Cal.Rptr. 388, fn. omitted.) Thus, it appears that rather than construe and apply *section 1646, Shippers* followed dicta *\*830* from *Blair.* Although it appears that the dicta may be somewhat consistent with *section 1646* with respect to the law governing contract interpretation, we must construe and apply the statute

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816                                          Page 12
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
(Cite as: 63 Cal.Rptr.3d 816)

rather than a purported rule of law of some other origin.

Some California opinions citing Civil Code section 1646 have concluded that there was no conflict between the laws of the states involved, and therefore have not determined whether the contract indicated a place of performance. (See e.g., *Gitano Group, Inc. v. Kemper Group* (1994) 26 Cal.App.4th 49, 56-57 & fn. 4, 31 Cal.Rptr.2d 271; *International Service Ins. Co. v. Gonzales* (1987) 194 Cal.App.3d 110, 116, 239 Cal.Rptr. 341.) Other opinions have cited section 1646 to support conclusions on choice-of-law issues other than the law governing the interpretation of a contract (e.g., *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995) 38 Cal.App.4th 1532, 1540-1541, 46 Cal.Rptr.2d 33 [statute of limitations]; *Klein v. Superior Court* (1988) 198 Cal.App.3d 894, 902, 244 Cal.Rptr. 226 [formation of an oral contract]; *Henderson v. Superior Court* (1978) 77 Cal.App.3d 583, 592-593, 142 Cal.Rptr. 478 [validity and enforceability of a contract, statute of limitations, statute of frauds, and parol evidence rule]; *Wheeling v. Financial Indem. Co.* (1962) 201 Cal.App.2d 36, 40, 19 Cal.Rptr. 879 [validity of an insurance policy exclusion]; *Bracker v. American Nat. Food* (1955) 133 Cal.App.2d 338, 344, 284 P.2d 163 [measure of contract damages]; *Hardy v. Musicraft Records* (1949) 93 Cal.App.2d 698, 702, 209 P.2d 839 [validity of a stock sale under securities laws]; *Blochman, supra,* 36 Cal.App. at p. 287, 171 P. 1084 [validity of a promissory note] ), without explaining why a statute that by its express terms establishes a choice-of-law rule only as to the interpretation of a contract should determine other choice-of-law issues. These and other California opinions offer little or no analysis of the meaning of "indicate a place of performance" in section 1646. [FN12]

> FN12. *Wheeling v. Financial Indemnity Co., supra,* 201 Cal.App.2d 36, 19 Cal.Rptr. 879 and *In re Grace's Estate* (1948) 88 Cal.App.2d 956, 200 P.2d 189 reflect differing views on the meaning of "indicate a place of performance" (Civ.Code, § 1646). *Wheeling* stated that an automobile liability insurance policy "was made and delivered in California, and did not specify a place of performance," and therefore applied California law to a claim arising from an accident in Virginia. (*Wheeling, supra,* at p. 40, 19 Cal.Rptr. 879.) In contrast, *Grace's Estate* stated that an adoption contract made in both Texas and California "necessarily would be performed wherever the Graces might take the child," and held that the contract was enforceable in California although void in Texas. (*Grace's Estate, supra,* at pp. 962-963, 966, 200 P.2d 189.)

### 5. The Governmental Interest Analysis Does Not Supplant *Civil Code Section 1646* as to the Law Governing the Interpretation of Contracts

[10] The most prevalent modern choice-of-law rule in California is the governmental interest analysis. The governmental interest analysis replaced former common law choice-of-law rules, and is sometimes labeled California's modern choice-of-law rule. Some courts and commentators (discussed *post* ) have inferred or suggested that the judicially developed governmental interest analysis supplants the choice-of-law rule stated in Civil Code section 1646. Our careful review of the governmental interest analysis as developed by the California Supreme Court, however, causes us to conclude that it does not supplant the legislative command of section 1646.

Under the governmental interest analysis, the court first determines whether the \*831 applicable rules of law of the potentially concerned jurisdictions are same or different. If the applicable rules of law are identical, the court may apply California law. If the applicable rules of law differ materially, the court proceeds to the second step, which involves an examination of the interests of each jurisdiction in having its own law applied to the particular dispute. If each jurisdiction has an interest in applying its own law to the issue, there is a "true conflict" and the court must proceed to the third step. In the third step, known as the comparative impairment analysis, the court determines which jurisdiction has a greater interest in the application of its own law to the issue or, conversely, which jurisdiction's interest would be more significantly impaired if its law were not applied. The court must apply the law of the jurisdiction whose interest would be more significantly impaired if its law were not applied. (*Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 107-108, 45 Cal.Rptr.3d 730, 137 P.3d 914 (*Kearney* ); *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 919-920, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (*Washington Mutual* ).)

The California Supreme Court first definitively adopted the governmental interest analysis for use in tort actions in *Reich v. Purcell* (1967) 67 Cal.2d 551,

63 Cal.Rptr.3d 816

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031

**(Cite as: 63 Cal.Rptr.3d 816)**

63 Cal.Rptr. 31, 432 P.2d 727 (*Reich* ), a wrongful death action arising from the collision of two automobiles driven by residents of California and Ohio. [FN13] (*Id.* at p. 552, 63 Cal.Rptr. 31, 432 P.2d 727.) The choice-of-law issue involved the amount of tort damages. A Missouri statute limited the amount of damages in a wrongful death action, while there was no such limitation under the laws of California and Ohio. (*Id.* at pp. 552-553, 63 Cal.Rptr. 31, 432 P.2d 727.) *Reich* rejected the former common law rule that the law of the place of the wrong governed in tort actions. (*Id.* at pp. 553, 555, 63 Cal.Rptr. 31, 432 P.2d 727.) *Reich* stated, "The forum must search to find the proper law to apply based upon the interests of the litigants and the involved states" (*id.* at p. 553, 63 Cal.Rptr. 31, 432 P.2d 727), and stated that the former rigid rule "must be subordinated to the objective of proper choice of law in conflict cases, i.e., to determine the law that most appropriately applies to the issue involved [citation]" (*id.* at p. 555, 63 Cal.Rptr. 31, 432 P.2d 727). *Reich* concluded that California had no interest in applying its law to the benefit of the defendant because California did not limit the amount of damages awardable, and that Missouri had no interest in applying its law limiting damages to the benefit of a defendant who was not a resident of that state as of the date of injury. The court therefore concluded that the law of Ohio governed the amount of damages and that the Missouri limitation on damages did not apply. (*Id.* at pp. 555-556, 63 Cal.Rptr. 31, 432 P.2d 727.)

> FN13. *Bernkrant v. Fowler* (1961) 55 Cal.2d 588, 12 Cal.Rptr. 266, 360 P.2d 906, a precursor to *Reich, supra,* 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727, was an action to cancel a promissory note pursuant to an oral contract. (*Bernkrant, supra,* at pp. 590-591, 12 Cal.Rptr. 266, 360 P.2d 906.) *Bernkrant* concluded that California had no interest in applying its own statute of frauds to a transaction made and performed in Nevada involving the refinancing of a loan secured by land in Nevada, and therefore held that the Nevada statute of frauds governed. (*Id.* at pp. 595-596, 12 Cal.Rptr. 266, 360 P.2d 906.)

The California Supreme Court subsequently applied the governmental interest analysis in several other cases involving questions of tort and contract law. *Travelers Ins. Co. v. Workmen's Comp.App. Bd.* (1967) 68 Cal.2d 7, 64 Cal.Rptr. 440, 434 P.2d 992 was an action for workmen's compensation benefits.

The plaintiff originally *832 entered into an oral employment contract in California, and later was injured in Utah. (*Id.* at pp. 9-11, 64 Cal.Rptr. 440, 434 P.2d 992.) The plaintiff was entitled to benefits under California's workmen's compensation statute only if he was injured while working under an employment contract that was entered into in California. (*Id.* at p. 11, 64 Cal.Rptr. 440, 434 P.2d 992.) The choice-of-law issues concerned the place of formation of the employment contract, whether an employment agency in Colorado acted as the employer's agent for purposes of transmitting an employment offer to the plaintiff, and whether the parties had rescinded the oral contract and formed a new employment contract in Wyoming. (*Ibid.*) *Travelers* decided each of these questions by considering the governmental interests of the states involved, stating, "California has rejected the traditional mechanical solutions to choice-of-law problems and adopted foreign law only when it is appropriate in light of the significant interests in the particular case. [Citations.]" (*Id.* at p. 11, 64 Cal.Rptr. 440, 434 P.2d 992.) *Travelers* concluded that California had a strong interest in applying its own laws to determine whether an injured Californian was entitled to benefits under the workmen's compensation act and that the other states involved had no significant interest in applying their laws to the dispute. (*Id.* at pp. 11- 14, 64 Cal.Rptr. 440, 434 P.2d 992.) The court therefore concluded that California law governed the place-of-contracting, agency, and rescission issues. (*Id.* at p. 14, 64 Cal.Rptr. 440, 434 P.2d 992.)

*Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 was a wrongful death action arising from a collision in California involving three automobiles driven by residents of California and Mexico. (*Id.* at p. 578, 114 Cal.Rptr. 106, 522 P.2d 666.) The choice-of-law issue involved the amount of tort damages. *Hurtado* concluded that Mexico had no interest in the application of its law limiting the amount of damages in a wrongful death action to the benefit of defendants who were not residents of Mexico, so there was no true conflict and the measure of damages of California, as the forum state, should apply. (*Id.* at pp. 580-582, 114 Cal.Rptr. 106, 522 P.2d 666.)

*Bernhard v. Harrah's Club* (1976) 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719 (*Bernhard* ) involved a collision in California between an automobile driven by a California resident and a motorcycle driven by the plaintiff, who was also a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816
Page 14
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 63 Cal.Rptr.3d 816)**

California resident. The automobile driver allegedly was intoxicated after drinking liquor served by the defendant at a gambling casino in Nevada. (*Id.* at pp. 315-316, 128 Cal.Rptr. 215, 546 P.2d 719.) The choice-of-law issue concerned the existence of tort liability. The allegations of the complaint supported negligence liability under California law, but did not support liability under Nevada law. (*Id.* at p. 317, 128 Cal.Rptr. 215, 546 P.2d 719.) *Bernhard* concluded that each state was interested in the application of its own law, so there was a true conflict, and that the true conflict should be resolved by a comparative impairment analysis. (*Id.* at pp. 318-321, 128 Cal.Rptr. 215, 546 P.2d 719.) *Bernhard* concluded that California's interest in preventing the sale of alcoholic beverages to intoxicated persons whose intoxicated state is likely to contribute to injuries in California would be more significantly impaired than would Nevada's interest in protecting its tavern keepers from unlimited liability. (*Id.* at pp. 322- 323, 128 Cal.Rptr. 215, 546 P.2d 719.) The court therefore concluded that California law applied and that the complaint alleged facts sufficient to state a cause of action under California law. (*Id.* at pp. 323, 325, 128 Cal.Rptr. 215, 546 P.2d 719.)

**\*833** *Offshore Rental Co. v. Continental Oil Co.* (1978) 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721 (*Offshore Rental* ) was a negligence action arising from a personal injury suffered by an officer of the plaintiff corporation while on the defendant's premises in Louisiana. The plaintiff sought to recover damages for injuries to its business interests resulting from the loss of the officer's services. (*Id.* at pp. 160-161, 148 Cal.Rptr. 867, 583 P.2d 721.) The choice-of-law issue concerned the existence of tort liability. *Offshore Rental* assumed that California law (Civ.Code, § 49) allowed a cause of action for negligent injury to a business employee, and concluded that Louisiana law did not allow such a cause of action. (*Offshore Rental, supra,* at pp. 162-163, 148 Cal.Rptr. 867, 583 P.2d 721.) *Offshore Rental* noted that no California court had squarely held that the California statute supported such a cause of action, while a Louisiana appellate court nine years earlier had held that Louisiana law did not allow a cause of action by a corporate plaintiff for the loss of services of its officer. (*Id.* at pp. 162, 168, 148 Cal.Rptr. 867, 583 P.2d 721.) *Offshore Rental* characterized the California statute as "unusual and outmoded" and concluded that California's interest in establishing liability under the statute was less strong than Louisiana's interest in the application of its " 'prevalent and progressive' " law. (*Id.* at p. 168, 148

Cal.Rptr. 867, 583 P.2d 721.) The court therefore concluded that Louisiana law applied and that the trial court's dismissal of the cause of action was proper. (*Id.* at pp. 169-170, 148 Cal.Rptr. 867, 583 P.2d 721.)

*Washington Mutual, supra,* 24 Cal.4th 906, 103 Cal.Rptr.2d 320, 15 P.3d 1071 was an action against a home mortgage lender for breach of contract, breach of the implied covenant of good faith and fair dealing, unfair business practices under the unfair competition law (UCL) (Bus. & Prof.Code, § 17200 et seq.), unjust enrichment, and conversion. The deed of trust included a choice-of-law provision stating that the security instrument was governed by federal law and the law of the jurisdiction where the secured property was located. (*Washington Mutual, supra,* at p. 912, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) The trial court certified the action as a nationwide class action without determining which law would apply to the class members. (*Id.* at p. 913, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) The *Washington Mutual* court stated that a consideration of the law applicable to the class members' claims was essential to an informed decision on class certification. (*Id.* at p. 915, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) It also stated that the trial court must apply the analysis set forth in *Nedlloyd Lines B.V. v. Superior Court, supra,* 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148 to determine whether the class causes of action were subject to enforceable choice-of-law agreements. (*Washington Mutual, supra,* at pp. 915-916, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) The court also stated that if the choice-of-law agreements were unenforceable or did not apply to the class causes of action and the party opposing class certification continued to assert that the law of another state applied to nonresident class members, the trial court must apply the governmental interest analysis to determine which state's law to apply. (*Id.* at pp. 918-919, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) Thus, the choice-of-law issues concerned the law governing the plaintiffs' causes of action for breach of contract, breach of the implied covenant, unfair business practices, unjust enrichment, and conversion.

*Washington Mutual, supra,* 24 Cal.4th at page 919, 103 Cal.Rptr.2d 320, 15 P.3d 1071 stated, "California follows a three-step 'governmental interest analysis' to **\*834** address conflict of laws claims and ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement. [Citations.]" After describing the governmental interest analysis, the court concluded, "[t]hese rules apply whether the dispute arises out of contract or

63 Cal.Rptr.3d 816
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 63 Cal.Rptr.3d 816)**

Page 15

tort [citations], and a separate conflict of laws inquiry must be made with respect to each issue in the case [citations]." (*Id.* at p. 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) *Washington Mutual* reversed the judgment by the Court of Appeal with directions to issue a peremptory writ of mandate directing the trial court to vacate its certification order and conduct the choice-of-law analyses described in the opinion. (*Id.* at p. 929, 103 Cal.Rptr.2d 320, 15 P.3d 1071.)

In *Kearney, supra,* 39 Cal.4th 95, 45 Cal.Rptr.3d 730, 137 P.3d 914, clients of the defendant brokerage firm alleged that the defendant had surreptitiously recorded their telephone conversations without their consent in violation of a California statute (Pen.Code, § 632). The plaintiffs, in a class action complaint, alleged violations of the statute and unfair business practices under the UCL. (*Kearney, supra,* at pp. 102-103 & fn. 1, 45 Cal.Rptr.3d 730, 137 P.3d 914.) The choice-of-law issue concerned the law governing those statutory causes of action. The court stated that the allegations of the complaint supported the alleged causes of action under California law, but did not support liability under Georgia law. (*Id.* at pp. 120-122.) *Kearney* concluded that California's interest in protecting individuals in California from the secret recording of their confidential telephone conversations would be more significantly impaired than would Georgia's interest in protecting the right of a business to record telephone conversations for legitimate business reasons. (*Id.* at pp. 124-128, 45 Cal.Rptr.3d 730, 137 P.3d 914.) The court therefore held that California law applied and that the complaint alleged facts sufficient to state a cause of action under California law. (*Id.* at pp. 123, 125, 45 Cal.Rptr.3d 730, 137 P.3d 914.)

Some federal courts have concluded or suggested that the governmental interest analysis has judicially supplanted the choice-of-law rule stated in Civil Code section 1646 or that the state of California law on this point is uncertain. The Ninth Circuit in *Strassberg v. New England Mut. Life Ins. Co.* (9th Cir.1978) 575 F.2d 1262 applied the governmental interest analysis to determine the law governing whether an insurance policy had lapsed due to nonpayment of insurance premiums. *Strassberg* stated, "California conflicts law has developed significantly since the original enactment of California Civil Code § 1646," and "California law moved away from a mechanical choice of law process to employ the 'governmental interest analysis.'" (*Id.* at p. 1263.) Later, in *Arno v. Club Med Inc.* (9th Cir.1994) 22 F.3d 1464, the Ninth Circuit applied the governmental interest analysis to

determine the law governing the existence of an implied-in-fact contract. *Arno* stated that section 1646 would yield the same result and, "[t]here appears to be some difference of opinion as to whether California's choice of law rule for contracts is the governmental interest test ... or the test of Cal.Civ.Code § 1646." [FN14] **\*835**(*Id.* at pp. 1468-1469 & fn. 6.) Although section 1646 states a choice-of-law rule only as to contract interpretation, *Strassberg* and *Arno,* in making these statements, did not distinguish contract interpretation from other choice-of-law issues.

> FN14. See also *Shannon-Vail Five Inc. v. Bunch* (9th Cir.2001) 270 F.3d 1207, 1210-1213 (Nevada law governed the viability of a usury cause of action under either Civil Code section 1646 or the governmental interest analysis), and *Costco Wholesale Corp. v. Liberty Mut. Ins. Co.* (S.D.Cal.2007) 472 F.Supp.2d 1183, 1197-1198, 1207 (Connecticut law governed the scope of an insurance policy exclusion under either section 1646 or the governmental interest analysis). In contrast, *Royal Indemnity Group v. Travelers Indemnity Co.* (N.D.Cal.2005) 2005 WL 2176896, pages 4-5 concluded that the California courts had not abrogated the choice-of-law rule in section 1646.

The Sixth Circuit in *Northland Insurance Co. v. Guardsman Products, Inc.* (6th Cir.1998) 141 F.3d 612 applied the governmental interest analysis to determine the law governing the interpretation of an insurance policy, stating, "the California Supreme Court 'has moved away from the mechanical application of § 1646'" and "'now employs what is commonly termed the 'governmental interest analysis' approach to choice of law questions' [citation]." (*Id.* at p. 616.) Similarly, *Vestrock Partners v. California Energy Co.* (S.D.N.Y. Aug. 26, 1993, No. 92 Civ. 5690) 1993 WL 328912 stated with regard to the governmental interest analysis, "California courts normally employ the choice of law test in contracts cases notwithstanding § 1646." (*Id.* at p. 5; see also Reppy, *Choice of Law Problems Arising when Unmarried Cohabitants Change Domicile* (2002) 55 S.M.U. L.Rev. 273, 292, fn. 90 [stating, "the California Supreme Court's adoption of interest analysis had worked a judicial repeal of the ... choice of law rule in section 1646"].) Again, in making these statements, these authorities did not distinguish contract interpretation from other choice-of-law issues.

63 Cal.Rptr.3d 816                                                                                   Page 16
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
(Cite as: 63 Cal.Rptr.3d 816)

After reviewing all of these authorities, and in light of the fact that our Supreme Court has not addressed this issue, we are unable to conclude that California has "judicially abrogated" the express legislative mandate of Civil Code section 1646 relating to the *interpretation* of contracts. Instead, we hold that the choice-of-law rule in Civil Code section 1646 determines the law governing the interpretation of a contract, notwithstanding the application of the governmental interest analysis to other choice-of-law issues. [FN15] The California Supreme Court has never applied the governmental interest analysis to determine the law governing the interpretation of a contract and has never stated or suggested that section 1646 does not determine the law governing the interpretation of a contract. Broad statements declaring the governmental interest analysis California's choice-of-law rule [FN16] and rejecting traditional choice-of-law rules [FN17] should be viewed in light of the particular choice-of-law issues that were before the court in those cases.

> FN15. Whether this differentiated approach is either wise or desirable is a question best addressed to the Legislature, which has the sole authority to repeal a statute.

> FN16. *Washington Mutual, supra,* 24 Cal.4th at page 919, 103 Cal.Rptr.2d 320, 15 P.3d 1071 ("California follows a three-step 'governmental interest analysis' to address conflict of laws claims and ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement"); *Offshore Rental, supra,* 22 Cal.3d at page 161, 148 Cal.Rptr. 867, 583 P.2d 721 ("Questions of choice of law are determined in California, as plaintiff correctly contends, by the 'governmental interest analysis' rather than by the trial court's 'most significant contacts theory' ").

> FN17. *Travelers Ins., supra,* 68 Cal.2d at p. 11, 64 Cal.Rptr. 440, 434 P.2d 992 ("California has rejected the traditional mechanical solutions to choice-of-law problems and adopted foreign law only when it is appropriate in light of the significant interests in the particular case").

The opinions by the California Courts of Appeal cited by Frontier and Wainoco are not inconsistent with our conclusion that *836 Civil Code section 1646 determines the law governing contract

interpretation notwithstanding the application of the governmental interest analysis to other choice-of-law issues. *Robert McMullan & Son, Inc. v. United States Fid. & Guar. Co.* (1980) 103 Cal.App.3d 198, 162 Cal.Rptr. 720 was a declaratory relief action against a liability insurer. The trial court determined that the insurer had a duty to defend an action against the insured, and the question on appeal was whether the insured was entitled to recover its attorney fees incurred in the declaratory relief action. Applying the governmental interest analysis, the *McMullan* court concluded that the laws of California and the other states involved did not differ on that question and that even if the laws differed, only California had an interest in applying its own laws to the dispute. (*Id.* at pp. 203-206, 162 Cal.Rptr. 720.) The choice-of-law issue concerned the right to recover attorney fees in an action to enforce the insured's rights under the policy and did not involve an issue of contract interpretation.

*Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.* (1993) 14 Cal.App.4th 637, 17 Cal.Rptr.2d 713 (*Stonewall* ) was a declaratory relief action by excess liability insurers against their insured. The trial court concluded that the insurers were not required to indemnify the insured for a punitive damages award because California law, for reasons of public policy, prohibits indemnity for punitive damages. (*Id.* at pp. 640-641, 17 Cal.Rptr.2d 713.) The question on appeal was whether the insurers could be required to indemnify the insured for punitive damages. Applying the governmental interest analysis, the Court of Appeal concluded that the laws of California and Wisconsin differed on that question and that California had a greater interest in applying its own laws to the dispute. (*Id.* at pp. 645, 649, 17 Cal.Rptr.2d 713.) In deciding that California law governed, *Stonewall* placed particular importance on the location of the insured risk. [FN18] (*Id.* at pp. 646-647, 17 Cal.Rptr.2d 713, citing Rest.2d Conflict of Laws, § 193 & com. f.) The choice-of-law issue concerned the existence of a right of indemnity for punitive damages and did not involve an issue of contract interpretation.

> FN18. We cited *Stonewall, supra,* 14 Cal.App.4th 637, 17 Cal.Rptr.2d 713 on this point in *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 514, 78 Cal.Rptr.2d 142 (*Downey Venture* ), and stated, "[a] liability insurance policy issued on a nationwide basis may be construed in accordance with the law of the jurisdiction

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816                                                                                     Page 17
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 63 Cal.Rptr.3d 816)**

in which a particular claim arises. [Citation.] Thus, the same policy language may receive different construction and application in different jurisdictions." We held in *Downey Venture* that Insurance Code section 533 precluded indemnification for malicious prosecution under California law but did not relieve an insurer of the duty to defend a malicious prosecution claim. (*Downey Venture, supra,* at pp. 506, 509, 78 Cal.Rptr.2d 142.) We concluded that despite the bar of indemnification under California law, an express promise to provide coverage for malicious prosecution was not illusory, not only because the insurer was required to defend such claims, but also because a California court could enforce the laws of other states that might not preclude indemnification. (*Id.* at pp. 514-516, 78 Cal.Rptr.2d 142.) Our statement with regard to such a choice-of-law decision by a California court concerned the enforceability of an express contractual promise, rather than contract interpretation.

### 6. The Intended Place of Performance of a Liability Insurance Policy Is the Place of the Insured Risk

[11][12] The liability insurance policy at issue in this case includes both indemnity and defense obligations. An indemnity obligation "entails the payment of money in order to resolve liability. [Citations.]" *837 (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 46, 65 Cal.Rptr.2d 366, 939 P.2d 766 (*Buss* ).) A defense obligation, in contrast, "entails the rendering of a service, viz., the mounting and funding of a defense [citations]." (*Ibid.*) An insurer performs its defense obligation by providing defense services through an attorney. If the insured risk involves operations at one or more fixed locations, as here, a third party complaint against the insured arising from those operations typically is prosecuted in the jurisdiction where the operations are located. The insurer provides defense services in the jurisdiction where the suit is prosecuted. There is little doubt that this was the understanding of the parties at the time they entered into the insurance contract in this case.

The policy provides general liability coverage and specifically refers to claims arising from oil and gas operations at Drill-Site # 1 in Beverly Hills, California. Two policy endorsements name the City of Beverly Hills and the Department of Transportation of the City of Los Angeles as additional insureds "with respect to claims arising out

of ... [¶ ] Oil or Gas Operations" in the City of Beverly Hills, California. In another endorsement, RLI waives its right of recovery against the City of Beverly Hills for certain payments made under the policy with respect to the same specified claims. These three endorsements clearly demonstrate that the parties intended the policy to provide coverage for the insureds' oil and gas operations in Beverly Hills. Accordingly, we conclude that the parties anticipated that a suit arising from those operations in Beverly Hills could be prosecuted in California and that RLI would be obligated to provide a defense in California if the claims were potentially covered under the policy.

We therefore conclude that California was the intended place of performance of the contract with respect to those claims, that the policy thus "indicate[s] a place of performance" within the meaning of Civil Code section 1646 with respect to such claims, and that California law governs the interpretation of the policy. Accordingly, we have no need to apply a governmental interest analysis or give consideration to Texas law with respect to the interpretation of the policy.

### 7. Interpreted Under California Law, the RLI Policy Includes a Duty to Defend Pollution Claims Arising from "Sudden and Accidental" Releases

[13] We interpret an insurance policy under California law using the same rules of interpretation applicable to other contracts. (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115, 90 Cal.Rptr.2d 647, 988 P.2d 568.) "The mutual intention of the contracting parties at the time the contract was formed governs. (Civ.Code, § 1636; *Palmer, supra,* at p. 1115[, 90 Cal.Rptr.2d 647, 988 P.2d 568].) We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. (Civ.Code, § § 1639, 1647.) We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation. (*Id.,* § 1641.) We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. (*Id.,* § 1644.) If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs. (*Id.,* § 1638.)" (*American Alternative Ins. Corp. v. Superior Court, supra,* 135 Cal.App.4th at p. 1245, 37 Cal.Rptr.3d 918.)

63 Cal.Rptr.3d 816                                                          Page 18
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
(Cite as: 63 Cal.Rptr.3d 816)

**\*838** [14][15][16][17] We interpret an insuring clause broadly consistent with the reasonable expectations of the insured. (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648, 3 Cal.Rptr.3d 228, 73 P.3d 1205; *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822, 274 Cal.Rptr. 820, 799 P.2d 1253.) An exclusion from coverage otherwise within the scope of an insuring clause must be clear and unmistakable to be given effect. (*MacKinnon, supra,* at p. 648, 3 Cal.Rptr.3d 228, 73 P.3d 1205.) " 'The exclusionary clause "must be *conspicuous, plain and clear*. [Citation.]" ' " (*Ibid.*) An exception to an exclusion is treated in the same manner as a coverage provision and therefore is interpreted broadly consistent with the insured's reasonable expectations. (*TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27-28, 50 Cal.Rptr.3d 597, 145 P.3d 472.)

[18][19][20][21] An endorsement modifies the basic insuring forms of the policy and is an integral part of the policy. [FN19] (*Adams v. Explorer Ins. Co.* (2003) 107 Cal.App.4th 438, 450-451, 132 Cal.Rptr.2d 24.) "Standing alone, an endorsement means nothing. 'Endorsements on an insurance policy form a part of the insurance contract [citation], and the policy of insurance with the endorsements and riders thereon must be construed together as a whole [citation].' " (*Id.* at p. 451, 132 Cal.Rptr.2d 24.) An endorsement can expand or restrict the coverage otherwise provided by the policy. If there is any conflict between an endorsement and the body of a policy, the endorsement controls, provided that any reduction in coverage reasonably expected under the body of a policy must be " 'conspicuous, plain and clear.' " (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1208, 13 Cal.Rptr.3d 68, 89 P.3d 381.)

> FN19. Moreover, the pollution liability endorsement here expressly states that it "forms a part of the policy to which attached."

[22] The policy here expressly promises both indemnity and a defense. The insuring clause in the commercial general liability coverage form provides coverage for sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by "an 'occurrence,' " and states that RLI has the right and duty to defend any suit seeking those damages. Exclusion f in the same coverage form states that the insurance does not apply to bodily injury or property damage caused by the actual or threatened release of pollutants at premises owned, occupied, or used by the insured. The pollution liability endorsement deletes exclusion f and provides coverage for sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by "a 'pollution incident.' " The endorsement does not mention the duty to defend, does not clearly and unmistakably exclude pollution claims from the duty to defend stated in the body of the policy, and therefore does not exclude pollution claims from the contractual duty to defend.

The insuring clause in the pollution endorsement provides coverage for damages arising from "a 'pollution incident,' " which is defined in relevant part as a "sudden and accidental" release resulting in environmental damage. California courts interpret the phrase "sudden and accidental" when used in this context to mean abrupt in time, unexpected, and unintended. (*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 755, 15 Cal.Rptr.2d 815.)

**\*839** Interpreting the policy under California law, we conclude that RLI promised to defend claims for damages arising from pollution incidents with respect to the oil and gas operations in Beverly Hills notwithstanding that the pollution liability endorsement does not mention a duty to defend.

### 8. The Allegations of the Third Party Complaints Create a Duty to Defend

#### a. The Applicable Choice-of-Law Rule

The fundamental principles under California law regarding whether a duty to defend arises were established in *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 (*Gray*). *Gray* rejected the argument that an insurer had a duty to defend under the policy only if the insured was entitled to indemnity, and held that the duty to defend was independent of and broader than the duty to indemnify. (*Id.* at pp. 274-275, 54 Cal.Rptr. 104, 419 P.2d 168.) *Gray* stated that uncertainties concerning policy interpretation must be resolved in favor of the reasonable expectations of the insured, and that in light of the policy language, the insured reasonably would expect the insurer to defend a suit involving a loss of the nature and kind covered by the policy. (*Ibid.*) *Gray* therefore concluded that an insurer must defend a suit that *potentially* seeks damages covered by the policy. (*Id.* at p. 275, 54 Cal.Rptr. 104, 419 P.2d 168.)

63 Cal.Rptr.3d 816
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 63 Cal.Rptr.3d 816)**

*Gray* seemed to state that these conclusions reflected the court's interpretation of policy provisions, as distinguished from a rule of law imposed on the parties for public policy reasons regardless of their intentions upon entering into the insurance contract. (*Gray, supra,* 65 Cal.2d at p. 274, 54 Cal.Rptr. 104, 419 P.2d 168.) [FN20] This suggests that the fundamental principals discussed above regarding whether a duty to defend arises are rules of law regarding policy interpretation and that Civil Code section 1646 determines the appropriate choice of law governing these issues. On the other hand, it was not necessary for the court in *Gray* to decide whether these rules of law were rules of policy interpretation for purposes of section 1646; these rules could be characterized as public policy choices that do not necessarily reflect the actual or presumed intention of the parties. Moreover, *Gray* stated further that the duty to defend arises whenever the insurer ascertains facts that create a potential for liability under the policy, whether the insurer learns those facts from the complaint, the insured, or other sources, and did not explain that conclusion as a question of policy interpretation or refer to the reasonable expectations of the insured. (*Gray, supra,* at pp. 276-277, 54 Cal.Rptr. 104, 419 P.2d 168.) [FN21] We need not decide whether these **\*840** or other rules regarding the duty to defend are rules of policy interpretation for purposes of section 1646 because our conclusion under either section 1646 or the governmental interest analysis is that California law governs, as we will explain. [FN22]

FN20. *Gray, supra,* 65 Cal.2d at page 274, 54 Cal.Rptr. 104, 419 P.2d 168 stated: "Since we must resolve uncertainties in favor of the insured and *interpret the policy provisions according to the layman's reasonable expectations,* [fn. omitted] and since the effect of the exclusionary clause is neither conspicuous, plain, nor clear, we hold that in the present case the policy provides for an obligation to defend and that such obligation is independent of the indemnification coverage." (Italics added.)

FN21. In *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (*Montrose* ), the Supreme Court made clear that its analysis in *Gray, supra,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 was not limited to policy interpretation: "Because the policy at issue in *Gray* was ambiguous, and could be read either to exclude or to provide for

coverage, we held that ordinary principles of insurance contract interpretation required it be construed in the insured's favor, according to his reasonable expectations. (*Gray, supra,* 65 Cal.2d at pp. 275-276, 54 Cal.Rptr. 104, 419 P.2d 168; [citation].) As a distinct, separate, and alternative basis for our decision, we recognized that the insured is entitled to a defense if the underlying complaint alleges the insured's liability for damages *potentially* covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy. (*Gray, supra,* 65 Cal.2d at pp. 275-276, 54 Cal.Rptr. 104, 419 P.2d 168.) [¶ ] The alternative holding in *Gray, supra,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168, establishes the rule that the insurer must defend in some lawsuits where liability under the policy ultimately fails to materialize; this is one reason why it is often said that the duty to defend is broader than the duty to indemnify. [Citation.]" (*Montrose, supra,* at p. 299, 24 Cal.Rptr.2d 467, 861 P.2d 1153.)

FN22. We explain our conclusion under Civil Code section 1646 that California law governs the interpretation of the policy in section 6, *ante.*

b. *The Applicable Rules of Law of California and Texas Do Not Materially Differ*

[23][24] The first step in the governmental interest analysis is to determine whether the applicable rules of law of the potentially concerned jurisdictions materially differ. (*Washington Mutual, supra,* 24 Cal.4th at p. 919, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) If there is no material difference, there is no choice-of-law problem and the court may proceed to apply California law. (See *id.* at p. 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) The party arguing that foreign law governs has the burden to identify the applicable foreign law, show that it materially differs from California law, and show that the foreign law furthers an interest of the foreign state. (*Id.* at p. 919, 103 Cal.Rptr.2d 320, 15 P.3d 1071; *Bernhard, supra,* 16 Cal.3d at pp. 317-318, 128 Cal.Rptr. 215, 546 P.2d 719.)

[25][26][27][28] A liability insurer has a duty to defend its insured under California law if facts alleged in the complaint, or other facts known to the insurer, potentially could give rise to coverage under

63 Cal.Rptr.3d 816

Page 20

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031

**(Cite as: 63 Cal.Rptr.3d 816)**

the policy. (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 654-655, 31 Cal.Rptr.3d 147, 115 P.3d 460 (*Scottsdale* ); *Gray, supra*, at 65 Cal.2d pp. 275-277, 54 Cal.Rptr. 104, 419 P.2d 168.) The facts need only "raise the possibility" that the insured will be held liable for covered damages. (*Montrose, supra*, 6 Cal.4th at p. 304, 24 Cal.Rptr.2d 467, 861 P.2d 1153.) An insurer has a duty to defend even if the claims against the insured are " 'groundless, false, or fraudulent.' " (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19, 44 Cal.Rptr.2d 370, 900 P.2d 619.) "Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." (*Montrose, supra*, at pp. 299-300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.)

[29][30][31] A duty to defend arises under California law upon the tender to the insurer of a potentially covered claim and continues until the lawsuit is concluded or until the insurer shows that facts extrinsic to the third party complaint conclusively negate the potential for coverage. (*Scottsdale, supra*, 36 Cal.4th at p. 655, 31 Cal.Rptr.3d 147, 115 P.3d 460; *Montrose, supra*, 6 Cal.4th at pp. 298-300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.) If a duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered. (*Buss, supra*, 16 Cal.4th at pp. 48-49, 65 Cal.Rptr.2d 366, 939 P.2d 766.) If a duty to defend has **\*841** arisen by virtue of the existence of a potential for coverage but is later extinguished, it is extinguished prospectively only, and not retroactively. (*Id.* at p. 46, 65 Cal.Rptr.2d 366, 939 P.2d 766.)

[32][33][34][35][36][37][38] A liability insurer has a duty to defend its insured under Texas law if facts alleged in the complaint potentially could give rise to coverage under the policy. (*GuideOne Elite v. Fielder Rd. Baptist Church* (Tex.2006) 197 S.W.3d 305, 310 (*GuideOne* ); *Heyden Newport Chemical Corp. v. Southern Gen. Ins. Co.* (Tex.1965) 387 S.W.2d 22, 26 (*Heyden* ).) "A plaintiff's factual allegations that potentially support a covered claim is all that is needed to invoke the insurer's duty to defend [citation]." (*GuideOne, supra*, at p. 310.) " 'Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. Stated differently, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the

action, such doubt will be resolved in insured's favor.' " (*Heyden, supra*, at p. 26; accord, *Nat. Union Fire v. Merch. Fast Motor Lines* (Tex.1997) 939 S.W.2d 139, 141 (*Nat. Union* ).) Under Texas law, the duty to defend is determined based on the policy terms and the allegations of the complaint, "without regard to the truth or falsity of those allegations" and without regard to extrinsic evidence. (*GuideOne, supra*, at p. 308; see also *Heyden, supra*, at p. 24.) Any doubt as to whether the complaint alleges facts that give rise to a duty to defend must be resolved in favor of the insured. [FN23] (*Allstate Ins. Co. v. Hallman* (Tex.2005) 159 S.W.3d 640, 643; *Heyden, supra*, at p. 26.) If the duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered. (*Warrantech Corp. v. Steadfast Ins. Co.* (Tex.Ct.App.2006) 210 S.W.3d 760, 766; *Nokia, Inc. v. Zurich American Ins. Co.* (Tex.Ct.App.2006) 202 S.W.3d 384, 388.)

> FN23. RLI quotes language from *Nat. Union, supra*, 939 S.W.2d at page 142, stating: "We will not read facts into the pleadings. [Citation.] ... Nor will we look outside the pleadings, or imagine factual scenarios which might trigger coverage." The complaint against the insured in that case alleged that the insured's driver negligently discharged a firearm while driving a truck, killing a passenger in another vehicle. (*Ibid.*) The Texas Supreme Court concluded that the facts alleged in the complaint did not indicate that the death resulted from use of the insured vehicle, as required for coverage under the policy. (*Id.* at p. 142.) The court stated, "the facts alleged in the pleadings do not suggest even a remote causal relationship between the truck's operation and Gonzalez's injury." (*Ibid.*) It was in this context that the court, in the language quoted *ante*, refused to augment the allegations of the complaint in the guise of a liberal construction.

[39] Texas law differs from California law in that under Texas law, facts extrinsic to the complaint cannot give rise to a duty to defend. (*GuideOne, supra*, 197 S.W.3d at p. 308; *Heyden, supra*, 387 S.W.2d at p. 24.) Under California law, in contrast, extrinsic facts known to the insurer give rise to a duty to defend if the facts create a potential for coverage under the policy. (*Scottsdale, supra*, 36 Cal.4th at p. 654, 31 Cal.Rptr.3d 147, 115 P.3d 460; *Gray, supra*, 65 Cal.2d 263, 276-277, 54 Cal.Rptr. 104, 419 P.2d 168.) Because the complaints in the underlying

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816
153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031
**(Cite as: 63 Cal.Rptr.3d 816)**

actions allege facts that create a potential for coverage without regard to extrinsic evidence, as explained *post*, this difference between California law and the law of Texas is not relevant here. Apart from this distinction, the foregoing Texas rules of law do not **\*842** materially differ from California law, and no party has shown that any other Texas rule of law applicable to these facts materially differs from California law. We therefore conclude that the applicable rules of law of California and Texas are substantially identical with respect to a liability insurer's duty to defend; thus, even if the governmental interest analysis was the choice of law rule that we were to use to determine if a duty to defend ever arose, California law would be applied. (*Washington Mutual, supra*, 24 Cal.4th at p. 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071.)

### c. The Third Party Complaints Allege Claims that Are Potentially Covered Under the Policy

[40] The complaints allege that the defendants, including Frontier and Wainoco, conducted oil and gas exploration, production, processing, and storage activities at Drill-Site # 1. They allege that as a result of those operations, hazardous substances were "spilled, emitted, released, [and] discharged" into the environment. They allege further that the operations resulted in "releases, discharges, fugitive emissions, leaks and spills." The complaints allege damage of a nature and kind covered by the policy and do not foreclose the possibility that the damage was caused by a sudden and accidental release, and therefore create a *potential* for coverage under the policy. (*Waller v. Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at p. 19, 44 Cal.Rptr.2d 370, 900 P.2d 619; *Gray, supra*, 65 Cal.2d at pp. 274-275, 54 Cal.Rptr. 104, 419 P.2d 168.) This is sufficient to establish RLI's duty to defend. (*Montrose, supra*, 6 Cal.4th at pp. 299-300, 24 Cal.Rptr.2d 467, 861 P.2d 1153; *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1082- 1083, 17 Cal.Rptr.2d 210, 846 P.2d 792.) RLI potentially could extinguish its defense duty prospectively, but cannot extinguish it retroactively. (*Scottsdale, supra*, 36 Cal.4th at p. 655, 31 Cal.Rptr.3d 147, 115 P.3d 460; *Buss, supra*, 16 Cal.4th at p. 46, 65 Cal.Rptr.2d 366, 939 P.2d 766.) RLI failed to show that facts extrinsic to the third party complaints conclusively negated the potential for coverage before the termination of the underlying actions and therefore failed to extinguish the duty to defend before the termination of those actions. Because RLI failed to establish the absence of a duty to defend, RLI was not entitled to summary judgment against Frontier and Wainoco on that basis.

### 9. *RLI Failed to Establish that Wainoco Is Not an Insured*

The policy declarations identify the named insured as "Wainoco Oil Corporation, et al." [FN24] (Capitalization omitted.) An endorsement referenced on the declarations page and incorporated in the policy lists several additional named insureds, including "Wainoco Oil & Gas Company, and the Northwestern Mutual Life Insurance Co., A Joint Venture" and several "Wainoco Appalachian" partnerships. The commercial general liability coverage form states that if the named insured is a partnership or joint venture, the insured's members and partners "are also insureds, but only with respect to the conduct of [the partnership's or joint venture's] business."

> FN24. Wainoco Oil Corporation was predecessor in interest to Frontier, as stated *ante*, and is to be distinguished from Frontier's wholly-owned subsidiary, Wainoco.

RLI argued in its summary judgment motion against Wainoco and argues again on appeal that Wainoco is not an insured with respect to the underlying actions because the alleged conduct does not pertain to Wainoco's joint venture activities. As the party moving for summary judgment, RLI had the burden to present either evidence **\*843** that negates an element of the cause of action or evidence that Frontier and Wainoco cannot reasonably obtain needed evidence. (*Kahn v. East Side Union High School Dist., supra*, 31 Cal.4th at p. 1003, 4 Cal.Rptr.3d 103, 75 P.3d 30.) RLI cited no evidence in support of its argument that Wainoco is not an insured apart from the policy and the third party complaints. A policy endorsement specifically identifies the Beverly Hills site and supports a reasonable inference that the parties intended the policy to provide coverage for Wainoco's operations at the site. The third party complaints allege that Wainoco conducted oil and gas operations at the Beverly Hills site. Nothing in either the policy or the third party complaints forecloses the possibility that Wainoco's operations at the Beverly Hills site pertained to its joint venture with Northwestern Mutual Life Insurance Co. Absent evidence to compel the conclusion that Wainoco's operations at the site did not pertain to its joint venture business, RLI failed to establish that Wainoco is not an insured.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Cal.Rptr.3d 816

Page 22

153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816, 07 Cal. Daily Op. Serv. 9352, 2007 Daily Journal D.A.R. 12,031

**(Cite as: 63 Cal.Rptr.3d 816)**

### *DISPOSITION*

The judgment is reversed.  The matter is remanded for further proceedings not inconsistent with the views expressed herein.  Frontier and Wainoco are entitled to recover their costs on appeal.

WE CONCUR:  <u>KLEIN</u>, P.J., and <u>KITCHING</u>, J.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

Westlaw.

26 Cal.App.4th 49                                                                 Page 1
26 Cal.App.4th 49, 31 Cal.Rptr.2d 271
(Cite as: 26 Cal.App.4th 49)

▷

GITANO GROUP, INC., et al., Plaintiffs and
Appellants,
v.
KEMPER GROUP et al., Defendants and
Respondents.
No. B073179.

Court of Appeal, Second District, Division 5,
California.

Jun 23, 1994.

SUMMARY

Insureds who were in the apparel business sued their
insurers, claiming that a provision in comprehensive
general liability insurance policies covering
"advertising injury" required the insurers to defend
the insureds from certain patent infringement actions.
The trial court granted the insurers' motion for
summary adjudication of issues, ruling that the
advertising injury provisions did not provide
coverage for patent infringement claims, and that
coverage did not extend to defendants in the patent
infringement actions who were not named insureds.
(Superior Court of Los Angeles County, No.
BC028125, David P. Yaffe, Judge.)

The Court of Appeal affirmed. It held that the trial
court properly applied both California and New York
law, since there was no conflict on the coverage issue
and the parties cited authorities from both states. The
court also held that an advertising injury must have a
causal connection with the insured's advertising
activities for there to be coverage, and that the trial
court correctly found no such causal connection in
this case. Despite a grant of additional time, the
insureds were unable to support their argument that
the patent infringement plaintiffs claimed a separate
harm suffered from the advertising of the infringing
product. Finally, the court held that the insurers had
no duty to defend or indemnify parties who were not
named insureds. (Opinion by Godoy Perez, J., with
Grignon, Acting P. J., and Armstrong, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Conflict of Laws § 5--Contracts--

Comprehensive General Liability Insurance--
Coverage of Advertising Injury--Where State *50
Laws Do Not Conflict.
In an action by insureds against insurers, alleging
failure to defend the insureds from patent
infringement actions, the trial court correctly
determined that it could apply both New York and
California law when ruling on the insurers' motion
for summary adjudication of issues. An insurance
policy is a contract subject to the choice of law
provisions of Civ. Code, § 1646, which requires a
contract made and performed in a foreign state to be
interpreted according to that state's law. In this case,
the contracts were made in New York, and related
activities had occured in four states, of which only
New York and California had reported cases on the
relevant coverage issue. California law could be
applied because there was no conflict, and New York
law could be applied because courts may normally
consider the laws of sister states. Further, the parties
cited the law of both states in the trial court and on
appeal.

[See 1 Witkin, Summary of Cal. Law (9th ed. 1989)
Contracts, § 62.]

(2) Insurance Contracts and Coverage § 79--Risks
Covered by Liability Insurance--Advertising Injury
Clause--Duty to Defend Patent Infringement Actions.
In an action by insureds against insurers, alleging
that a provision in comprehensive general liability
insurance policies covering "advertising injury"
required the insurers to defend the insureds from
patent infringement actions, the trial court properly
granted the insurers summary adjudication on the
coverage issue. Patent infringement is not covered as
a type of advertising injury; an advertising injury
must have a causal connection with the insured's
advertising activities for there to be coverage. In this
case, the trial court correctly found no such causal
connection; despite a grant of additional time, the
insureds were unable to support their argument that
the plaintiffs in the underlying patent actions claimed
a separate harm suffered from the advertising of the
infringing product.

(3) Insurance Contracts and Coverage § 77--
Liability and Indemnity Insurance--Coverage Limited
to Named Insureds.
In an action by insureds against insurers, alleging
that a provision in comprehensive general liability

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Cal.App.4th 49
26 Cal.App.4th 49, 31 Cal.Rptr.2d 271
(Cite as: 26 Cal.App.4th 49)

Page 2

insurance policies covering "advertising injury" required the insurers to defend the insureds from patent infringement actions, the trial court properly ruled on summary adjudication that the insurers had no duty to defend or indemnify defendants in the patent infringment actions who were not named insureds. **51**

COUNSEL

Conkle & Olesten, Mark D. Kremer and William C. Conkle for Plaintiffs and Appellants.

Lewis, D'Amato, Brisbois & Bisgaard, Joseph K. Hegedus, Mary G. Whitaker and Lance A. Selfridge for Defendants and Respondents.

**GODOY PEREZ, J.**

Plaintiffs/appellants the Gitano Group, Inc., et al., (appellants), [FN1] appeal from the judgment entered upon the granting of the motion for summary adjudication of issues made by defendants/respondents the Kemper Group et al., (respondents). [FN2] Appellant had sued respondents and others for, inter alia, breach of contract in that respondents refused to indemnify and defend appellant in some underlying actions for patent infringement. In respondents' motion, they asserted that the underlying actions did not fall within the purview of the contract of insurance, and as to some of the appellants, there was no duty owed because they were not named insureds. The trial court agreed, ruling that plaintiffs in the underlying actions suffered no harm from appellants' use of their patented product in advertising distinct from the harm suffered from appellant's sale of the infringing product.

> FN1 Plaintiffs/appellants are the Gitano Group, Inc., a Delaware corporation and several of its subsidiaries, Bagland, U.S.A., Inc., a New York corporation; Noel Industries, Inc., a Mississippi corporation; the Orit Corporation, a New York corporation; Orit Menswear Company, Inc., a New Jersey corporation, Eva Joia Incorporated, a New York corporation.
>
> FN2 As named in the complaint, defendants/respondents are the Kemper Group, American Manufactures Mutual Insurance Company, American Motorists Insurance Company.

For the reasons set forth below, we affirm the judgment.

Factual and Procedural Background

Appellants manufacture, use and market clothing, including denim jeans. Appellants engage in about $17 million worth of advertising a year, including television, magazine, newspapers, trade shows, posters, point of purchase items, samples, cooperative advertising with retailers, and fashion shows.

Respondents issued three comprehensive general liability policies to appellants. In pertinent part, these policies had identical language and provided: "II. A. The Company will pay ... damages because of ... advertising injury ... and the Company shall have the right and duty to defend **52** any suit against the insured seeking damages on account of such injury even if any of the allegations of the suit are groundless, false or fraudulent." The policies' endorsements defined advertising injury as, "injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan." These policies were in effect during all relevant times.

Respondents issued the subject policies from its offices in New York to an insurance brokerage, representing appellants, Franco & Son, which was also located in New York. Appellants maintained several places of business in New York, and Franco & Son serviced the subject policies from its New York office by acting as an intermediary between appellants and respondents for purposes of communication concerning the policies. Franco & Son accepted some of appellants' premium payments in New York, and New Jersey was the only other state in which appellant made any premium payments.

Appellants were defendants in three underlying patent infringement lawsuits, two of which are relevant to this appeal: Golden Trade S.R.L. v. Jordache Enterprises, Inc. (S.D.N.Y. 1990, No. 90CIV6292 (JMC)) (the *Greater Texas* lawsuit), filed in the federal court in the Southern District of New York; and Ocean Wash, Inc. v. Gitano Group, Inc. (W.D. Tex., 1990, No. 90CA775) (the *Ocean Wash* lawsuit), filed in the federal court for the Western District of Texas. In these suits, plaintiffs were holders of patents, which claimed methods of producing what is commonly called the "acid

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Cal.App.4th 49
26 Cal.App.4th 49, 31 Cal.Rptr.2d 271
**(Cite as: 26 Cal.App.4th 49)**

washed" look. Their respective complaints alleged appellants had committed various forms of patent infringement when they marketed, sold and used certain clothing, produced by the underlying plaintiffs' patented processes.

In pertinent part, the *Greater Texas* lawsuit alleged that appellants "have infringed, are infringing, and inducing others to infringe, and intend to continue infringing and inducing others to infringe the claims of the '213 patent' by using or inducing others to use methods of producing a random faded effect on garments or other cloth products which infringe the '213 patent,' and by making, using or selling products which infringe the claims of the '213 patent.' " The complaint seeks injunctive relief and damages because of appellants' "infringement, inducement of infringement or contributory infringement."

In pertinent part, the *Ocean Wash* lawsuit alleged appellants "infringed one or more claims" of two patents belonging to the underlying plaintiffs, *53 that they duplicated the plaintiffs' patented process, and that they sold products manufactured in violation of the plaintiffs' patented process. The complaint seeks injunctive relief, enjoining appellants from "infringing plaintiffs' patents, and from selling, marketing, or otherwise disposing of any fabric or denim that is treated by the methods and/or compositions claimed in the patents," and damages from appellants "as a consequence of [their] infringement of said patents, [and their] misappropriation of plaintiffs' trade secrets."

Appellants notified respondents of the *Greater Texas* and *Ocean Wash* actions, and respondents refused to defend either suit.

On May 31, 1991, appellants filed their complaint against respondents, alleging causes of action for breach of contract and bad faith and seeking declaratory relief. In sum, appellants alleged the advertising injury provision of its policies covered the claims of *Greater Texas* and *Ocean Wash*.

Respondents answered, denying any duty to defend or indemnify these actions.

Appellants moved for summary adjudication of the issue that respondents had the duty to defend and indemnify the underlying actions. The court denied the motion, ruling that appellants had failed to show, as a matter of law, that the underlying plaintiffs were claiming damages stemming from appellants' advertising of the infringing product.

Respondents then moved for summary adjudication of the issues. Asserting that New York law applied, respondents contended they owed no duty to defend because the underlying lawsuits sought damages for patent infringement, and, pursuant to New York law, patent infringement claims do not constitute advertising injury. They further asserted that their duty to defend, if any, was due only those insureds named as defendants in the underlying lawsuits, i.e., the Gitano Group, Inc.

In opposition, appellants challenged the applicability of New York law, asserting some activities related to the policies had occurred in New Jersey and California, and in any event, there was no conflict between New York and California law. Among other things, appellants represented as an undisputed fact that the underlying lawsuits did seek damages for the use of the infringing product in appellants' advertising. In support appellants cited the declaration of their counsel, Ben Milam, who defended appellants in the underlying lawsuits. Mr. Milam, in turn, referenced answers to interrogatories in the *Greater Texas* suit and the consent judgment entered in the *Ocean *54 Wash* suit, declaring that these documents evinced that the underlying plaintiffs did seek damages for appellants' use of the infringing products in the course of their advertising activities.

On July 17, 1992, a hearing on the motion was held. The court's tentative decision granted respondents' motion as to the applicability of New York law and respondents' duty to defend. The court invited appellants' counsel to address specifically its concern as to whether the underlying plaintiffs could suffer "any damage or why there's any harm from the advertising as opposed to the sale of the infringing product." The court noted that it had looked beyond the complaint and considered the answers to the interrogatories, but that these answers did nothing more than the complaint and failed to address how the underlying plaintiffs were harmed by the advertising. Counsel requested time to depose the appropriate parties to gather the evidence of the underlying plaintiffs' claim for damages based solely on the advertising. The court clarified its concern, stating, "I'm saying that everything that I look at that you've given me to look at about the underlying action shows there is no harm. That's what I am saying." The court granted a 30-day continuance to allow appellants to conduct further discovery.

On August 14, 1992, the continued hearing was held.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Cal.App.4th 49
26 Cal.App.4th 49, 31 Cal.Rptr.2d 271
(Cite as: 26 Cal.App.4th 49)

[FN3] The court's tentative ruling remained the same. Counsel objected to being burdened with having to show the underlying plaintiffs suffered actual harm from the advertising. He argued appellants' only burden was to show a "potential" liability. The court acknowledged that any doubts as to the duty to defend were to be resolved in favor of the insured but further noted, "what I don't think I must permit here is for the insured to simply invent the likelihood or the possibility of such coverage and obtain the carriers' defense when there is no actual basis whatsoever that the insured can show for such coverage, and I don't think that the insured can simply go to the underlying plaintiff **55 who is suing him, whose interests are not adverse to the insured on the question of coverage of the insured ... and simply say to the underlying plaintiff, well, do you contend that you were injured by the advertising; and when the underlying plaintiff says yes, that that's the end of the inquiry."

> FN3 According to respondents' final memorandum in support of its motion, appellants had filed interrogatory answers in the *Greater Texas* suit and the transcript of the deposition testimony of David Henry, counsel for plaintiffs in the *Ocean Wash* suit. The *Greater Texas* documents indicated that plaintiffs "contended that every use by [appellants] of accused garments, including use of such garments in advertising, has been a proximate cause of damages to the plaintiffs." Answer to interrogatory No. 3 stated, "[Appellants] use of accused garments in its advertising violates plaintiffs' exclusive rights under '213' patent to use such garments." In Mr. Henry's deposition, he testified that he could not recall the contentions of the underlying plaintiffs with respect to the damages they were seeking, and that even if he could, he would feel compelled to assert the attorney-client privilege and the attorney work product doctrine in declining to discuss them. Mr. Henry testified generally with respect to his understanding of patent law, as a patent law attorney. When asked if it was his understanding that using the patented product itself in advertising or promoting would constitute an infringement, he replied, "The use, the unlicensed use of a patented article itself, the making of the article itself which is then used in some other context was an infringement, I would certainly consider the use an infringement."

The court granted the bulk of respondents' motion. The court's minute order explained: "Based upon the complaints in the underlying actions, the responses to discovery and the consent judgment rendered therein, and all other evidence concerning those actions submitted by the parties, it is clear that the wrong for which redress is sought in those actions is the sale of faded jeans without license from, or payment of royalties, to the underlying plaintiffs. There is no reason to believe that the 'advertising activities' of the plaintiffs herein, as opposed to the sale of jeans in alleged infringement of the patent, caused any injury to the underlying plaintiffs [or] in any way motivated them to file or maintain the underlying actions. The statements made by the underlying plaintiffs and by their counsel in responses to discovery do not specify or allege any harm suffered by the underlying plaintiffs as the result of advertising activities, separate or apart from the harm suffered by sales of the infringing product. Under New York law the policy issued by defendant does not cover acts of alleged unfair competition arising out of the manufacturing or sale of goods in violation of another's patents rights. *Meyers v. Zurich* (1989) 74 N.Y.2d 298 [546 N.Y.S.2d 818, 545 N.E.2d 1206]. Plaintiffs concede that there is no conflict between New York law and California law on the point, and no California or New Jersey authority is cited that conflicts with *Meyers v. Zurich*. The evidence here is no different from the evidence before the trial court in *Meyers v. Zurich* when it granted summary judgment. *Meyers v. Zurich* has been recently cited by the California Supreme Court in *Bank of the West v. Superior Court* ..., in support of the following: '... according to the Bank, there is coverage if any connection, however remote, exists between the ... advertisements and the ... practices that harmed the [underlying] plaintiffs, even if the advertisements themselves did not cause harm. [¶ ] This argument has not found acceptance in other jurisdictions. Those courts that have addressed the issue in published opinions have rejected coverage claims based upon injuries that did not have a causal connection with the insured's advertising activities.' [¶ ] When this motion originally came on for hearing plaintiffs besought permission to conduct further discovery in an attempt to show that the underlying plaintiffs suffered some articulable harm that was caused by the advertising of faded jeans. Such permission was granted, additional discovery was conducted, and the plaintiffs have been unable to make any showing. In fact, the answers by the underlying plaintiffs to Questions 3 and 8 of the Fourth Set of Interrogatories make it clear that they are unable to articulate any such harm.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Cal.App.4th 49                                                                                                    Page 5
26 Cal.App.4th 49, 31 Cal.Rptr.2d 271
**(Cite as: 26 Cal.App.4th 49)**

[¶ ] Summary Adjudication as to *56 Issues 5 and 6 are granted. A duty to defend cannot arise in favor of an insured who is not a defendant. Until the insured is sued there is nothing to defend."

Standard of Review

"Matters summarily adjudicated utilize the same procedural rules as summary judgment motions. 'Summary judgments look behind the pleadings to determine if the claims or defenses of a party are sham or without any evidence to support the claim.' [Citation.] The proponent of the summary judgment must establish that, based upon the declarations presented [citation] and those matters of which courts can take judicial notice [citations], there are no triable issues of fact.... [¶ ] 'We recognize that summary judgment procedures are viewed as " drastic" [citations]; however, the purpose of a summary judgment is to expedite litigation by avoiding needless trials[] [citation]. If there are no triable issues, summary judgment is appropriate. [Citation.]' " (*Starkman v. Mann Theatres Corp.* (1991) 227 Cal.App.3d 1491, 1495 [278 Cal.Rptr. 543].)

Discussion

*1. Conflict of Laws*

Appellants assert the summary adjudication procedure was the incorrect manner in which to bring the conflict of laws determination to the court's attention and challenges the propriety of applying New York law. Respondents counter that we must apply New York law but in their argument on the substantive issue also rely upon California authority.

We need not determine whether one method is more appropriate than another because the ruling on which law to apply was one which the court necessarily had to make before considering the motion for summary adjudication.

(1) Here, New York, New Jersey, Texas and California are states in which some activities related to the contracts at issue occurred. The contracts were issued by respondents in New York through an insurance brokerage firm also located in New York. [FN4] Some of the premium payments were made in New Jersey; none were paid in California. California is the forum in *57 which the instant lawsuit was filed. The underlying patent infringement lawsuits were filed in New York and Texas. Under these circumstances, the trial court was required to first determine whether the laws of New York, California, New Jersey and Texas are "identical." (*Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 580 [114 Cal.Rptr. 106, 522 P.2d 666].) The court concluded

that there was no conflict, noting that appellants had conceded such. We agree.

> FN4 An insurance policy is a contract. (Ins. Code, § 22.) It is, therefore, subject to the choice of law provisions codified in Civil Code section 1646. In pertinent part, Civil Code section 1646 provides, "[a] contract is to be interpreted according to the law and usage of the place where it is being performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." This section requires a contract made and performed in a foreign state to be interpreted according to the law of that state. (See *Crumley v. Walter M. Ballard Corp.* (1950) 100 Cal.App.2d 698, 702 [224 P.2d 455].)

Federal patent statutes recognize three forms of patent infringement: direct patent infringement; inducing patent infringement; and contributory patent infringement. (35 U.S.C. § 271(a), (b), and (c).) Here, appellants were sued for all three forms of patent infringement in the *Greater Texas* lawsuit, pending in New York; and for direct and contributory infringement in the *Ocean Wash* lawsuit, pending in Texas. Texas and New Jersey have no reported cases interpreting the advertising injury provisions of a comprehensive general liability contract of insurance. Texas and New Jersey laws, therefore, do not conflict with California law.

New York and California each have published cases which discuss this issue. Our discussion below reveals that the holdings of these cases are not in conflict. We conclude, therefore, that the court correctly determined that it could apply both California and New York law-California law because there is no conflict, and New York law because normally we are not precluded from considering the laws of sister states. We further note that the parties cited to New York and California law in the proceedings below and continue to do so on appeal.

*2. The Coverage Issue*
*(a). Applicable law*

(2) *Meyers & Sons v. Zurich American Ins.* (1989) 74 N.Y.2d 298 [546 N.Y.S.2d 818, 545 N.E.2d 1206], *held that a general comprehensive liability policy, with an advertising injury provision identical to the one before us, applies to false or misleading advertising and does not apply to advertising done as part and parcel of patent infringing manufacture and sale.* (*Meyers & Sons Corp. v. Zurich American Ins.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Cal.App.4th 49
26 Cal.App.4th 49, 31 Cal.Rptr.2d 271
(Cite as: 26 Cal.App.4th 49)

*supra,* 546 N.Y.S.2d at pp. 819, 820-821.) In *Meyers, supra,* the plaintiff had asserted the insurer had a duty to defend, pursuant to the policies' advertising injury provision, in a suit brought before the International Trade Commission. The suit alleged plaintiff had engaged in "unlawful manufacture, importation and sale" of the ***58** infringing product and engaged in unfair competition. (*Id.,* at p. 819.) Plaintiff argued that the charge of "unfair competition" required the insurer to provide a defense under the "advertising injury" provisions of the policy. (*Id.,* at p. 820.) The court rejected this argument, holding that the complaint alleged harm arising out of the importation and sale of the infringing product, not injury arising out of the plaintiff's advertising. (*Id.,* at p. 821.) The court also rejected plaintiff's argument that a price list it circulated to its customers constituted advertising, concluding that the price list was solely evidence that plaintiff was selling the infringing product, a necessary element of proof in the complaint. (*Ibid.*)

*National Union Fire Insurance Co. v. Siliconix, Inc.* (N.D.Cal. 1989) 729 F.Supp. 77, supports a conclusion that advertising as an element of patent infringement does not produce a separate harm. In *Siliconix, supra,* the insured was sued for patent infringement and demanded defense by its insurer pursuant to the "advertising injury" provision of his policy. The *Siliconix* court admitted to "having gone back and forth on the issue" and concluded that the insurer had no duty to defend. (*Id.,* at p. 78.) In *Siliconix,* the parties had agreed that mere advertising, without more, could not constitute actionable patent infringement, and the court cited case authority for this proposition. (*Id.,* at p. 79.) Citing 35 United States Code section 71, the court noted that the infringing act would be the making, using or selling of a patented invention. The insured argued that advertising was "part and parcel" of selling, and therefore the selling of an infringing product was an infringement occurring in the course of advertising. (*Ibid.*) The court disagreed, holding that to accept the insured's argument would "lead to the conclusion that any harmful act, if it were advertised in some way, would fall under the grant of coverage merely because it was advertised.... [A] great many acts may fall within the ambit of advertising, extending advertising injury coverage far beyond the reasonable expectations of the insured." (*Id.,* at p. 80.) Thus, the court ruled that patent infringement is not covered as a type of advertising injury. We are in accord with this analysis.

In *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254 [10 Cal.Rptr.2d 538, 833 P.2d 545], our

Supreme Court addressed the scope of the coverage afforded by an "advertising injury" provision identical to the one at issue here. In *Bank of the West,* the insured was sued for, among other things, violations of the Unfair Business Practices Act, [FN5] incorporating violations of the Truth-in-Lending Act. The insured asserted its insurer was required to cover an amount it had paid in settlement, pursuant to its ***59** "advertising injury" provision because the suit was one for unfair competition, within the meaning of that provision. (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1261.) Among other things, the *Bank of the West* court held that the policy term "unfair competition" did not refer to the conduct prohibited by the Unfair Businesses Act. (*Id.,* at pp. 1265-1266.) The court also articulated an independent basis for its decision finding no coverage, i.e. the lack of the requisite connection between "advertising activities" and "advertising injury." (*Id.,* at p. 1274.) The insured had argued that there would be coverage if any connection, however remote, existed between its advertisements and the lending practices that harmed the underlying plaintiffs, even if the advertisements, themselves, did not cause harm. (*Ibid.*) Citing both *Meyers & Sons Corp. v. Zurich American Ins., supra,* and *National Union Fire Ins. Co. v. Siliconix, Inc., supra,* the court rejected the insured's position. The court held that as a "matter of interpretation and a matter of common sense" the context of the comprehensive general liability policy "strongly indicates the requirement of a causal connection." (2 Cal.4th at p. 1276.) The court noted that "Virtually every business that sells a product or service advertises, if only in the sense of making representations to potential customers. If no causal relationship were required between ' advertising activities' and 'advertising injuries,' then 'advertising injury' coverage, alone, would encompass most claims related to the insured's business." (*Id.,* at pp. 1276-1277.) The court, therefore, held that " 'advertising injury' must have a causal connection with the insured's ' advertising activities' before there can be coverage." (*Id.,* at p. 1277; accord, *Iolab Corp. v. Seaboard Sur. Co.* (9th Cir. 1994) 15 F.3d 1500.)

> FN5 The comprehensive general liability policy "advertising injury" provision in *Bank of the West* included injury in the course of advertising activities, arising out of, inter alia, unfair competition. (*Bank of the West, supra,* 2 Cal.4th at p. 1262.)

(b). *The Present Case*

Appellants contend the court erred, as a matter of

26 Cal.App.4th 49
26 Cal.App.4th 49, 31 Cal.Rptr.2d 271
(Cite as: 26 Cal.App.4th 49)

law, when it concluded that respondents had no duty to defend, asserting they presented evidence showing there was a "potential" for liability, and questions of material fact exist as to the issue of whether advertising of a patented product creates a distinct injury from that created by the "normal" patent infringement.

Appellants spend some time asserting they suffered injury from the fact that the complaints in the underlying lawsuits were federal notice pleadings. We reject this contention because the record indicates that the trial court offered appellants ample time to collect and present evidence to support their position, considered all this evidence, and did not limit itself to the four corners of the complaint.

The trial court ruled respondents had no duty to defend because it found no causal connection between the advertising of the patented product and the *60 injury suffered. As noted, the court allowed respondents additional time to conduct discovery to support their contention that the underlying plaintiffs were claiming a separate harm suffered from appellants' advertising of the infringing product. The court could not identify any harm separate from that caused by patent infringement, and we are in accord. The cases cited above leave no doubt that this causal connection is required. (See *Meyers & Sons, supra, 74 N.Y.2d 298; Silonix, supra, 729 F.Supp. 77;* and *Bank of the West, supra, 2 Cal.4th 1251.)*

The operative pleadings of the underlying suit generally plead patent infringement by appellants through various means, with the ultimate harm suffered by the use of the infringing process/product in production and sale of jeans. When appellants deposed counsel of the underlying plaintiffs, Mr. Henry, he was unable and unwilling to disclose what exact damages his clients were claiming, asserting both the attorney-client privilege and work product privilege. As evident in footnote 3, *ante,* Mr. Henry did testify generally as an expert in patent law and explained that his practice was to plead any kind of "use," including advertising, to support a claim of infringement. He noted that the cessation of marketing, which necessarily includes advertising, would be a purpose of the underlying suits.

(3) As the court did below, we conclude this testimony by Mr. Henry did not identify a separate harm suffered from the advertising; instead, it bolstered respondents' position that the harm suffered by the underlying plaintiffs stemmed from appellants' use, in a variety of ways, of the infringing

process/product. As no separate harm from the advertising could be shown and the requisite causal connection is lacking (*Bank of the West, supra, 2 Cal.4th 1251),* the court ruled correctly.

As to those plaintiffs/appellants in this action, who were not named in the underlying complaints, the court also correctly ruled respondents had no duty to defend or indemnify.

Disposition

The judgment is affirmed.

Grignon, Acting P. J., and Armstrong, J., concurred. *61

Cal.App.2.Dist.,1994.

Gitano Group, Inc. v. Kemper Group

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.