# TAB 7

Westlaw.

11 Cal.3d 574

11 Cal.3d 574, 522 P.2d 666, 114 Cal.Rptr. 106

**(Cite as: 11 Cal.3d 574)**

Page 1

▷

MANUEL CID HURTADO, Petitioner,
v.
THE SUPERIOR COURT OF SACRAMENTO
COUNTY, Respondent; MARIA DE JESUS
FLORES DE
HURTADO et al., Real Parties in Interest
**Sac. No. 8005.**

Supreme Court of California

May 31, 1974.

SUMMARY

A California resident named as a defendant in an action in this state for the wrongful death, in this state, of a resident domiciliary of a foreign country, brought by residents of that country, sought a writ of mandate from the Supreme Court directing the trial court to vacate its ruling that the applicable measure of damages was that prescribed by California law without any maximum limitation, rather than that prescribed by the foreign country which limits the amount of recovery in such an action.

The Supreme Court denied the writ. In resolving the conflict of law issue, the court applied the "governmental interests" rule which requires an analysis of the respective interests of the states or countries involved. The court pointed out that a cause of action for wrongful death concerns three distinct aspects, to wit: compensation for survivors, deterrence of conduct, and limitation, or lack thereof, on damages recoverable. It was held that the interest of the foreign country at stake in the present litigation was one aimed at protecting defendants who are residents of that country, and that inasmuch as it was the plaintiffs, not defendants, who were residents of the foreign country, that country had no interest in denying full recovery. Consequently, it was held that the trial court, both as the forum and as an interested state, had correctly looked to its own law. (In Bank. Opinion by Sullivan, J., expressing the unanimous view of the court.) *575

HEADNOTES

Classified to California Digest of Official Reports

(1a, 1b, 1c) Death § 48--Actions for Wrongful

Death--Damages-- Mandamus.
 In the absence of any other adequate remedy, mandamus was appropriate to review a determination of the question of law as to whether the measure of damages applicable in an action for the wrongful death, in California, of a resident and domiciliary of a foreign country was that of California or of that country.

(2a, 2b) Mandamus and Prohibition § 40--To Courts and Court Officers-- When Judicial Action May Be Controlled.
 Mandamus cannot be issued to control a court's discretion, but in unusual cases, the writ will lie where, under the facts, the discretion can be exercised in only one way. The trial court is under a legal duty to apply the proper law and may be directed by mandamus to perform that duty.

(3) Conflict of Laws § 13--Torts--"Governmental Interests" Approach.
 A determination whether the law of the forum or of the place of wrong applies to a particular tort action requires an analysis of the respective interests of the states involved, the objective of which is to determine the law which most appropriately applies to the issue involved. This "governmental interests" approach is applicable not only to situations involving multi-state contacts, but also to those involving a state of the United States vis-a-vis a political entity of a foreign country.

(4a, 4b) Conflict of Laws § 14--Torts--Actions for Wrongful Death-- Limits on Damage Award.
 With respect to the "governmental interests" approach to an apparent choice-of-law matter, the interest of a state in a tort rule limiting damages for wrongful death is to protect defendants from excessive financial burdens or exaggerated claims. Thus, the law of California, rather than that of the foreign country of which decedent had been, and plaintiffs were, residents, governed the matter of damages in an action in a California court against California residents for a wrongful death which occurred in California.

(5) Conflict of Laws § 1--Resolution of Choice-of-Law Problem.
 Where the forum court undertakes to resolve a choice-of-law problem *576 presented by the litigants, it does not choose between foreign law and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 Cal.3d 574                                                                              Page 2
11 Cal.3d 574, 522 P.2d 666, 114 Cal.Rptr. 106
**(Cite as: 11 Cal.3d 574)**

its own law, but selects the appropriate rule of decision for the forum to apply as its law to the case before the court.

(6) Conflict of Laws § 1--Need for Party to Invoke Foreign Law.
 Generally, the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event, he must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one to apply to the case.

(7) Conflict of Laws § 1--Application of Forum's Law.
 Where both California, as the forum state, and a foreign state or country are potentially concerned in a choice-of-law question with respect to an issue in tort and it appears that the foreign state or country has no interest whatsoever in having its own law applied, California, as the forum state, should apply California law.

(8) Death § 12--Actions for Wrongful Death-- Nature of Action Under Code-- State's Interests.
 Insofar as plaintiffs are concerned, the creation of a wrongful death action is directed toward compensating decedent's beneficiaries. As to defendants, however, the state interest is to deter conduct.

(9) Conflict of Laws § 14--Torts--Actions for Wrongful Death--State's Interest in Deterring Conduct.
 With regard to the "governmental interests" approach to an apparent choice-of-law matter, California has a decided interest, under its deterrent policy, in applying its own law to California defendants who allegedly caused a wrongful death within its borders. On the other hand, a state which prescribes a limitation on the damages available in a wrongful death action modifies the sanction by a countervailing concern to protect local defendants against excessive financial burdens for the conduct sought to be deterred.

(10) Conflict of Laws § 14--Torts--Actions for Wrongful Death--State's Interests.
 The aspect of a cause of action for a wrongful death concerned with the compensation for survivors reflects, insofar as plaintiffs are concerned, the state's interest in providing for compensation and in determining distribution of the proceeds. Such interest extends only to local decedents and local beneficiaries. The aspect involving deterrence of

conduct reflects, insofar as defendants are concerned, the *577 state's interest in deterring conduct. This interest extends to all persons present within its borders. The aspect concerned with limitation, or lack thereof, on damages recoverable reflects, insofar as defendants are concerned, the state's interest in protecting resident defendants from excessive financial burdens. In making a choice of law, these three aspects must be carefully separated. The key step in the process is delineating the issue to be decided.

(11) Conflict of Laws § 14--Torts--Actions for Wrongful Death:Death § 51-- Actions for Wrongful Death--Damages--Limitations as to Amount.
 A state's interest in limiting recovery in wrongful death actions is concerned with protecting resident defendants from excessive financial burdens, rather than with compensation of survivors. (Disapproving any language in _Ryan v. Clark Equipment Co._ (1969) 268 Cal.App.2d 679 [74 Cal.Rptr. 329], to the extent that it is inconsistent with the instant opinion.)

[See **Cal.Jur.2d,** Wrongful Death, § 44; **Am.Jur.2d,** Death, § 117.]

(12) Conflict of Laws § 14--Torts--Actions for Wrongful Death:Death § 51-- Actions for Wrongful Death--Damages--Limitation as to Amount.
 With respect to the "governmental interests" approach to an apparent choice-of-law matter, a state's legislation limiting damages in a wrongful death action does not express an overriding state interest in denying its own residents unlimited recovery in such an action.

COUNSEL

Johnson, Greve, Clifford & Diepenbrock, Johnson, Davies, Greve & Clifford, Johnson, Greve & Clifford and Robert Lea for Petitioner.

Leonard G. Ratner as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Alfonso Z. Gonzalez for Real Parties in Interest.

Gerald J. Adler and Crow, Lytle, Schleh & Gilwee as Amici Curiae on behalf of Real Parties in Interest. *578

**SULLIVAN, J.,**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 Cal.3d 574

Page 3

11 Cal.3d 574, 522 P.2d 666, 114 Cal.Rptr. 106

**(Cite as: 11 Cal.3d 574)**

In this proceeding, petitioner Manuel Cid Hurtado seeks a writ of mandate directing respondent superior court to vacate its ruling that the applicable measure of damages in the underlying action for wrongful death was that prescribed by California law without any maximum limitation, rather than that prescribed by the law of Mexico which limits the amount of recovery. We have concluded that the trial court correctly chose the law of California. We deny the writ.

Real parties in interest, the widow and children of Antonio Hurtado (hereafter plaintiffs) commenced against Manuel Hurtado and Jack Rexius (hereafter defendants) the underlying action for damages for wrongful death, arising out of an automobile accident occurring in Sacramento County on January 19, 1969. Plaintiffs' decedent was riding in an automobile owned and operated by his cousin, defendant Manuel Hurtado. Defendant Hurtado's vehicle, while being driven along a two-lane paved road, collided with a pick-up truck, owned and operated by defendant Rexius, which was parked partially on the side of the road and partially on the pavement on which defendant Hurtado was driving. Upon impact, the truck in turn collided with an automobile parked in front of it, owned by Rexius and occupied by his son. Decedent died as a result of the collision.

At all material times plaintiffs were, and now are, residents and domiciliaries of the State of Zacatecas, Mexico. Decedent, at the time of the accident, was also a resident and domiciliary of the same place and was in California temporarily and only as a visitor. All three vehicles involved in the accident were registered in California; Manuel Hurtado, Jack Rexius and the latter's son were all residents of California. Both defendants denied liability.

Defendant Hurtado moved respondent court for a separate trial of the issue whether the measure of damages was to be applied according to the law of California or the law of Mexico. The motion was granted and at the ensuing trial of this issue the court took judicial notice (Evid. Code, § § 452, 453) of the relevant Mexican law prescribing a maximum limitation of damages for wrongful death. [FN1] As a result it was established that **\*579** the maximum amount recoverable under Mexican law would be 24,334 pesos or $1,946.72 at the applicable exchange rate of 12.5 pesos to the dollar. After submission of the issue on briefs, the trial court announced its intended decision (Cal. Rules of Court, rule 232) and filed a memorandum opinion, ruling in substance that it would apply a measure of damages in accordance

with California law and not Mexican law. Defendant Hurtado then sought a writ of mandate in the Court of Appeal to compel the trial court to vacate its ruling and to issue a ruling that Mexico's limitation of damages for wrongful death be applied. The Court of Appeal granted an alternative writ and thereafter issued a peremptory writ of mandate so directing the trial court. We granted a hearing in this court upon the petition of plaintiffs.

> FN1 Section 1889 of the Civil Code of the State of Zacatecas, Mexico, provided that a decedent's survivors may receive a maximum of 25 pesos per day for a period of 730 days. This section expressly makes the Federal Labor Law (of Mexico) applicable in determining the amount of damages recoverable in wrongful death actions. Section 1890 of the Zacatecas Civil Code provides that the court may, in its discretion, award an additional amount, not to exceed one-third of the first amount, as extra indemnity.

(1a) It is clear that mandate is an appropriate remedy to review the proceedings below. (2a) "Although it is well established that mandamus cannot be issued to control a court's discretion, in unusual circumstances the writ will lie where, under the facts, that discretion can be exercised in only one way." (*Babb v. Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379]; *Mannheim v. Superior Court* (1970) 3 Cal.3d 678, 685 [91 Cal.Rptr. 585, 478 P.2d 17]; *Hilmer v. Superior Court* (1934) 220 Cal. 71, 73 [29 P. 175].) (1b) Here the facts have been stipulated to and are not in dispute. The sole issue is a question of law as to which measure of damages should be applied. (2b) The trial court is under a legal duty to apply the proper law and may be directed to perform that duty by writ of mandate. ( *Babb v. Superior Court, supra,* at p. 851; *Mannheim v. Superior Court, supra,* at p. 685). (1c) The absence of another adequate remedy was determined by the Court of Appeal when it granted the alternative writ. ( *Mannheim v. Superior Court, supra,* at p. 686; *County of Sacramento v. Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593].)

(3) In the landmark opinion authored by former Chief Justice Traynor for a unanimous court in *Reich v. Purcell* (1967) 67 Cal.2d 551 [63 Cal.Rptr. 31, 432 P.2d 727] (see Symposium, *Comments on Reich v. Purcell* (1968) 15 U.C.L.A. L.Rev. 551-654), we renounced the prior rule, adhered to by courts for many years, that in tort actions the law of the place of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 Cal.3d 574
11 Cal.3d 574, 522 P.2d 666, 114 Cal.Rptr. 106
**(Cite as: 11 Cal.3d 574)**

the wrong was the applicable law in a California forum regardless of the issues before the court. We adopted in its place a rule requiring an analysis of the respective interests of the states involved (governmental interest approach) the objective of which is "to determine the law that *580 most appropriately applies to the issue involved." ( *Reich v. Purcell, supra,* at p. 554.) [FN2]

> FN2 "The forum must search to find the proper law to apply based upon the interests of the litigants and the involved states." ( *Reich v. Purcell, supra,* 67 Cal.2d at p. 553.) The governmental interests approach is applicable not only to situations involving multistate contacts but also to those involving a state of the United States vis-a-vis a political entity of a foreign country. (*Kasel v. Remington Arms Co.* (1972) 24 Cal.App.3d 711, 731 [101 Cal.Rptr. 314].)

The issue involved in the matter before us is the measure of damages in the underlying action for wrongful death. Two states or governments are implicated. (1) California - the place of the wrong, the place of defendants' domicile and residence, and the forum; and (2) Mexico - the domicile and residence of both plaintiffs and their decedent.

The fact that two states are involved does not in itself indicate that there is a "conflict of laws" or "choice of law" problem. There is obviously no problem where the laws of the two states are identical. (Comment, *False Conflicts,* 55 Cal.L.Rev. 74, 76; Cavers, The Choice of Law Process (1965) pp. 89-90.) Here, however, the laws of California and Mexico are not identical. Mexico limits recovery by the survivors of the decedent in a wrongful death action to 24,334 pesos (see fn. 1, *ante,* and accompanying text). California provides that the heirs of the decedent are entitled to recover such sum, as under all the circumstances of the case, will be just compensation for the pecuniary loss which each heir has suffered by reason of the death of the decedent. (*Bond v. United Railroads* (1911) 159 Cal. 270, 276-279 [113 P. 366]; *Valente v. Sierra Railway Co.* (1910) 158 Cal. 412, 418-419 [111 P. 95]; *Redfield v. Oakland C. S. Ry. Co.* (1895) 110 Cal. 277, 285 [42 P. 822, 1063]; Code Civ. Proc., § 377.)

Although the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied. (Comment, *False Conflicts,* 55 Cal.L.Rev. at p. 77;

Cavers, *op. cit. supra,* pp. 89-90.) "When one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, there is no real problem; clearly the law of the interested state should be applied." (Currie, Selected Essays on Conflicts of Laws (1963) p. 189.) [FN3]

> FN3 "The case of Reich v. Purcell seems the very paradigm of the false conflict, and, apart from its service in aligning California squarely with the states rejecting the vested rights theory, Chief Justice Traynor's opinion should prove invaluable as a methodological exercise in the resolution of the choice-of-law problem by reference to the purposes of the laws involved." (Cavers, *Comments on Reich v. Purcell,* 15 U.C.L.A. L.Rev. 647, fn. omitted.)

(4a) The interest of a state in a tort rule limiting damages for wrongful *581 death is to protect defendants from excessive financial burdens or exaggerated claims. ( *Reich v. Purcell, supra,* at p. 556; Cavers, *op. cit. supra,* at p. 151.) As stated in *Reich* this interest "to avoid the imposition of excessive financial burdens on [defendants] ... is also primarily local." ( *Reich v. Purcell, supra,* at p. 556; Kay, *Comments on Reich v. Purcell,* 15 U.C.L.A. L.Rev. 584, 591-592); that is, a state by enacting a limitation on damages is seeking to protect its residents from the imposition of these excessive financial burdens. Such a policy "does not reflect a preference that widows and orphans should be denied full recovery." (Cavers, *op. cit. supra,* at p. 151.) Since it is the plaintiffs and not the defendants who are the Mexican residents in this case, Mexico has no interest in applying its limitation of damages - Mexico has no defendant residents to protect and has no interest in denying full recovery to its residents injured by non-Mexican defendants.

As the forum, California "can only apply its own law" ( *Reich v. Purcell, supra,* at p. 553). (5) When the forum undertakes to resolve a choice-of-law problem presented to it by the litigants, it does not choose between foreign law and its own law, but selects the appropriate rule of decision for the forum to apply as its law to the case before it. ( *Reich v. Purcell, supra,* at p. 553.) Therefore, when the forum state undertakes its "search to find the proper law to apply based upon the interests of the litigants and the involved states" ( *Reich v. Purcell, supra,* at p. 553), it is understood that "[n]ormally, even in cases involving foreign elements, the court should be expected, as a matter of course, to apply the rule of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 Cal.3d 574

11 Cal.3d 574, 522 P.2d 666, 114 Cal.Rptr. 106

**(Cite as: 11 Cal.3d 574)**

decision found in the law of the forum." (Currie, *op. cit. supra*, at p. 183.) "Only 'when it is suggested that the law of a foreign state should furnish the rule of decision' must the forum determine the governmental policy of its own and the suggested foreign laws, preparatory to assessing whether either or both states have an interest in applying their policy to the case." (Kay, *Comments on Reich v. Purcell*, 15 U.C.L.A. L.Rev. 584, 585.) (6) In short, generally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event he must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it. (Currie, *op. cit. supra*, at pp. 1-76, 177-187; Symposium, *Comments on Reich* v. *Purcell*, 15 U.C.L.A. L.Rev. 551.)

(4b) In the case at bench, California as the forum should apply its own measure of damages for wrongful death, unless Mexico has an interest in having its measure of damages applied. Since, as we have previously explained, Mexico has no interest whatsoever in the application of its limitation *582 of damages rule to the instant case, we conclude that the trial court correctly chose California law.

(7) To recapitulate, we hold that where as here in a California action both this state as the forum and a foreign state (or country) are potentially concerned in a question of choice of law with respect to an issue in tort and it appears that the foreign state (or country) has no interest whatsoever in having its own law applied, California as the forum should apply California law. Since this was done, we deny the writ.

Nevertheless, although our holding disposes of the mandamus proceeding before us, we deem it advisable to consider the argument addressed by defendant to the interest of California in applying its measure of damages for wrongful death. We do this because the argument reflects a serious misreading of *Reich* which apparently has not been confined to the parties before us.

First, defendant contends that California has no interest in applying its measure of damages in this case because *Reich v. Purcell, supra*, 67 Cal.2d 551, determined that the interest of a state in the law governing damages in wrongful death actions is "in determining the distribution of proceeds to the beneficiaries and that interest extends only to local decedents and beneficiaries." ( *Reich, supra*, at p.

556.) Decedent and plaintiffs were residents of Mexico and not "local decedents and beneficiaries" in California. Therefore, so the argument runs, California has *no* interest whatever in how plaintiff survivors, residents of Mexico, should be compensated for the wrongful death of their decedent, also a resident of Mexico, and conversely Mexico *does* have an interest.

Defendant's reading of *Reich* is inaccurate. It confuses two completely independent state interests: (1) the state interest involved in *creating* a cause of action for wrongful death so as to provide *some* recovery; and (2) the state interest involved in *limiting* the *amount* of that recovery. In *Reich* this court carefully separated these two state interests, although it referred to them in the same paragraph. The state interest in creating a cause of action for wrongful death is in "determining the distribution of proceeds to the beneficiaries"; [FN4] the state interest in limiting damage is "to *583 avoid the imposition of excessive financial burdens on them [defendants]." [FN5] (

> FN5 Missouri's limitation on damages expresses an additional concern *for defendants*, however, in that it operates to avoid the imposition of excessive financial burdens on them. That concern is also primarily local." (
>
> FN4 "Wrongful death statutes create causes of action in specified beneficiaries and distribute the proceeds to those beneficiaries. The proceeds in the hands of the beneficiaries are not distributed through the decedent's estate and, therefore, are not subject to the claims of the decedent's creditors and consequently do not provide a fund for local creditors. Accordingly, the interest of a state in a wrongful death action insofar *as plaintiffs* are concerned is in determining the distribution of proceeds to the beneficiaries and that interest extends only to local decedents and beneficiaries." ( *Reich v. Purcell, supra*, at p. 556, italics added.) *Reich v. Purcell, supra*, at p. 556; italics added.) *Reich v. Purcell, supra*, at p. 556.)

In the case at bench, the entire controversy revolves about the choice of an appropriate rule of decision on the issue of the proper *measure* of damages; there is no contention that plaintiffs are not entitled under the applicable rules of decision to *some* recovery in

11 Cal.3d 574

11 Cal.3d 574, 522 P.2d 666, 114 Cal.Rptr. 106
**(Cite as: 11 Cal.3d 574)**

wrongful death. The Mexican rule is a rule limiting damages. Thus, the interest of Mexico at stake is one aimed at protecting resident defendants in wrongful death actions and, as previously explained, is inapplicable to this case, because defendants are not Mexican residents. Mexico's interest in limiting damages is not concerned with providing compensation for decedent's beneficiaries. It is Mexico's interest in creating wrongful death actions which is concerned with distributing proceeds to the beneficiaries and that issue has not been raised in the case at bench.

(8) The creation of wrongful death actions "insofar as plaintiffs are concerned" is directed toward compensating decedent's beneficiaries. (See fn. 4, *ante*.) California does not have this interest in applying its wrongful death statute here because plaintiffs are residents of Mexico. However, the creation of wrongful death actions is not concerned solely with plaintiffs. As to defendants the state interest in creating wrongful death actions is to deter conduct. We made this clear in *Reich*: "Missouri [as the place of wrong] is concerned with conduct within her borders and as to such conduct she has the predominant interest of the states involved." ( *Reich v. Purcell, supra*, at p. 556.) We went on to observe that the predominant interest of the state of the place of the wrong in conduct was not in rules concerning the *limitation* of damages: "Limitations of damages for wrongful death, however, have little or nothing to do with conduct. They are concerned not with how people should behave but with how survivors should be compensated." ( *Reich v. Purcell, supra*, at p. 556.) Since it was not involved in *Reich*, we left implicit in our conclusion the proposition that the predominant interest of the state of the place of the wrong in conduct is in the creation of a cause of action for wrongful death.

It is manifest that one of the primary purposes of a state in creating a cause of action in the heirs for the wrongful death of the decedent is to deter the kind of conduct within its borders which wrongfully takes life. (Seidelson, *The Wrongful Death Action* (1972) 10 Duquesne L.Rev. 525; *584 see generally Cavers, op. cit. supra*, at pp. 139-180; Currie, *op. cit. supra*, at pp. 690-742] Symposium, *Comments on Reich v. Purcell*, 15 U.C.L.A. L.Rev. 551.) It is also abundantly clear that a cause of action for wrongful death without any limitation as to the amount of recoverable damages strengthens the deterrent aspect of the civil sanction: "the sting of unlimited recovery ... more effectively penalize[s] the culpable defendant and deter[s] it and others similarly situated from such

future conduct." (*Seidelson, op. cit. supra*, at p. 528, fn. 12.) Therefore when the defendant is a resident of California and the tortious conduct giving rise to the wrongful death action occurs here, California's deterrent policy of full compensation is clearly advanced by application of its own law. This is precisely the situation in the case at bench. (9) California has a decided interest in applying its own law to California defendants who allegedly caused wrongful death within its borders. On the other hand, a state which prescribes a limitation on the measure of damages modifies the sanction imposed by a countervailing concern to protect local defendants against excessive financial burdens for the conduct sought to be deterred.

(10) It is important, therefore to recognize the three distinct aspects of a cause of action for wrongful death: (1) compensation for survivors, (2) deterrence of conduct and (3) limitation, or lack thereof, upon the damages recoverable. *Reich v. Purcell* recognizes that all three aspects are primarily local in character. The first aspect, insofar as *plaintiffs* are concerned, reflects the state's interest in providing for compensation and in determining the distribution of the proceeds, said interest extending only to local decedents and local beneficiaries (see fn. 4, *ante*); the second, insofar as *defendants* are concerned, reflects the state's interest in deterring conduct, said interest extending to all persons present within its borders; the third, insofar as *defendants* are concerned, reflects the state's interest in protecting resident defendants from excessive financial burdens. In making a choice of law, these three aspects of wrongful death must be carefully separated. The key step in this process is delineating the issue to be decided.

The difficulty and importance of this process is underscored by *Ryan v. Clark Equipment Co.* (1969) 268 Cal.App.2d 679 [74 Cal.Rptr. 329], which defendant erroneously claims to be supportive of his position. In *Ryan*, the plaintiff's decedent was killed in Oregon while operating a front-end loader in the course of his employment by two Oregon corporate employers. At the time of the accident, the decedent, the plaintiff and their children were residents of Oregon. The plaintiff received on behalf of herself and her children a total of $35,000 from the decedent's employers in full settlement of their rights under the Employer's Liability *585 Act of the State of Oregon. Thereafter the plaintiff on behalf of the decedent's heirs brought an action in California against the manufacturer of the front-end loader, a Michigan corporation doing business in California. Oregon law limited recovery for wrongful death to

11 Cal.3d 574

Page 7

11 Cal.3d 574, 522 P.2d 666, 114 Cal.Rptr. 106

**(Cite as: 11 Cal.3d 574)**

$20,000 and further provided that the $35,000 already received must be set-off against any wrongful death recovery. As a consequence, any possible recovery for wrongful death would be extinguished by the set-off. Michigan law, however, imposed no limitation on the measure of damages for wrongful death. The Court of Appeal upheld the choice of Oregon law.

Since the plaintiffs resided in Oregon, that state had an interest in seeing that they received compensation and did not become wards of the state. However, by placing a limitation on this recovery, Oregon had subordinated its interest in compensating resident survivors in amounts in excess of $20,000 to its interest in protecting the financial security of resident defendants by preventing the imposition of excessive burdens. The Oregon plaintiffs, through workmen's compensation, had already been compensated in excess of $20,000. Oregon's interest in their compensation had been fulfilled. The defendant manufacturing corporation, while not incorporated in Oregon, was lawfully doing business there and Oregon had an interest extending to such a resident business entity in applying that state's limitation of damages in order to protect such defendant's financial security.

In *Ryan,* the allegedly tortious conduct was in the manufacture of the loader which had been accomplished in Michigan by a corporation incorporated in that state. Michigan had an interest in applying its rule of compensation without limitation as to amount to all who committed tortious conduct within that state, but particularly to resident defendants, in order to deter such conduct.

Both Oregon and Michigan had an interest in applying their respective wrongful death statutes to the same corporate defendant. Insofar as the defendant did business in Oregon, that state had an interest in protecting the defendant's financial security by limiting damages; insofar as the defendant was a Michigan corporation and allegedly committed tortious conduct in Michigan, that state had an interest in subjecting the defendant to unlimited liability in order to deter such conduct. Thus *Ryan* is a case of true conflict; both states there involved had a legitimate interest in the measure of damages.

The Court of Appeal resolved the conflict by applying the monetary limitations of Oregon law and declared that Oregon's interest "overrides any possible concern of Michigan in the regulation of the

activities of **\*586** manufacturers." (*Ryan v. Clark Equipment Co., supra,* 268 Cal.App.2d 679, 683.)

(11) Without addressing ourselves to the accuracy of this conclusion, we must note that the Court of Appeal incorrectly identified Oregon's interest in applying its limitation of damages in exactly the manner as contended by defendants herein, namely that limitations of damages are concerned with compensation of survivors. The court relied on *Reich v. Purcell, supra,* 67 Cal.2d 551 for that proposition. As hereinabove explained, this court concluded in *Reich* that a state's interest in limiting recovery in wrongful death actions is in protecting resident defendants from excessive financial burdens. Consequently Oregon's interest in limiting the amount of recovery, as opposed to providing some recovery, is directed at resident defendants not resident plaintiffs. To the extent that any language in *Ryan v. Clark Equipment Co., supra,* 268 Cal.App.2d 679 is inconsistent with this opinion it is disapproved.

Defendant's final contention is that California has no interest in extending to out-of-state residents greater rights than are afforded by the state of residence, citing *Ryan v. Clark Equipment Co., supra,* 268 Cal. App.2d 679, 683 and *Howe v. Diversified Builders, Inc.* (1968) 262 Cal.App.2d 741, 745- 746 [69 Cal.Rptr. 56]. Defendant urges seemingly as an absolute choice of law principle that plaintiffs in wrongful death actions are not entitled to recover more than they would have recovered under the law of the state of their residence. (12) In effect defendant argues that the state of plaintiffs' residence has an overriding interest in denying their own residents unlimited recovery.

Limitations of damages express no such state interest. A policy of limiting recovery in wrongful death actions "does not reflect a preference that widows and orphans should be denied full recovery." (Cavers, *op. cit. supra,* at p. 151.) Nor do the cases cited by defendant support his contention. In both *Ryan* and *Howe* the Court of Appeal determined that no other state had a sufficient interest in the case to require or justify the plaintiffs receiving unlimited recovery under the rules of decisions of those states. For example in *Howe* the court stressed that California had no real interest in applying its law, that only Nevada had such an interest, and that accordingly the Nevada plaintiffs suing in California should be bound by the law of Nevada as the only applicable rule of decision.

Because Mexico has no interest in applying its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 Cal.3d 574                                                                                    Page 8
11 Cal.3d 574, 522 P.2d 666, 114 Cal.Rptr. 106
**(Cite as: 11 Cal.3d 574)**

limitation of damages in wrongful death actions to nonresident defendants or in denying full **\*587** recovery to its resident plaintiffs, the trial court both as the forum, and as an interested state, correctly looked to its own law.

 The alternative writ of mandate is discharged and the petition for a peremptory writ is denied.

 Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Clark, J., concurred.

 Petitioner's application for a rehearing was denied July 10, 1974. **\*588**

Cal.,1974.

Hurtado v. Superior Court of Sacramento County

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 8

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 1378025 (E.D.Cal.)
**(Cite as: 2007 WL 1378025 (E.D.Cal.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. California.
MITSUI SUMITOMO INSURANCE COMPANY
OF AMERICA, Plaintiff,
v.
DELICATO VINEYARDS, Defendant.
**No. CIV. S-06-2891 FCD GGH.**

May 10, 2007.
David A. Tartaglio, Musick Peeler and Garrett LLP, Los Angeles, CA, for Plaintiff.

James P. Wagoner, McCormick, Barstow, Sheppard, Wayte and Carruth, Fresno, CA, for Defendant.

*MEMORANDUM AND ORDER*

FRANK C. DAMRELL, JR., United States District Judge.

**\*1** This matter is before the court on defendant Delicato Vineyards' ("Delicato") motion to dismiss for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1), on the basis that there was no actual case or controversy at the time plaintiff Mitsui Sumitomo Insurance Company ("Mitsui") filed its complaint seeking declaratory relief. In the alternative, Delicato requests the court to exercise its discretion under the Declaratory Judgment Act and decline to assert jurisdiction over the matter. Mitsui opposes the motion. For the reasons set forth below, defendant's motion is DENIED. [FN1]

> FN1. Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. E.D. Cal. L.R. 78-230(h).

**BACKGROUND**
Delicato is a wine producer, with its principal place of business located in Manteca, California. (Pl.'s Comp., filed December 22, 2006, ¶ 2). Mitsui is an insurance provider, with its principal place of business located in Warren, New Jersey. (*Id.* at ¶ 1). In 2006, Mitsui issued an insurance policy to Delicato providing coverage for direct physical loss to covered property, including Delicato wine, for a

policy period of July 1, 2006 through July 1, 2007. (*Id.* at ¶¶ 6-8).

In July 2006, a heat wave occurred in the Central Valley region of California. (Def.'s Mot. to Dismiss, filed February 26, 2007, at 2). Delicato stored significant quantities of its wines in two warehouses located in this region, the Klein Brothers warehouse in Stockton and the Sierra Pacific warehouse in Modesto. (Pl.'s Comp. at ¶ 9).

On August 2, 2006, Delicato filed a claim with Mitsui, alleging that it had suffered "[i]nventory spoilage of wine due to weather (heat)," as a result of the July heat wave. (*Id.* at ¶ 12). Mitsui acknowledged receipt of the claim on August 4, and advised Delicato that it reserved its rights pending an investigation into the claim. (*Id.* at ¶ 13). Mitsui then retained A. Dolence & Associates ("Dolence") to adjust the claim, and Thomas G. Eddy & Associates ("Eddy") to inspect and evaluate the wine in question and the circumstances surrounding the claim. (*Id.* at ¶¶ 14, 17).

On October 31, 2006, Dolence forwarded to Delicato a copy of the Eddy report, dated October 19, 2006. (*Id.* at ¶ 19). The report indicated that only a small number of wines suffered damage due to the elevated temperatures in the two warehouses, and that the ambient temperatures inside the warehouses during the July heat wave may not have been substantially higher than the warehouses' typical ambient temperatures. (*Id.* at ¶¶ 20-21).

On November 10, Delicato's counsel wrote to Dolence regarding Delicato's claim. (Declaration of James P. Wagoner in Supp. of Mot. to Dismiss, filed February 26, 2007, Ex. C). In this letter, Delicato insisted that its claim be paid, and that Mitsui's delay in resolving the claim was "outrageous" and had caused substantial economic losses to Delicato. (*Id.*). Counsel also accused Mitsui of "shopping" for coverage counsel who would provide Mitsui with a favorable opinion. (*Id.*).

**\*2** Dolence responded to Delicato by letter dated November 14. (Wagoner Decl., Ex D). Dolence indicated that the matter had been referred to counsel for a coverage opinion; that Mitsui was not "shopping" for coverage counsel, as only one counsel had been retained; and that the delay in resolving the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1378025 (E.D.Cal.)
(Cite as: 2007 WL 1378025 (E.D.Cal.))

claim was not outrageous considering the time needed for Eddy to complete the investigation. (*Id.*).

In a letter dated November 30, Delicato's counsel responded to Dolence, insisting that Mitsui's handling of the Delicato claim was in violation of the California Code of Regulations and that Delicato would report such violations to the State Insurance Commissioner unless Mitsui responded immediately. (Wagoner Decl., Ex. E). Delicato's counsel also reiterated his contention regarding Mitsui's "efforts to 'shop' for coverage counsel." (*Id.*).

In a letter dated December 4, 2006, Mitsui acknowledged its receipt of Delicato's November 30 letter to Dolence. (Wagoner Decl., Ex. F). Mitsui stated it strongly disagreed with Delicato's characterization of its handling of the Delicato claim. (*Id.*). Mitsui also informed Delicato that it was completing its coverage analysis and would inform Delicato of its coverage position within fourteen days. (*Id.*).

Delicato's counsel responded on December 6. (Wagoner Decl., Ex. G). In his response, Delicato's counsel again criticized Mitsui's handling of the Delicato claim and reasserted Delicato's contention that Mitsui was violating state regulations. (*Id.*). The letter states that Delicato "has no confidence that its claim is being handled in good faith, nor any confidence that its claim, which is fully covered, will be honored." (*Id.*).

Mitsui's counsel responded in a letter dated December 8. (Wagoner Decl., Ex. H). After defending its claims handling practices, Mitsui informed Delicato that "there is an issue as to the existence and extent of any damaged wine," as well as an issue as to "whether any loss associated with the allegedly damaged wine falls within the scope of the coverage provided" by the Mitsui policy. (*Id.*).

In a letter dated December 18, 2006, Delicato's counsel responded, again arguing that Mitsui's handling of the claim was severely deficient and in violation of state regulations. (Wagoner Decl., Ex. I). Delicato concluded the letter, stating:

> As to your comments concerning the coverage issues, please be advised that Delicato considers the claim fully covered; and in any event, because of the delays in processing the claim in violation of the Fair Claims and Settlement Practices Regulations, any remotely arguable coverage defenses which Mitsui Sumitomo might have had have now been waived and Mitsui Sumitomo is

> estopped to assert them.
> Delicato therefore demands that its claim be paid in full immediately.
> (*Id.*).

In a letter dated December 19, 2006, Mitsui issued its denial of coverage for the claim, contending that there was no direct physical loss or damage to the vast majority of the Delicato wines stored at the two warehouses. (Pl.'s Comp. at ¶ 24; Wagoner Decl., Ex. J). Additionally, Mitsui cited a policy exclusion for "loss or damage ... caused by or resulting from changes in or extremes of temperature." (Wagoner Decl., Ex. J).

**\*3** On December 22, 2006, three days after it issued its denial of coverage, Mitsui filed the instant action, pursuant to the Declaratory Judgment Act, <u>28 U.S.C. § 2201</u>. Mitsui seeks a declaration that Delicato's claim does not involve, in significant part, "direct physical loss to covered property" and that, to the extent the claim does involve such loss, coverage is precluded by the policy's exclusion for loss resulting from changes in or extremes of temperature. (Pl.'s Comp. at ¶¶ 28, 31-32). The complaint invokes this court's diversity jurisdiction. (*Id.* at ¶ 3).

Delicato acknowledged receipt of the summons and complaint on February 6, 2007. Delicato then filed a state court action in Stanislaus County Superior Court on February 23, 2007. (Wagoner Decl., Ex. K). Delicato's state complaint asserts six causes of action: (1) breach of contract, (2) breach of the duty of good faith and fair dealing, (3) fraud in the inducement, (4) interference with contract and/or prospective business advantage, (5) defamation, and (6) unfair business practices. Mitsui is named as a defendant for all six causes of action. Additionally, Delicato names Dolence and a California insurance brokerage (John Sutak Insurance Brokers, Inc.), two non-diverse parties, for the claims of interference with contract and defamation.

On February 26, 2007, three days after filing its state court action, Delicato filed the instant motion to dismiss Mitsui's declaratory relief complaint on the basis that there was no actual case or controversy at the time Mitsui filed its federal action.

## STANDARD

<u>Federal Rule of Civil Procedure 12(b)(1)</u> allows a party to raise, by motion, a defense that the court lacks "jurisdiction over the subject matter" of a claim. <u>Fed.R.Civ.P. 12(b)(1)</u>. As "the federal courts are courts of limited jurisdiction," the party seeking to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 3
Slip Copy, 2007 WL 1378025 (E.D.Cal.)
(Cite as: 2007 WL 1378025 (E.D.Cal.))

invoke the court's jurisdiction bears the burden of establishing its existence. *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (citations omitted); *Stock West, Inc. v. Confederated Tribes,* 873 F.2d 1221, 1225 (9th Cir.1989).

A motion to dismiss for lack of jurisdiction may attack the allegations in the complaint used to establish jurisdiction as insufficient on their face ("facial attack"), or may attack the existence of subject matter jurisdiction in fact ("factual attack"). *Thornhill Publ'g Co. v. Gen. Tel. & Elec. Corp.,* 594 F.2d 730, 733 (9th Cir.1979); *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). If, as in this case, the motion constitutes a factual attack, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Thornhill,* 594 F.2d at 733 (quoting *Mortensen,* 549 F.2d at 891). In fact, "[w]here a jurisdictional issue is separable from the merits of a case," [FN2] the court "may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary." *Thornhill,* 594 F.2d at 733.

> FN2. The parties do not dispute that the jurisdictional issue raised by defendant is separable from the merits of plaintiff's claims.

## ANALYSIS

**\*4** Delicato contends that this court lacks jurisdiction because this case did not satisfy Article III's case or controversy requirement at the time Mitsui filed its complaint. Alternatively, defendant asks this court to abstain from exercising jurisdiction over the matter pursuant to *Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942), contending that Mitsui's action is "reactive" and that exercising jurisdiction would encourage forum shopping.

## A. Subject Matter Jurisdiction under the Declaratory Judgment Act

The Declaratory Judgment Act provides:
> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such

declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). The Declaratory Judgment Act "was enacted to afford an added remedy to one who is uncertain of his rights and who desires an early adjudication without having to wait until he is sued by his adversary." *Plum Creek Timber Co. Inc. v. Trout Unlimited,* 255 F.Supp.2d 1159, 1164 (D.Idaho 2003) (quoting *Levin Metals Corp. v. Parr-Richmond Terminal Co.,* 799 F.2d 1312, 1315 (9th Cir.1986)).

The Declaratory Judgment Act does not itself confer federal subject matter jurisdiction. *Staacke v. United States Secretary of Labor,* 841 F.2d 278, 280 (9th Cir.1988). As such, there must be an independent basis for such jurisdiction. *Id.* Here, subject matter jurisdiction is properly predicated on diversity of citizenship. *See* 28 U.S.C. § 1332.

A lawsuit seeking federal declaratory relief must first present an actual case or controversy within the meaning of Article III, section 2 of the United States Constitution. *Gov't Employees Ins. Co. v. Dizol,* 133 F.3d 1220, 1222-23 (9th Cir.1998) (en banc) (citations omitted). Declaratory relief may be granted so long as there is "a real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937). In order for there to exist an actual case or controversy under the Declaratory Judgment Act, the plaintiff must assert a real and reasonable apprehension that he will be subject to liability as a result of defendant's actions. *Spokane Indian Tribe v. United States,* 972 F.2d 1090 (9th Cir.1992). However, in the context of insurance coverage cases, the Declaratory Judgment Act does not require that the insured have previously filed an action against the insurer. *Haworth,* 300 U.S. at 240.

Delicato argues that there was no case or controversy at the time Mitsui filed its complaint, as any dispute over the extent of damaged wine or the scope of the policy's coverage "had not yet crystallized into a distinct, definite dispute." Delicato asserts it did not challenge the findings of the Eddy report as to the extent of damage, and that there was no clear dispute as to the policy's scope of coverage. Delicato argues that Mitsui did not even raise the possibility that coverage may be limited by the temperature exclusion until its letter of December 8, 2006, and did

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1378025 (E.D.Cal.)
**(Cite as: 2007 WL 1378025 (E.D.Cal.))**

Page 4

not definitively assert such a defense until its denial issued on December 19. Delicato contends that its response to Mitsui's December 8, 2006 letter "did not directly address the 'changes or extremes in temperature' exclusion alluded to" by Mitsui and did not assert coverage specifically based upon an exception to that exclusion. Delicato further argues that there was no time for Delicato to respond to Mitsui's denial of the claim before Mitsui filed its complaint.

**\*5** In response, Mitsui points to four different letters Delicato's counsel sent to Mitsui and its representatives, in which Delicato repeatedly asserted that its claim should be paid and that Mitsui was estopped from challenging the policy's scope of coverage. The overall nature of the Delicato letters, with Delicato's repeated assertions that Mitsui's handling of the claim violated California's Fair Claims Settlement & Practice Regulations, and threats to commence an action with the State Insurance Commissioner, support Mitsui's reasonable apprehension of litigation. *See, e.g., Chesebrough-Pond's, Inc. v. Faberge, Inc.,* 666 F.2d 393, 397 (9th Cir.1982) (threat of filing an opposition proceeding with the Patent Trademark Office held sufficient to create a real and reasonable apprehension of litigation, even when no lawsuit was threatened); *Freecyclesunnyvale v. Freecycle Network, Inc.,* No. C 06-00324, 2006 WL 870688 (N.D.Cal. Apr.4, 2006) (a real and reasonable apprehension of litigation was created by a letter that "implie[d] a harsh response for failure to cease usage," even though a lawsuit was not threatened).

A specific threat of imminent litigation is not necessary to show that the declaratory relief plaintiff held a real and reasonable apprehension that he would be subject to liability. Delicato's continued assertions that its claim was valid and should immediately be paid in full, and that the policy's coverage included any damage caused by the elevated temperatures in the warehouses was enough to create a real and reasonable apprehension of litigation when Mitsui issued its denial. This question presents a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *See Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941) (finding an actual controversy between an insurance company and an insured where insurance company sought declaratory relief after a third-party filed a state action against the insured). Accordingly, the court finds that Mitsui's

complaint presents an actual case or controversy within the meaning of Article III and the Declaratory Judgment Act.

**B. Discretionary Dismissal**

Alternatively, Delicato requests that the court exercise its discretion under the Declaratory Judgment Act not to hear this action pursuant to the factors cited in *Brillhart v. Excess Ins. Co.,* 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942), and *Government Employee Ins. Co. v. Dizol,* 133 F.3d 1220 (9th Cir.1998). Under *Brillhart* and *Dizol,* even when subject matter jurisdiction exists, the district court may, in the exercise of its discretion, decline to entertain the action. *Dizol,* 133 F.3d at 1223 (noting that the Declaratory Judgment Act is "deliberately cast in terms of permissive, rather than mandatory, authority"). "The Declaratory Judgment Act provides that a court 'may declare the right and other legal relations of any interested party' ... not that it must do so." *MedImmune, Inc. v. Genentech,* --- U.S. ----, ----, 127 S.Ct. 764, 776, 166 L.Ed.2d 604 (2006) (citing 28 U.S.C. § 2201(a)) (emphasis in original). Accordingly, district courts retain "unique and substantial discretion in deciding whether to declare the rights of litigants." *Id.* (citing *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995)).

**\*6** In *Brillhart,* the Supreme Court held that a federal court sitting in diversity, presiding over an action for declaratory relief, may exercise its discretion to dismiss the action where another suit is pending in state court, between the same parties, and presenting the same issues of state law. 316 U.S. at 495. However, the Ninth Circuit has noted that "there is no presumption in favor of abstention in declaratory actions, generally, nor in insurance coverage cases specifically." *Dizol,* 133 F.3d at 1225. A court's decision to abstain from entertaining such a suit must be based on more than "whim or personal disinclination." *Id.*

The Ninth Circuit has concluded that the factors articulated in *Brillhart* remain the "philosophic touchstone for the district court." *Id.* The relevant factors for the district court to consider in deciding whether to abstain from exercising jurisdiction are: (1) avoiding needless determination of state law issues, (2) discouraging forum shopping by declaratory relief plaintiffs, and (3) avoiding duplicative litigation. *Id.* (citing *Continental Cas. Co. v. Robsac Indus.,* 947 F.2d 1367, 1371-73 (9th Cir.1991) (overruled on other grounds by *Dizol,* 133

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 5
Slip Copy, 2007 WL 1378025 (E.D.Cal.)
(Cite as: 2007 WL 1378025 (E.D.Cal.))

F.3d 1220)). If there are parallel state proceedings involving the same issues and parties pending at the time the federal declaratory action is filed, there is a presumption that the entire suit should be heard in state court. *Id.* However, the pendency of a state court action does not, by itself, require a district court to refuse federal declaratory relief. *Id.* Nonetheless, federal courts should generally decline to entertain reactive declaratory actions. *Id.*

**1. Avoiding Needless Decisions of State Law**

Delicato argues against the exercise of jurisdiction over the Mitsui complaint, as "Mitsui's coverage position as well as the factual questions regarding the scope of Delicato's loss can and clearly will be resolved in [the state court] action." (Def.'s Mot. to Dismiss, filed February 26, 2007, at 22). When the sole basis for federal jurisdiction is diversity of citizenship, "the federal interest is at its nadir and the *Brillhart* policy of avoiding unnecessary declarations of state law is especially strong." *Robsac*, 947 F.2d at 1371. However, the instant dispute does not require this court to decide novel questions of state law. To the contrary, the parties' dispute requires the interpretation of the Mitsui policy. While this analysis is governed by state law, the principles of contract interpretation are well settled, and this court is an appropriate forum to adjudicate this matter. *See Dizol*, 133 F.3d at 1225 ("We know of no authority for the proposition that an insurer is barred from invoking diversity jurisdiction to bring a declaratory judgment action against an insured on the issue of coverage.").

**2. Avoiding Forum Shopping**

Delicato urges this court not to exercise jurisdiction over the Mitsui complaint, contending that Mitsui forum-shopped by rushing to file its complaint in this court in order to avoid being named in a non-removable state court action. (Def.'s Mot. at 16). Delicato argues that the Mitsui complaint falls within the type of "reactive" litigation that the Ninth Circuit has cautioned exercising jurisdiction over. *See Robsac*, 947 F.2d 1367.

*7 The Ninth Circuit has explained that a "declaratory judgment action by an insurance company against its insured during the pendency of a non-removable state court action presenting the same issues of state law is an archetype of what we have termed 'reactive' litigation." *Robsac*, 947 F.2d at 1372-73. If there are parallel state proceedings involving the same issues and parties pending at the time the federal declaratory action is filed, there is a presumption that the entire suit should be heard in state court. *Dizol*, 133 F.3d at 1225.

However, while *Dizol* cautions against entertaining reactive declaratory actions, the pendency of a state court action does not require a district court to dismiss a declaratory relief action that was filed before the state court action. The instant case is distinguishable from *Robsac* and other cases cited by Delicato, as those cases involved a federal action filed *after* a state court action was already pending. While *Robsac* court indicated that the federal suit would have been reactive even if it had been filed first, this conclusion was dictum as the federal suit in that case had not been filed first. *See Aetna Casualty & Surety Co. v. Merritt*, 974 F.2d 1196, 1199 (9th Cir.1992) (upholding a district court's decision to assert jurisdiction when there was no state court action pending at the time the federal declaratory relief action was filed).

Just as Delicato argues that a "first-to-file" rule should not be mechanically applied, there is also no requirement that any pending state court action requires dismissal of a first-filed federal action. Delicato argues that the short timeframe between Mitsui's issuance of its denial and its filing of the instant action indicates that Mitsui anticipated that Delicato was about to file a non-removable state court action. However, the court finds no indication within the correspondence between Delicato and Mitsui that a non-removable state court action, naming non-diverse parties, was imminent. While there was a clear dispute between the parties and Mitsui had a reasonable apprehension of litigation, there was no indication that Delicato would be filing a non-removable state court action immediately. The court finds that Mitsui's suit was not "reactive" and that asserting jurisdiction over the suit would not encourage forum shopping in violation of *Brillhart*.

**3. Avoiding Duplicative Litigation**

Delicato argues that this court should not exercise jurisdiction over Mitsui's complaint, "as all the legal issues would be best and most economically determined in the state court action, the forum with the closest connection to this cases." (Def.'s Reply, filed March 26, 2007, at 12). It is true that there may be some overlap between the issues determined by this court and the state court, as the state court may need to determine the validity's of Mitsui's denial in order to determine the validity of Delicato's breach of contract claim. However, the state court action

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1378025 (E.D.Cal.)
**(Cite as: 2007 WL 1378025 (E.D.Cal.))**

involves several causes of action that do not involve a determination of the same issues of policy coverage, such as Delicato's claim for defamation against the non-diverse defendants. Accordingly, this action will not be duplicative of almost all of the issues to be determined in the state court action. [FN3]

> FN3. Delicato's counsel filed a Supplemental Declaration in support of its motion to dismiss on April 23, 2007, indicating that Mitsui filed a cross-complaint against Delicato in the state court action, seeking declaratory relief similar to that sought in the instant case. The court declines to consider this late filing. Even if the court were to consider the existence of a cross-complaint in the state court action, it would not impact the court's analysis of the *Brillhart* factors.

## CONCLUSION

**\*8** Based upon the foregoing analysis, in the totality of the circumstances, the *Brillhart* factors do not weigh in favor of the court's abstention from exercising jurisdiction in this case. There is no evidence that plaintiff has filed this case as "reactive litigation" in an effort to forum shop. Further, while this case involves issues of state law which were subsequently brought in state court by defendant, subsequent state court filings cannot be solely dispositive of the *Brillhart* inquiry as such an analysis would necessitate abstention from jurisdiction in almost all declaratory relief actions brought into this court on the basis of diversity jurisdiction and would encourage forum shopping and "reactive litigation" by parties seeking to litigate their claims in state court. As such, the court will exercise its discretion to assume jurisdiction over the instant declaratory judgment action. Therefore, defendant's motion to dismiss is DENIED.

IT IS SO ORDERED.

Slip Copy, 2007 WL 1378025 (E.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 9

Westlaw.

188 Cal.App.3d 28
188 Cal.App.3d 28, 224 Cal.Rptr. 408
**(Cite as: 188 Cal.App.3d 28)**

▶

Nicolet, Inc. v. Superior Court (Insurance Co. of North America)
Cal.App. 1 Dist.,1986.

Court of Appeal, First District, Division 1, California.
**NICOLET**, INC., Petitioner,
v.
**SUPERIOR COURT** of the State of California, City and County of San Francisco, Respondent,
INSURANCE COMPANY OF NORTH AMERICA, Real Party in Interest.
GAF CORPORATION, Petitioner,
v.
**SUPERIOR COURT** of the State of California, City and County of San Francisco, Respondent,
KEMP AND COMPANIES, Real Parties in Interest.
GAF CORPORATION and GAF Insurance, Ltd., Petitioners,
v.
**SUPERIOR COURT** of the State of California, City and County of San Francisco, Respondent,
INSURANCE COMPANY OF NORTH AMERICA, et al., Real Parties in Interest.
**A030879, A030933 and A030934.**

March 25, 1986.
Review Granted June 24, 1986.

Asbestos manufacturers brought action against insurers which had declined coverage of claims by workers with diseases arising from exposure to asbestos. The San Francisco Superior Court, Ira Brown, Jr., J., entered orders determining that Pennsylvania law and English law governed certain actions on question of punitive damages for bad-faith conduct. Insured manufacturers petitioned for writs of mandate. The Court of Appeal, Newsom, J., consolidated petitions and held that California law, which allows punitive damages where insurer has been guilty of bad faith, applied in actions against Pennsylvania and English insurers.

Writ issued.

**\*409** Paul, Hastings, Janofsky & Walker, Daniel H. Williams, III, Peter K. Rosen, David W. Steuber, Los Angeles, for petitioner Nicolet, Inc.
O'Melveny & Myers, John G. Niles, Robert S. Draper, John F. Daum, Paul G. McNamara, Los Angeles, for real party in interest Insurance Co. of North America.
Paul, Hastings, Janofsky & Walker, David W. Steuber, Grace A. Carter, Martin D. Katz, Keker & Brockett, John W. Keker, Los Angeles, for petitioner GAF Corp.
Hancock, Rothert & Bunshoft, Barry L. Bunshoft, Patrick R. Matthews, Philip R. Matthews, Christina M. Benitez, William J. Baron, San Francisco, for real party in interest Kemp and Companies.

INTRODUCTION AND SUMMARY
NEWSOM, Associate Justice.
By these timely (Code Civ.Proc., § 437c, subd. (*l* )) [N1] petitions for writs of mandate which we consolidate for decision, Nicolet, Inc. and GAF Corporation (hereafter Nicolet and GAF) seek reversal of certain choice of law rulings made by the San Francisco Superior Court. These rulings, made upon real parties' motions for summary adjudication of issues (*Beech Aircraft Corp. v. Superior Court* (1976) 61 Cal.App.3d 501, 514-517, 132 Cal.Rptr. 541) are properly subject to pre-trial review. (*Ibid.;* **\*410**_Hurtado v. Superior Court_ (1974) 11 Cal.3d 574, 579, 114 Cal.Rptr. 106, 522 P.2d 666.)

> FN1. Unless otherwise expressly noted all further statutory references are to the Code of Civil Procedure.

Petitioners are plaintiffs below [FN2] in three of the law suits coordinated (§ 404 and Cal.Rules of Court, rule 1520 et seq.) in San Francisco Superior Court as Judicial Counsel Coordination Proceeding No. 1072. Characterized by one authority as "one of the largest trials in the State's history" (Maher, *Asbestos Extravaganza* (1985) 5 State Bar J. 61) the proceeding generally pits some five plaintiff asbestos manufacturers against 50 insurance companies. At issue are insurance coverage questions, including the so-called trigger-of-coverage issue, which may arise when an asbestos producer has had a number of insurers over the years and now faces claims by workers with diseases arising from exposure to asbestos. "Were the claimants 'injured' while the producer was insured in one period by carrier A, in another period by carrier B, or in yet another period by carrier C?" (*Ibid.*) Asked to respond to such claims, the insurers have regularly declined coverage, whereupon the producer has sued all. The questions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

188 Cal.App.3d 28                                                                    Page 2
188 Cal.App.3d 28, 224 Cal.Rptr. 408
**(Cite as: 188 Cal.App.3d 28)**

common to such suits are: What event triggered coverage and which company was providing insurance when the event triggering coverage occurred?

   FN2. There are three petitions filed with this court which we label for clarity as follows: A030897-hereafter, Nicolet/INA; A030933-hereafter GAF/Kemp; and A030934-hereafter GAF/INA.

   We will also use these same references when referring to various portions of the proceedings below even though in the underlying lawsuits, coordinated as Judicial Counsel Coordination Proceedings No. 1072, there are other defendants. Those other defendants did not bring motions subject to these petitions.

No asbestos victims are parties to these coordinated proceedings. The petitioner manufacturers have generally alleged bad faith in the insurers' refusal to defend and indemnify claims, and seek punitive as well as compensatory damages for such bad faith.

In the underlying proceeding, real parties INA and Kemp brought motions for summary adjudication of issues as follows.

As to the Nicolet/INA and GAF/INA actions, it was claimed that Pennsylvania law applies to the question of the availability of punitive damages, and that that state's law will not permit recovery of such damages against INA. As to the GAF/Kemp action, real party claimed that British law governs, and that it likewise precludes recovery of punitive damages.

The respondent court agreed with the INA and Kemp contentions and ruled accordingly, whereupon these petitions followed.

We initially note the standard of review, as proper to this proceeding:

"Since the validity of a summary judgment is to be determined solely by the sufficiency of the affidavits (*McComsey v. Leaf*, 36 Cal.App.2d 132 [97 P.2d 242]; *Dudum v. City of San Mateo*, 167 Cal.App.2d 593 [334 P.2d 968] ), this court will consider no facts other than those which were before the lower court; '[w]e are limited to the facts shown by the affidavits (*Kimber v. Jones, supra*, 122 Cal.App.2d 914 [265 P.2d 922] ), and are to determine only whether the facts *so shown* give rise to a triable issue (*Coyne v.*

*Krempels, supra*, 36 Cal.2d 257 [223 P.2d 244].)' (Italics added.) (*Dudum v. City of San Mateo*, 167 Cal.App.2d 593, 598 [334 P.2d 968].) Thus any new matter urged upon us cannot be examined; this applies ... to any additional facts 'which might be adduced at a trial' or [plaintiff] claims [it] can prove...." (*Green v. Green* (1963) 215 Cal.App.2d 37, 46, 30 Cal.Rptr. 23; see also *Dixon v. Ford Motor Co.* (1975) 53 Cal.App.3d 499, 507, 125 Cal.Rptr. 872, 877; *Wiler v. Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 627, 157 Cal.Rptr. 248, 250-51; *G. & D. Holland Construction Co. v. City of Marysville* (1970) 12 Cal.App.3d 989, 997, 91 Cal.Rptr. 227.)

The record before us is a voluminous one. Likewise many of the briefs of the parties fail utterly to comply with California Rules of Court rule 15 regarding length **\*411** and citations to the record, and we are deluged with facts and argument never presented to the trial court. We choose nevertheless to address the merits of the petition, given the complexity of the lower court proceedings and the large number of persons who will be affected by its outcome. (*Chambers v. Superior Court* (1981) 121 Cal.App.3d 893, 896-897, 175 Cal.Rptr. 575.) Other reasons favoring our proceeding to decision without further delay appear. Thus, respondent court's order bars a substantial portion of petitioners' cases from being heard on the merits during the coordination proceeding (*Nazaroff v. Superior Court* (1978) 80 Cal.App.3d 553, 557-558, 145 Cal.Rptr. 657); many cases and parties are affected; rights of non-parties are involved, and the question is one of importance to the bench and bar if for no other reason than because of the financial magnitude of the law suit. (*Daly v. Superior Court* (1977) 19 Cal.3d 132, 140, 137 Cal.Rptr. 14, 560 P.2d 1193.)

We wish, however, to emphasize that in reviewing the rulings of the court below we have disregarded factual assertions (and arguments relying on those factual assertions) which were not presented to the trial court.

We turn now to the crucial issue-common to all of the consolidated petitions-of choice of law and the governmental interest analysis which underlies it in California decisional law. First adopted in *Reich v. Purcell* (1967) 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727, the analysis has been most recently applied and explained in *Hurtado v. Superior Court, supra*, 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666, *Bernhard v. Harrah's Club* (1976) 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719, and in *Offshore*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

188 Cal.App.3d 28                                                   Page 3
188 Cal.App.3d 28, 224 Cal.Rptr. 408
(Cite as: 188 Cal.App.3d 28)

*Rental Co. v. Continental Oil Co.* (1978) 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721 (hereafter sometimes *Offshore* ).

According to that analysis, given the choice of law alternatives set out in the consolidated petitions, we first turn to California law, and to that of Pennsylvania or England, in order to determine whether they differ on the question of punitive damages. As we shall assume, *infra*, they do, and thus present a conflict. Nevertheless, " '[a]lthough the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied.... "When one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, there is no real problem; clearly the law of the interested state should be applied." (Currie, Selected Essays on Conflicts of Laws (1963) p. 189.) [Fn. omitted.]' (*Hurtado v. Superior Court, supra,* 11 Cal.3d at p. 580 [114 Cal.Rptr. 106, 522 P.2d 666].)" (See *Offshore Rental Co. v. Continental Oil Co., supra,* 22 Cal.3d at p. 163, 148 Cal.Rptr. 867, 583 P.2d 721.)

"We must therefore examine the governmental policies underlying the ... laws, 'preparatory to assessing whether either or both states have an interest in applying their policy to the case.' (Kay, *Comments on Reich v. Purcell* (1968) 15 UCLA L.Rev. 584, 585.) Only if each of the states involved has a 'legitimate but conflicting interest in applying its own law' will we be confronted with a 'true' conflicts case. (*Bernhard v. Harrah's Club, supra,* 16 Cal.3d at p. 313, 319 [128 Cal.Rptr. 215, 546 P.2d 719].)" (*Offshore, supra,* 22 Cal.3d at p. 163, 148 Cal.Rptr. 867, 583 P.2d 721.)

According to high authority, when a true conflict is discovered, the forum state, before simply applying its own law should reexamine its policy to determine if a more restrained interpretation is more appropriate. " '[T]o assert a conflict between the interests of the forum and the foreign state is a serious matter; the mere fact that a suggested broad conception of a local interest will create conflict with that of a foreign state is a sound reason why the conception should be reexamined, with a view to a more moderate and restrained interpretation both of the policy and of the circumstances in which it must be applied to effectuate the forum's legitimate purpose.... An analysis of this kind ... was **\*412** brilliantly performed by Justice Traynor in *Bernkrant v. Fowler* (1961) 55 Cal.2d 588 [12 Cal.Rptr. 266,

360 P.2d 906].' (Currie, *The Disinterested Third State* (1963) 28 Law & Contemp. Prob., pp. 754, 757; see also Sedler in *Symposium, Conflict of Laws Round Table, supra,* 49 Texas L.Rev. 211, at pp. 224-225.) This process of reexamination requires identification of a 'real interest as opposed to a hypothetical interest' on the part of the forum (Sedler, *Value of Principled Preferences,* 49 Texas L.Rev. 224) and can be approached under principles of 'comparative impairment.' (Baxter, *Choice of Law and the Federal System, supra,* 16 Stan.L.Rev. 1-22; Horowitz, *The Law of Choice of Law in California-A Restatement, supra,* 21 UCLA L.Rev. 719, 748-758.)" (*Bernhard v. Harrah's Club, supra,* 16 Cal.3d at p. 320, 128 Cal.Rptr. 215, 546 P.2d 719.)

And, as our high court has explained in *Offshore, supra,* " 'Once [a] preliminary analysis has identified a true conflict of the governmental interests involved as applied to the parties under the particular circumstances of the case, the "comparative impairment" approach to the resolution of such conflict seeks to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state. This analysis proceeds on the principle that true conflicts should be resolved by applying the law of the state whose interest would be the more impaired if its law were not applied.' (Citation.)

"As Professor Horowitz has explained, this analysis does not involve the court in 'weighing' the conflicting governmental interests 'in the sense of determining which conflicting law manifest[s] the "better" or the "worthier" social policy of the specific issue. An attempted balancing of conflicting state policies in that sense ... is difficult to justify in the context of a federal system in which, within constitutional limits, states are empowered to mold their policies as they wish.' (Fn. omitted.) (Horowitz, *The Law of Choice of Law in California-A Restatement* (1974) 21 UCLA L.Rev. 719, 753.)

"Rather, the resolution of true conflict cases may be described as 'essentially a process of allocating respective spheres of lawmaking influence.' (Baxter, *Choice of Law and the Federal System* (1963) 16 Stan.L.Rev. 1, 11-12." (*Offshore Rental Co. v. Continental Oil Co., supra,* 22 Cal.3d 157, at pp. 164-165, 148 Cal.Rptr. 867, 583 P.2d 721.) [FN3]

FN3. One commentator finds *Offshore, supra,* to skip entirely Professor Currie's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

step of reexamination, and to find that both *Offshore* and *Bernhard v. Harrah's Club* wrongly grasp *Baxter's* comparative impairment analysis, overlaying it on a governmental interest analysis. The former was meant, it is argued, to be used only with an over-arching standard provided by its presence as part of federal common-not state-law. (Kay, The Use of Comparative Impairment to Resolve True Conflicts: An Evaluation of the California Experience, (1980) 68 Cal.L.Rev. 577, 579-582.) Whatever the merits of that thesis, we are bound (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 452, 20 Cal.Rptr. 321, 369 P.2d 937) by the analysis set forth in *Offshore, supra.*

We recognize that our Supreme Court has still more recently dealt with the election of one of conflicting substantive laws in *Wong v. Tenneco, Inc.* (1985) 39 Cal.3d 126, 216 Cal.Rptr. 412, 702 P.2d 570. Since the majority declined to address the issues therein within the conflicts analysis framework, but instead found that analysis inapplicable labeling the question one of "comity," we do not read the case as modifying the analysis applied in *Offshore, supra,* and its predecessors.

We are directed by our high court's decision in *Offshore, supra,* and related authority to consider several factors in determining the proper allocation of legal spheres of influence when attempting to resolve a true conflict of laws. These are, first, that wherever possible, we are to determine whether the policy underlying state law was more strongly held in the past than now. (*Offshore, supra,* 22 Cal.3d 157, at p. 165, 148 Cal.Rptr. 867, 583 P.2d 721.) Next, we are to consider whether " 'one of the competing laws is archaic and isolated in the context of the laws of the federal union, [and if it is] it may not unreasonably have to yield to the more prevelant and progressive law, other **413** factors of choice being roughly equal.' (Freund, *Chief Justice Stone and The Conflict of Laws* (1946) 59 Harv.L.Rev. 1210, 1216)" (*Offshore, supra,* at p. 165, 148 Cal.Rptr. 867, 583 P.2d 721, italics omitted.) We are also to consider whether the law is infrequently enforced or interpreted even within its own state. (*Id.,* at p. 166, 148 Cal.Rptr. 867, 583 P.2d 721.) Finally, deference must be paid to the " 'maximum attainment of underlying purpose by all governmental entities.' This necessitates identifying the focal point of concern of the contending lawmaking groups and

ascertaining the *comparative pertinence* of that concern to the immediate case.' (Italics added.) (Baxter, *Choice of Law, supra,* 16 Stan.L.Rev. 1, 12.) The policy underlying a statute may be less 'comparatively pertinent' if the original object of the statute is no longer of pressing importance: a statute which was once intended to remedy a matter of grave public concern may since have fallen in significance to the periphery of the state's laws. As Professor Currie observed in another context, 'If the truth were known, it would probably be that [those few states which have retained the archaic law of abatement have done so] simply because of the proverbial inertia of legal institutions, and that no real policy is involved.' (Fn. omitted.) (Currie, Selected Essays on The Conflict of Laws, *supra,* p. 143.)

"Moreover, the policy underlying a statute may also be less 'comparatively pertinent' if the same policy may easily be satisfied by some means other than enforcement of the statute itself. Insurance, for example, may satisfy the underlying purpose of a statute originally intended to provide compensation to tort victims. The fact that parties may reasonably be expected to plan their transactions with insurance in mind may therefore constitute a relevant element in the resolution of a true conflict." (*Offshore, supra,* 22 Cal.3d at p. 166, 148 Cal.Rptr. 867, 583 P.2d 721.)

Also common to each petition before us is the question whether the choice of California law violates the due process clause of the Fourteenth Amendment and the Full Faith and Credit Clause of Article 4, section 1, of the United States Constitution.

The United States Supreme Court has most recently addressed this issue in *Phillips Petroleum Co. v. Irl Shutts, et al.,* (1985) 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628, hereafter *Phillips Petroleum,* and in *Allstate Ins. Co. v. Hague* (1981) 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521, hereafter sometimes cited as *Allstate.* The plurality in *Allstate,* and the majority in *Phillips Petroleum* observed " 'that for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.' " (*Allstate, supra,* at pp. 312, 313, 101 S.Ct. at p. 640; *Phillips Petroleum, supra,* 105 S.Ct. 2965, at pp. 2978-2979.)

In *Allstate,* the wife of a Wisconsin decedent filed suit in the Minnesota court which applied

188 Cal.App.3d 28
188 Cal.App.3d 28, 224 Cal.Rptr. 408
(Cite as: 188 Cal.App.3d 28)

Page 5

Minnesota's rule permitting stacking of separate uninsured motorists policies. Wisconsin courts did not allow such a procedure. The decedent had lived in Wisconsin, obtained his insurance policies there and was killed there. He was, however, employed in Minnesota and after his death his widow had moved to Minnesota for reasons unrelated to the litigation. The *Allstate* court allowed Minnesota to apply its own law, stressing the importance of examining the "contacts of the State, whose law was applied, with the parties and with the occurrence or transaction giving rise to the litigation." (449 U.S. at 308, 101 S.Ct. at 638.)

In an instructive discussion, the *Allstate* plurality contrasted its result with that reached in *Home Ins. Co. v. Dick* (1930) 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926, and *John Hancock Ins. Co. v. Yates* (1936) 299 U.S. 178, 57 S.Ct. 129, 81 L.Ed. 106.

In *Home Ins. Co. v. Dick,* the court held that the application of Texas law to void the limitation of actions clause in an insurance policy violated due process. The policy had been issued in Mexico to a Mexican **414 citizen covering a Mexican risk; the insurer was also Mexican. Subsequently, however, the policy was assigned to Mr. Dick who was then domiciled in Mexico and "physically present and acting in Mexico," (281 U.S. at 408, 50 S.Ct. at 341), even though he remained nominally a permanent resident in Texas. Dick brought suit in Texas against a New York reinsurer. As the court concluded in rejecting the choice of Texas law, "Neither the Mexican insurer nor the New York reinsurer had *any* connection to Texas." (*Allstate Ins. Co. v. Hague, supra,* 449 U.S. 302, 310, 101 S.Ct. 633, 638, emphasis added.)

Similarly, in *John Hancock Ins. Co. v. Yates,* the insurer, a Massachusetts corporation, had issued a contract of insurance on the life of a New York resident. The insured died in New York and his spouse moved to Georgia, bringing suit on the policy there. The original contract of insurance had been applied for and issued in New York at a time when the insured and his spouse resided there. The Supreme Court held the application of Georgia law to be unconstitutional. As stated by *Allstate,* "[The] *Yates* [case] held that a post occurrence change of residence to the forum State-standing alone-was insufficient to justify application of forum law" (*Allstate Insurance Co. v. Hague, supra,* 449 U.S. 302, at p. 311, 101 S.Ct. at p. 639), while *Dick* "concluded that nominal residence-standing alone-was inadequate." *(Ibid.)*

The *Allstate* court went on to compare *Dick* and *Yates* to *Alaska Packers Assn. v. Comm'n* (1935) 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044, in which it had upheld California's application of its Workmens' Compensation Act "where the most significant contact of the worker with California was his execution of an employment contract in California." (*Allstate, supra,* 449 U.S. 302, at p. 311, 101 S.Ct. 633, at p. 639.) The worker was a Mexican nonresident alien hired in California for seasonal work in Alaska; the employer, doing business in California, agreed to transport the worker to Alaska and to return him to California at the end of the canning season. The employee had contracted to be bound by Alaska workmen's compensation, and he was injured in Alaska; however, he sought his award under the California Workmen's Compensation Act. Sufficient contacts with California justified application of the law of that state.

In *Phillips Petroleum, supra,* 105 S.Ct. 2965, a class action suit for interest on delayed royalty payments was brought in Kansas by royalty owners possessing rights to leases from which an oil company produced gas. Despite the fact that approximately 97 percent of the 28,000 class members and 99 percent of the leases had no apparent connection with Kansas, that state's court applied Kansas law to every claim. The Supreme Court remanded for further proceedings, holding that "Kansas must have a 'significant contact or aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests' in order to ensure that the choice of Kansas law is not arbitrary or unfair. (*Allstate, supra,* 449 U.S. at 312-313 [101 S.Ct. at 640].)" "Given Kansas' lack of 'interest' in claims unrelated to that State, and the substantive conflict with jurisdictions such as Texas, we conclude that application of Kansas law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional limits." (*Phillips Petroleum, supra,* 105 S.Ct. at p. 2980, fn. omitted).

Also evident in the Court's decision in *Phillips Petroleum, supra,* is an emphasis upon the expectation of the parties. There was, the Court said, "no indication that when the leases involving land and royalty owners outside ... Kansas were executed, the parties had any idea ... Kansas law would control" (*Phillips Petroleum, supra,* 105 S.Ct. at p. 2980.) And while nothing in the Due Process or Full Faith and Credit clauses required Kansas to substitute for its own law as applied to its own citizens the conflicting statutes of another state, Kansas " 'may

188 Cal.App.3d 28
188 Cal.App.3d 28, 224 Cal.Rptr. 408
**(Cite as: 188 Cal.App.3d 28)**

not abrogate the rights of parties beyond its borders having no relation to anything done or to be done within them.' (*415*Home Ins. Co. v. Dick, supra, 281 U.S., at 410 [50 S.Ct., at 342]*) " (105 S.Ct. at p. 2981.)

As with the choice of law analysis itself, the foregoing principles concerning due process and full faith and credit must be applied to the facts of the individual cases before us, to which we now turn.

By its first amended complaint, Nicolet "seeks declaratory and injunctive relief and damages against its insurers for their continuing refusal to acknowledge and honor their contractual obligations to provide Nicolet with insurance coverage." According to that complaint, the following facts warrant imposition of punitive damages.

INA provided primary comprehensive liability and/or product liability coverage and excess comprehensive and/or product liability coverage to Nicolet pursuant to one or more policies which were in effect from 1950 through 1970.[FN4] Nicolet also purchased a claim service from ESIS in July of 1976. Under the terms of the contract, ESIS agreed to act as the agent and fiduciary of Nicolet. The contract with ESIS remained in effect from 1976 through March 27, 1980. Some 19,000 plaintiffs have sued Nicolet for bodily injury or death resulting from exposure to asbestos or asbestos products manufactured, sold or distributed by Nicolet or its predecessors, and of these over 7,800 are before the courts of the State of California.[FN5] The policies issued to Nicolet contained standard language drafted in concert by the entire insurance industry, which expressly rejected the "manifestation" approach to coverage. Yet, according to the complaint, despite this express rejection of the manifestation approach, INA denied coverage to Nicolet in the asbestos cases on the very basis of that same approach, thus in bad faith refusing to honor its policies. Moreover, in doing so, INA acted for the conscious and continuing purpose of denying Nicolet the benefits to which it was entitled, thus breaching its obligations to act in good faith and to deal fairly with Nicolet.

FN4. The primary policies were in effect between 1950 and 1970 while the excess policies covered periods commencing in 1962.

FN5. These figures are those presented below in Nicolet's separate statement of material facts.

The switch in INA's interpretation of the policy language occurred in 1977. In various memoranda, INA's asbestos coordinator estimated that INA's potential liability in asbestos cases could reach 20 billion dollars, and an INA officer is quoted as noting "we are going to try and influence case law by picking and trying the ideal case, jurisdiction etc. ... Odds are against us but its worth a try." INA brought suit in 1977 against Nicolet in the State of Ohio, and it is further charged that INA witnesses offered false testimony and that the company consciously concealed relevant evidence and so misrepresented material facts for the purpose of deceiving the courts.

It is further claimed that Nicolet was coerced and deceived by INA into signing, in 1978, an interim agreement in which INA was required to pay 25 percent of the cost of all defense and indemnification in the asbestos cases until a decision was entered in the Ohio action. Further, a second interim agreement is alleged to have been made in July of 1981, in which INA agreed to reimburse Nicolet for prior amounts paid for defense and indemnification in the asbestos cases, all of which it has failed and refused to do.

The foregoing allegations are the core of Nicolet's claims for punitive damages in causes of action for bad faith, fraud, fraudulent breach of fiduciary duties, and intentional interference with contractual relations.

On the motion for summary judgment, the following facts were undisputed. INA is organized under the laws of Pennsylvania and has its corporate headquarters in Philadelphia. It has been located there since 1872. Corporate headquarters has responsibility for formulating INA official policy, and for the interpretation and scope of coverage provided by individual policies. Nicolet, while organized and existing under the laws of Delaware, has its corporate *416 headquarters in Pennsylvania. Its primary manufacturing facility is located in Ambler, Pennsylvania, with another manufacturing facility being located in Norristown. Nicolet has used a Pennsylvania insurance broker since 1939. Premium payments for the purchase or renewal of each policy at issue in the Nicolet-INA action were delivered by Nicolet to its brokers located in Pennsylvania; the brokers in turn delivered or caused to be delivered Nicolet's payments to INA's offices in Pennsylvania. INA's conversion to a manifestation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

188 Cal.App.3d 28
188 Cal.App.3d 28, 224 Cal.Rptr. 408
**(Cite as: 188 Cal.App.3d 28)**

theory of coverage was made at INA's corporate headquarters in Philadelphia, Pennsylvania. While Nicolet has been sued nationwide by asbestos plaintiffs, thousands of such cases were instituted in California. No evidence was presented below that any asbestos victims suffered harm as a result of the alleged switch in coverage.

INA has been authorized to transact insurance business in California since 1936, and Certificates of Authority issued to the company by the California Department of Insurance are conditioned upon INA fully complying with the laws of California. The policies issued by INA specify that the place of performance is the United States or the world. For the years 1972-1975, INA wrote substantial premiums in California, although the numbers of its premium writings in Pennsylvania exceeded those written in California.

Applying the governmental interest analysis to the foregoing, we must first determine whether in fact Pennsylvania law conflicts with California law. Upon a careful reading of the Pennsylvania Supreme Court's decision in *D'Ambrosio v. P.A. Nat. Mut. Cas. Ins. Co.* (1981) 494 Pa. 501, 431 A.2d 966, we will assume, arguendo, that that state probably would *not* allow the punitive damage claims herein.[FN6]

> FN6. We are aware of the decision of the court in *White v. Erie Indemnity Company* (1983) 29 Pa.D. & C.3d 453, overruling the granting of a demurrer to a punitive damage claim, finding *D'Ambrosio, supra,* inapplicable as follows:
> "In *D'Ambrosio,* the court confronted a situation involving an insurance carrier's alleged bad faith in failing to adjust a claim made by its insured for damages sustained by a motor boat and outboard motor which were damaged as the result of a severe storm. *D'Ambrosio* and the above cases involved *direct actions by the insured against insurance companies* wherein the parties were in an adversarial position from the beginning. Our appellate courts did not and have not addressed the issues of whether similar results would obtain where an insurance company has assumed a fiduciary obligation involving the negotiation of claims made by third parties against its insured or of whether the Unfair Insurance Practices Act creates a cause of action in favor of a member of the protected class

against an insurance company which violates the provisions of the Act. It would be unconscionable to leave this plaintiff to face a judgment in excess of $400,000 where she purchased insurance coverage in good faith only to later find that her insurer breached its obligation to her and then exposed itself to no more than a $5,000 civil penalty under the Unfair Insurance Practices Act." (Emphasis added.) (*Id.* at p. 457.)

Rejecting California's policy of allowing punitive damages for bad faith insurance practices, the court observed "There is no evidence to suggest, and we have no reason to believe, that the system of sanctions established under the Unfair Insurance Practices Act must be supplemented by a judicially created cause of action.... Surely it is for the Legislature to announce and implement the Commonwealth's public policy governing the regulation of insurance carriers. In our view, it is equally for the Legislature to determine whether sanctions beyond those created under the Act are required to deter conduct which is less than scrupulous." (*D'Ambrosio v. Pa. Nat. Mut. Cas. Ins. Co., supra,* 494 Pa. 501, 431 A.2d 966, at p. 970.)

In California, on the contrary, our high court has made it plain that punitive damages are available where an insurance company has been guilty of bad faith. We quote from its decision in *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819-821, 169 Cal.Rptr. 691, 620 P.2d 141, fn. omitted, "Civil Code section 3294 provides: 'In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of **417** example and by way of punishing the defendant.' ...

"In the present context, the principal purpose of section 3294 is to deter acts deemed socially unacceptable and, consequently, to discourage the perpetuation of objectionable corporate policies. (Citation.) Traditional arguments challenging the validity of exemplary damages lose force when a punitive award is based on this justification. The special relationship between the insurer and the insured illustrates the public policy considerations that may support exemplary damages in cases such as this.

"As one commentary has noted, 'The insurers' obligations are ... rooted in their status as purveyors

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

188 Cal.App.3d 28
188 Cal.App.3d 28, 224 Cal.Rptr. 408
(Cite as: 188 Cal.App.3d 28)

Page 8

of a vital service labeled quasi-public in nature. Suppliers of services affected with a public interest must take the public's interest seriously, where necessary placing it before their interest in maximizing gains and limiting disbursement ... [A]s a supplier of a public service rather than a manufactured product, the obligations of insurers go beyond meeting reasonable expectations of coverage. The obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of a fiduciary. Insurers hold themselves out as fiduciaries, and with the public's trust must go private responsibility consonant with that trust.' (Citation.) Furthermore, the relationship of insurer and insured is inherently unbalanced;  the adhesive nature of insurance contracts places the insurer in a superior bargaining position.   The availability of punitive damages is thus compatible with recognition of insurers' underlying public obligations and reflects an attempt to restore balance in the contractual relationship. (Citations.)"

If, then, as we assume, the Pennsylvania high court would reject the punitive damage claim, we perceive the conflict to be a "true" one, and the issue is obviously one of major importance, so as to compel the conclusion that each state has a strong interest in applying its law.  We will assume as well-arguendo-that INA correctly argues that allegations concerning its relationship with ESIS are not relevant to the choice of law question here presented.   And we will assume, finally, that certificates reflective of INA's promise to "abide by" California's law simply mean that INA is bound by this state's laws, *including its choice of law* analysis.

California's interest in applying its punitive damage laws to a case like that at bench is strong, and largely undisputed by INA-which instead argues the primacy of Pennsylvania's contrary interests.   As our Supreme Court has repeatedly made clear, the purpose of such damages is to deter future conduct by punishing past misdeeds.

While it is a nationwide company, INA has done extensive business in California since 1936, and has substantial contacts with this state.  And California's larger interest in invoking its bad faith law in a case such as this one is rooted in its concern that all California citizens who pay premiums to companies doing business in this state, and with whom they occupy a fiduciary relationship, will not be victimized by conduct which, arguendo, is outrageous particularly in its potential impact on

seriously stricken citizens of this state afflicted with the lethal disease asbestosis.[FN7]

> FN7. We recognize that punitive damages would run to the plaintiff manufacturers, not necessarily to the victims.   We also recognize that no showing was made below concerning the potential negative impact of INA's bad faith might have on the victims.

Ranged against California's right and obligations to enact and enforce laws promotive of public protection and the sanctity of contract, is Pennsylvania's concern for the possibility of limitless money damage awards as well as-it may be-for the financial protection of its resident insurance companies in the out of state conduct of their business.  The financial health of such companies of course enhances the general welfare of Pennsylvania. We are aware, too, that important elements of the conduct prompting consideration and punitive damages, such as INA's decision to adopt the manifestation approach and its *418 decision to sue Nicolet in Ohio, were made at its corporate headquarters in Pennsylvania, where it has been incorporated since 1792, nor, indeed, has California any close affinity with Nicolet, which is a Pennsylvania company whose primary manufacturing plant is located in that state, and which paid all of its premiums there.

Confronted with this "true" conflict, we are reminded of Professor Currie's original solution, that the forum apply its own law, for application of the more complicated analysis subsequently advocated by Currie [FN8] and others leads us to the same result. Applying the comparative impairment factors outlined by our high court in *Offshore, supra, 22 Cal.3d 157, 166, 148 Cal.Rptr. 867, 583 P.2d 721*, we observe that both the California and Pennsylvania high courts have quite recently spoken on the subject of punitive damages (cf. *Offshore, supra; D'Ambrosio, supra* ), and reached opposite results. Still, as the court in *White v. Erie Indemnity Company, supra, 29 Pa.D. & C.3d 453* observed, the Pennsylvania high court has not confronted a factual context in which the application of penalties under that state's Unfair Insurance Practices Act would clearly constitute a meaningless attempt to deter conduct attempting to avoid billions of dollars in liability.   In short, we venture to join with the court in *White v. Erie, supra*, in questioning the viability of the *D'Ambrosio* doctrine under widely different facts from the conservative ones there at issue.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

188 Cal.App.3d 28
188 Cal.App.3d 28, 224 Cal.Rptr. 408
**(Cite as: 188 Cal.App.3d 28)**

Page 9

FN8. Professor Currie, it may be recalled, would ask us to reconsider California's interest in a moderate and restrained fashion to be sure that it is a real one.

Continuing with the comparative analysis, we of course cannot say that Pennsylvania's seeming rejection of punitive damages is "archaic" and "isolated." Neither California nor Pennsylvania, as the parties have pointed out, is alone in its current position on the subject. Nor can we say that the refusal by Pennsylvania to impose punitive damages is unrelated to the purpose of protecting companies incorporated or doing business in that state.

We believe, however, that requiring California to adopt Pennsylvania's rule against punitive damages would create in this state an archaic result in the context of the modern realities of INA's role as a multi-state corporation. (Cf. *Pacific Diamond Co. v. Superior Court* (1978) 85 Cal.App.3d 871, 876-877, fn. 1, 149 Cal.Rptr. 813.) To adopt the Pennsylvania rule, as INA would have us do, would require that California assist that state in sheltering against the world a corporation whose blatant misconduct, if proved, might wreak immense damage outside the confines of its home state.

If Pennsylvania as the forum state elects not to punish the corporation for its decisions in Pennsylvania that is of course Pennsylvania's sovereign right; if it should decline to attempt to deter similar conduct within its borders in the future the choice is again undeniably its own when it sits as the forum. But where, as here, the "offending" corporation has done business in California, and continues to do so, and where California's concern is legitimately with the manner in which such business is conducted, the reach of Pennsylvania's protection must be curtailed. In sum, the interest of California in providing assurance to all of its citizens that rejection of any insurance claim will not be made in bad faith with impunity is paramount, and justifies invocation of its own law in cases brought in this state.FN9

FN9. Nothing in *Keene Corp. v. Insurance Co. of North America* (D.D.C.1984) 597 F.Supp. 934 changes our view. *Keene* involved a choice of law question virtually identical to that here-whether the forum's law which allowed punitive damages-that of

the District of Columbia-or Pennsylvania law should apply to causes of action arising from the same conduct allegedly committed by INA here. Washington, D.C., applies an "interest analysis" approach to tort claims, an analysis similar but not identical to our governmental interest approach. And *Keene* went on to rely on the Restatement (Second) of Conflict of Laws section 145 comments c-e, and *In re Air Crash Disaster Near Chicago, Illinois, etc.* (1981) 644 F.2d 594, U.S. cert. den. 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187, for the proposition that "[w]hen the primary purpose of a rule of law is to deter or punish conduct, the States with the most significant interests are those in which the conduct occurred and in which the principal place of business and place of incorporation of defendant are located," (*Keene, supra*, 597 F.Supp. at p. 938), and held Pennsylvania law applicable. The court's analysis does not address the interests asserted by California here. To the extent that it requires a mechanistic place-of-wrongful-decision analysis, we reject it.

**\*419** For similar reasons, we do not believe that application of California's punitive damage law violates either the full faith and credit clause or the due process clause of the Fourteenth Amendment. INA itself observes that it headquartered itself in Pennsylvania almost two hundred years ago. Certainly that choice was not made in expectation that it could thereby shelter its corporate decisions from California's punitive damage laws. INA has subsequently elected to do business nationwide; its insurance policies as shown below contemplate that its insureds will face claims nationwide; it can hardly claim prejudice at finding itself subject to the laws-including the punitive damage laws-of states other than Pennsylvania. Finally, for reasons already stated, we do not believe that the manner in which Pennsylvania's chooses to regulate conduct which impacts its citizens should override California's concerns in controlling the conduct of a corporation doing business within its borders.

As relevant to these proceedings, the allegations in GAF's third amended complaint which support a claim for punitive damages, are similar to the facts alleged by Nicolet in the Nicolet/INA action. From 1969 through 1977, INA followed a coverage approach to asbestos claims under which GAF received indemnity and defense. In 1977, motivated by its desire to substantially decrease its own

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

188 Cal.App.3d 28
188 Cal.App.3d 28, 224 Cal.Rptr. 408
**(Cite as: 188 Cal.App.3d 28)**

Page 10

extraordinarily high exposure, INA switched to the "manifestation" interpretation of its policies.[FN10] INA tried to induce GAF to enter into written agreements limiting coverage of INA's primary insurance for prior years, and, following GAF's refusal to accede, refused to defend GAF in *all* asbestos lawsuits-refusing, in addition, to state reasons for its actions, and declining to respond to inquiries from GAF respecting asbestos lawsuits. Only after the GAF/INA action was commenced, in September of 1979, did INA offer to prospectively defend and indemnify GAF under a somewhat threadbare reservation of rights.

> FN10. In the GAF cases alone this exposure could be as high as $20 billion. (*Insurance Company of North America v. Superior Court* (1980) 108 Cal.App.3d 758, 761, 166 Cal.Rptr. 880.)

The undisputed facts presented on the motion below were similar to those presented in the Nicolet/INA action.   They show additionally that the policies issued to GAF and its predecessor Ruberoid were issued in New York and delivered there to GAF's and Ruberoid's brokers.   GAF had been sued in some 25,000 asbestos cases, of which 7,000 were instituted in California.   GAF is a Delaware corporation, but engaged in business at various California locations.   Prior to its 1967 merger with GAF, Ruberoid manufactured products containing asbestos and maintained facilities in California.   At least two of the policies at issue are "following form" policies-incorporating other policies essentially by reference and in doing so, incorporating a "service of suit" clause which provides, inter alia, that "all matters arising hereunder shall be determined in accordance with the law and practice" of any court of competent jurisdiction within the United States.

While we agree, arguendo, that the foregoing is not a choice of law clause, for the same reasons we have recited under our analysis of the Nicolet/INA petition, we think that California law is the proper one to apply to the punitive damage issue between GAF and INA.

As to the GAF/Kemp dispute, we note initially that "Kemp & Companies" are certain underwriters at Lloyd's, London (an "incorporated association of underwriters located in Great Britain") and other British insurance companies, all of which-it is uncontradicted-have their principal places of business in England.   GAF alleges that **\*420** Kemp &

Companies breached an implied duty of good faith and fair dealing by refusing to defend it under excess liability policies in asbestos-related personal injury litigation during the period January 1978 to September 1979.

The relevant policies contain a "service of suit" clause virtually identical to that at issue in GAF/INA, and GAF has provided evidence in the summary judgment proceeding that at least one underwriting member of Lloyd's viewed the clause generally as a consent to the law of the forum.   And while no evidence was presented below concerning where the alleged bad faith decisions were made, [FN11] GAF has alleged, and Kemp did not dispute, that California's Unfair Practices Act (Insurance Code section 790 et seq.) specifically applies to, among others "Lloyd's Insurers."   (Ins.Code, § 790.01.)   No evidence was presented below concerning the precise volume of Kemp & Companies business in California although it appears inferentially that Kemp has done significant business within the state during the period at issue.

> FN11. However, the manner in which insurance is placed by the underwriters was described in *Edinburgh Assur. Co. v. R.L. Burns Corp* (C.D.Cal.1979) 479 F.Supp. 138, 144-145, reversed in part on another ground 669 F.2d 1259 (1982):   "[t]akes place on the floor of the underwriting room at Lloyd's and also in the offices of individual insurance companies in London....   The underwriter agent, or underwriter, sits at his box on the floor waiting for brokers to approach him with possible insurance risks....   [T]he broker moves around the insurance market, both at Lloyd's and among the insurance companies, until he has obtained underwriters' commitments subscribing to one hundred percent of the risk on the slip."

It is evident, and we will assume, that English courts would not allow GAF's punitive damage claims-so that a true conflict of law exists.   Accordingly, and even assuming-as we do-that the "service of suit" clause does not mandate application of California law to the GAF-Kemp action, for reasons recited at length in this opinion, we believe that California's is the governing law on the subject of punitive damages.

Therefore, let a peremptory writ of mandate issue commanding respondent superior court to set aside

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

188 Cal.App.3d 28
188 Cal.App.3d 28, 224 Cal.Rptr. 408
**(Cite as: 188 Cal.App.3d 28)**

those portions of its orders filed February 5 and March 4, 1985 in Judicial Council Coordination Proceeding No. 1072, In re: Asbestos Coverage Cases, which determine that Pennsylvania law and English law govern the Nicolet/INA, GAF/INA, and GAF/Kemp included actions on the question of punitive damages for bad faith conduct, and to instead enter orders holding that California law is applicable to the issue of such damages.

Trial has already commenced in the underlying coordinated proceeding. We thus direct that this opinion is final forthwith as to this court. (Cal.Rules of Court, rule 24(c).) The stays previously imposed shall remain in effect until the finality of this opinion.

RACANELLI, P.J., and HOLMDAHL, J., concur.
Cal.App. 1 Dist.,1986.
Nicolet, Inc. v. Superior Court (Insurance Co. of North America)
188 Cal.App.3d 28, 224 Cal.Rptr. 408

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 10

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 231026 (N.D.Cal.)
**(Cite as: 1996 WL 231026 (N.D.Cal.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. California.
Robert SCARPONE, Plaintiff,
v.
EMPIRE BLUE CROSS BLUE SHIELD, Quantum
Health Resources, Does 1 through 30,
inclusive, Defendants.
**No. C-95-2094 MHP.**

April 29, 1996.

*MEMORANDUM AND ORDER*

PATEL, District Judge.

**\*1** Plaintiff Robert Scarpone brought this action in state court against defendants Empire Blue Cross Blue Shield ("Empire") and Quantum Health Resources ("Quantum"), alleging breach of contract, breach of the implied covenant of good faith and fair dealing, fraud in the inducement and negligence. Scarpone seeks injunctive relief and restitution, pursuant to California Business and Professions Code section 17204, and declaratory relief. Empire removed the action to this court based upon both the court's diversity jurisdiction [FN1], 28 U.S.C. § 1332, and federal question jurisdiction [FN2], 28 U.S.C. 1331. Scarpone voluntarily dismissed Quantum as a defendant.

Now before the court are cross-motions for summary judgment. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

*BACKGROUND*

Plaintiff Scarpone was treasurer and part owner of Rcadia Polishing and Plating Company ("Rcadia"), a New York corporation doing business in New York, in November 1983, when he obtained insurance coverage from Empire. Empire, which solicited business only in New York, issued Scarpone a "Million Dollar Master Medical Policy" ("group policy"). [FN3] While Scarpone claimed dual residence between New York and California prior to 1992 and in 1993 and 1994, during which time he

was covered by the group policy, his primary residence was in California at all relevant times. Although the parties agree that a group of Rcadia employees were insured under the group policy, they dispute the extent of Rcadia's administrative involvement in the plan. The group policy remained in effect until 1993, when Rcadia went out of business and the policy was cancelled.

Pursuant to the terms of the group policy, Scarpone was given the option of converting the group policy to an individual direct pay contract by applying for the new contract and paying the new contract premiums when due. The conversion provision in the group policy provided that "your new contract will be the direct payment contract we are then issuing to a new subscriber with benefits most like those you get under this contract." Scarpone applied for a direct pay contract.

At the time of Scarpone's application, Empire was offering three types of direct pay contracts: TraditionPLUS Hospital, HealthNet (an HMO), and TraditionPLUS Comprehensive Hospital and Major Medical. [FN4] Scarpone applied for the TraditionPLUS Comprehensive Hospital and Major Medical contract ("conversion policy"), and Empire issued it to him on July 11, 1993. The maximum aggregate lifetime benefit under the conversion policy was $500,000.00, reduced by the aggregate benefits paid under the group policy. Scarpone had received aggregate benefits of $281,580.00 under the group policy.

The group plan did not contain a choice of law provision, but the conversion policy provided: "This Contract has been issued to you in New York State. In any dispute between you and us, New York law shall be applied to determine your rights and our rights." Complaint, Ex. B. at 44.

**\*2** All correspondences between the parties occurred between Scarpone's primary residence in California and Empire's New York office.

*LEGAL STANDARD*

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 231026 (N.D.Cal.)
**(Cite as: 1996 WL 231026 (N.D.Cal.))**

Page 2

and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987) (the nonmoving party may not rely on the pleadings but must present significant probative evidence supporting the claim); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The court's function, however, is not to make credibility determinations, *Anderson,* 477 U.S. at 249, and the inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.,* 809 F.2d at 631.

## DISCUSSION

### A. *ERISA Preemption*

Scarpone and Empire cross-move for summary judgment on the question of whether the policies at issue in this litigation are governed exclusively by the Employment Retirement Income Securities Act ("ERISA").

ERISA applies to "any employee benefit plan." 29 U.S.C. § 1003(a). An employee benefit plan is synonymous with "an employee welfare benefit plan," *Id.* § 1002(3), which is defined as:

any plan, fund, or program which was ... established or maintained by an employer ... for the purpose of providing [benefits] for its participants or their beneficiaries, through the purchase of insurance or otherwise ....

*Id.* § 1002(1). The crux of the ERISA preemption dispute is whether the plan qualifies for the exemption from ERISA coverage set forth in regulations promulgated by the Department of Labor. The regulations provide that a plan is not governed by ERISA if:

(1) No contributions are made by an employer or employee organization;

(2) Participation [in] the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or

members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

**\*3** 29 C.F.R. § 2510.3-1(j) (1995) ("the exemption regulation"). ERISA governs a group plan offered by an employer to its employees unless all four factors of the exemption regulation are satisfied. *See Crull v. GEM Ins. Co.,* 58 F.3d 1386, 1390 n.2 (9th Cir. 1995); *Kanne v. Connecticut Gen. Life Ins. Co.,* 867 F.2d 489, 492 (9th Cir. 1988), *cert. denied,* 492 U.S. 906 (1989). The defendants bear the burden of proof on the defense of ERISA preemption. *Kanne,* 867 F.2d at 492 n.4. It is Empire's burden, therefore, to produce evidence contradicting at least one element of the exemption regulation. *See Id.*

In its motion for summary judgment, Empire produced no evidence that Rcadia contributed to the plan, that Rcadia endorsed the plan or that Rcadia received any consideration beyond reimbursement for administrative expenses. Instead, Empire notes that it required Rcadia to meet Empire's underwriting requirements by demonstrating an employer/employee relationship to qualify as a "group" and by ensuring a minimum percentage employee participation in the plan. As to subsection (2), Empire argues that participation could not have been completely voluntary because of the minimum participation requirement. However, Empire produces no evidence that Rcadia found it necessary to endorse or require participation in order to exceed the minimum percentage participation. As to subsection (3), Empire appears to argue that Rcadia's functions went beyond allowing Empire to publicize the plan, collecting premiums and remitting them to Empire. However, Empire produces no evidence of any function Rcadia performed that cannot fairly be characterized as publicity or collecting and remitting payments. The mere fact that Rcadia reported to Empire that it would comply with the underwriting requirements is inadequate proof that Rcadia's plan-related functions exceeded those allowed under the exemption regulation.

Empire also claims that *Crull v. GEM Ins. Co.,* 58 F.3d 1386 (9th Cir. 1995), supports a finding of ERISA preemption based merely on the employer's administrative involvement in the plan. As Scarpone

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 231026 (N.D.Cal.)
**(Cite as: 1996 WL 231026 (N.D.Cal.))**

Page 3

correctly notes, however, the employer in *Crull* made contributions to the plan, thereby defeating the exemption under subsection (1) of the regulation. *Crull,* 58 F.3d at 1389-90 (employer can establish an ERISA plan merely by arranging for a ""group-type insurance program' ... *unless it is a mere advertiser who makes no contributions on behalf of its employees"*') (emphasis added). The court finds that the evidence, at least when viewed in a light most favorable to Rcadia, does not demonstrate that the exemption fails. [FN5]

Because the court finds that Empire has not shown the original group plan was an ERISA plan, Empire's argument that the conversion option is an ERISA plan benefit need not be addressed.

Scarpone asks the court to decide that the plan is *not* an ERISA plan as a matter of law. For Scarpone to obtain a summary judgment that his state claims are not preempted by ERISA, the evidence must not permit an inference that any element of the exemption regulation fails. [FN6] The court must determine whether it is possible to infer from Rcadia's compliance with Empire's underwriting requirements either that the plan was not completely voluntary or that Rcadia performed functions beyond those allowed by the exemption regulation. Again, the mere fact that a minimum percentage of employees accepted coverage under the group plan does not establish that Rcadia played an active role in inducing participation. Similarly, nothing in the record supports the conclusion that Rcadia's involvement in the plan was inconsistent with the permitted functions of collecting and remitting payments or allowing the insurer to publicize.

*\*4 At this stage, the record supports a decision to grant Scarpone's motion as to the ERISA preemption issue. However, because evidence developed through further discovery may indicate that the group plan should be governed by ERISA, the court reserves the right to revisit this issue.

B. *Choice of Law*

Each party seeks summary judgment regarding choice of law. Empire argues that it solicits group policies only in New York and places a choice of law provision in its conversion policies to ensure that New York law will govern any dispute with its insureds. Scarpone responds that the group policy lacked any choice of law provision and that the conversion policy was a contract of adhesion, so the choice of law provision is not binding. Scarpone

argues that in the absence of a valid choice of law provision, disputes are governed by the law of California, the state of his primary residence when the policies were issued.

First, the court must determine whether the choice of law provision in the conversion policy should be enforced. Empire relies on *Nedlloyd Lines BB v. Superior Ct.,* 3 Cal. 4th 459, 465 (1992), to argue that California has a strong policy favoring enforcement of contractual choice of law provisions. In *Nedlloyd,* the Court adopted the "principles set forth in Restatement section 187." *Id.* at 464-65. Section 187 recommends enforcement of contractual choice of law provisions unless "the chosen state has no substantial relation to the parties or the transaction and there is no other reasonable basis for the parties' choice" or "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." *Id.* at 465 (quoting Restatement (Second), Conflicts of Law § 187 (1971)). The *Nedlloyd* court enforced a choice of law provision agreed to by "two sophisticated, commercial entities." *Id.* at 470. Scarpone argues that *Nedlloyd* does not apply to a choice of law provision in an insurance contract, which is inherently adhesive.

The comment to section 187 provides guidance regarding choice of law provisions in contracts of adhesion:

A factor which a forum may consider is whether the choice of law provision is contained in an "adhesion" contract, namely one that is drafted unilaterally by the dominant party and then presented on a "take-it-or-leave-it" basis to the weaker party who has no real opportunity to bargain about its terms.... Common examples are ... insurance policies. Choice of law provisions contained in such contracts are usually respected. Nevertheless, the forum will scrutinize such contracts and will refuse to apply any choice of law provision they may contain if to do so would result in substantial injustice to the adherent.

Restatement (Second), Conflicts of Law § 187 cmt. b (1971). Thus, under California law, this court must ensure that enforcing the choice of law provision in this adhesive insurance contract would not result in substantial injustice to Scarpone.

*\*5 In *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392 (9th Cir. 1986), the Ninth Circuit refused to enforce a clause in an insurance contract specifying that contractual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                     Page 4
Not Reported in F.Supp., 1996 WL 231026 (N.D.Cal.)
(Cite as: 1996 WL 231026 (N.D.Cal.))

disputes would be governed by Cayman Island law. *Id.* at 1402. Applying California choice of law rules, the court noted that "a court is not bound by a contract's choice of law provision if strong public policy requires the application of California law." *Id.* at 1402-03. The court refused to enforce the choice of law provision because "[p] rotection of California residents from the potential risk of injury thought to be created by insurance and from the unscrupulous practices of insurance companies which profit from premiums from California constitute sufficient interest to apply California law." *Id.* at 1403. Although *Haisten* is analyzed in terms of public policy, the *Haisten* court likely would have reached the same result under section 187 of the Restatement, namely, that to apply Cayman Islands law would have subjected the insured to substantial injustice.

Here, while New York law may be more protective than Cayman Islands law, other factors suggest that enforcement of the choice of law provision would lead to substantial injustice to Scarpone. Importantly, the choice of law clause was absent from the original group policy. Insureds covered under group policies are statutorily entitled to convert their policies to direct pay policies under either New York or California law. *See* Cal. Ins. Code § 12672; N.Y. Ins. Law § 4305(d)(1) (McKinney Supp. 1996). These provisions particularly protect individuals like Scarpone who collected sizable medical benefits under a group policy and might find it difficult to arrange direct pay coverage with another insurer. As a result, Scarpone was particularly incapable of bargaining over changes to the conversion policy imposed unilaterally by Empire. Moreover, each of Scarpone's claims arises under both the group policy and the conversion policy, while the choice of law provision applies only to disputes arising under the conversion policy. Enforcing the choice of law provision might therefore force Scarpone to litigate those aspects of each claim relating to the group policy under California law and those relating to the conversion policy under New York law. Because Scarpone's claims are not clearly separable along those lines, such a result could also contribute to the substantial injustice he would face. For these reasons, the choice of law provision in the conversion policy will not be enforced. Thus, the applicable law must be determined as if the parties did not agree to a particular choice of law.

Federal courts sitting in diversity apply the choice of law principles of the state in which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). This principle applies to determine what state's contract law applies to an insurance policy dispute. *See Western Casualty and Surety Co. v. Harris Petroleum Co.,* 220 F. Supp. 952, 954 (S.D. Cal. 1963). Thus, this court looks to California choice of law rules.

*6 Absent an enforceable choice of law provision, California follows a "governmental interests" approach to resolve conflict of law issues. *In re Yagman,* 796 F.2d 1165, 1170 (9th Cir. 1986); *Reich v. Purcell,* 67 Cal. 2d 551, 554 (1967). The court considers "the interests of the litigants and the involved states" to choose which state's law governs. *Offshore Rental Co. v. Continental Oil Co.,* 22 Cal. 3d 157, 161 (1978). The analysis "embodies the presumption that California law applies unless the proponent of foreign law can show otherwise. *Marsh v. Burrell,* 805 F. Supp. 1493, 1496 (N.D. Cal. 1992). The proper approach is sometimes called the "comparative impairment" approach: if a true conflict exists, *see Marsh v. Burrell,* 805 F. Supp. at 1497, the court looks to the policies underlying the conflicting laws and applies the law of the state whose policies would be more significantly impaired by application of the other state's law. *Paulo v. Bepex Corp.,* 792 F.2d 894 (9th Cir. 1986); *Bernhard v. Harrah's Club,* 16 Cal. 3d 313, 320, *cert. denied,* 429 U.S. 859 (1976).

The governmental interest approach was applied in *Lettieri v. Equitable Life Assur. Soc. of United States,* 627 F.2d 930 (9th Cir. 1980), to hold that California's interest in protecting resident insurance beneficiaries from improper denials of benefits outweighed New York's interest in protecting resident insurance companies from fraudulent claims. *Id.* at 933. Empire attempts to distinguish *Lettieri* on the grounds that the plaintiff had fewer contacts with New York than Scarpone has. However, the focus in *Lettieri* was on the relative interests of the states, not the contacts of the parties with the states. Empire argues that New York's interest in regulating insurance companies that solicit health insurance coverage only to New York residents outweighs California's interest in protecting its resident insureds. Whether Empire solicited Scarpone's business or not, it chose to issue him a contract at his California address. Similarly to *Lettieri,* California's interest in protecting resident insureds from improper denials or reductions in coverage outweighs New York's interest in regulating insurers based in New York.

Another court applying the governmental interest approach has held that "California has a very strong interest in regulating [under California law] insurance

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 231026 (N.D.Cal.)
**(Cite as: 1996 WL 231026 (N.D.Cal.))**

contracts entered into with its own residents in its own jurisdiction." *Clemco Indus. v. Commercial Union Ins. Co.*, 665 F. Supp. 816, 818 (N.D. Cal. 1987), *aff'd*, 848 F.2d 1242 (9th Cir. 1988); *see also Haisten*, 784 F.2d at 1403 (California has an interest in regulating insurance companies that profit from premiums paid from California). Although Scarpone claimed dual residency in California and New York for a portion of the time he was covered under the policies, the parties do not dispute that he maintained his primary residence in California during all relevant times. [FN7] Under *Clemco* and *Haisten*, therefore, Scarpone's primary residence in California, combined with the fact that he paid all his premiums from California, [FN8] support the application of California law despite his dual residency.

*\*7* Empire argues that the insurance policies are more closely connected to New York than to California. Empire is both incorporated and has its principal place of business in New York. The initial group policy insured employees of Rcadia, a New York corporation. However, the parties to both insurance contracts are clearly Empire and Scarpone, not Empire and Rcadia. *See* Complaint, Ex. A, at 1. Therefore, Rcadia's place of business carries little weight. Empire knew when it issued the group policy that Scarpone primarily resided in California, not New York. In addition, Empire offered insurance to Scarpone knowing that the contract would be performed in California to the extent that Scarpone required medical treatment near his primary residence. In sum, California's interest in protecting its residents who pay insurance premiums to out-of-state insurers would be more severely impaired by applying New York law than would New York's interest in regulating its resident insurers if California law were applied.

Scarpone's motion for summary judgment is granted as to the application of California law to the contract claims, and Empire's motion is denied as to the application of New York law. [FN9]

As Scarpone's tort claims are based on the same factual allegations as the contract claims, the same policies and state interests apply. Accordingly, the court will apply California law to the tort claims as well.

*C. Legality of the Conversion*

Empire moves for summary judgment that the conversion policy was legal and enforceable as issued. Empire argues that even under California law,

the conversion policy it issued to Scarpone is legal despite the reduction in aggregate benefits from $1,000,000 under the group policy to $500,000 under the conversion policy.

California law requires that any group policy must provide for conversion to an individual policy upon cancellation of the group policy. Cal. Ins. Code § 12672. The converted policy must be issued upon request and "without evidence of insurability." Empire met these requirements. In addition, the conversion policy must provide minimum aggregate lifetime benefits of $100,000. *Id.* § 12684(a). Scarpone's conversion policy provided $500,000 in aggregate benefits.

Scarpone also argues that California requires an insurer to offer "continuation benefits" under the conversion policy which are identical to the benefits under the group policy. Under California Insurance Code section 12692, insurers cancelling a group policy "shall offer to group policyholders a continuation benefit which, if selected, shall have a duration of at least 90 days and which shall be offered consecutively to any federal requirement for continuation benefits." Empire does not dispute that "continuation benefits" must be identical to those offered under the group policy. On the face of the statute, however, these continuation benefits need only last 90 days.

Scarpone argues further that the minimum aggregate benefit of $100,000 under a conversion policy must be read in light of California Insurance Code section 12682 to require insurers to provide aggregate benefits identical to those of the group policy. However, section 12682 does not compel such a result. First, section 12682 forbids the insurer from excluding coverage of preexisting conditions covered under the group policy. Cal. Ins. Code § 12682. Second, it allows aggregate benefits payable under the conversion policy to be reduced by the amount paid under the group policy. *Id.* Third, it allows the insurer to limit conversion policy benefits "during the first policy year" such that the total benefits paid in that year under both policies would not exceed those payable under the group policy alone had it remained in effect. *Id.* The portion of section 12682 that Scarpone argues should alter the $100,000 statutory minimum aggregate benefit for conversion policies relates only to benefits in the first year of coverage under the conversion policy, not to lifetime aggregate benefits. The minimum aggregate lifetime benefit is unambiguously defined in section 12684(a) to be $100,000.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 231026 (N.D.Cal.)
(Cite as: 1996 WL 231026 (N.D.Cal.))

*8 Therefore, for the reasons stated above, Empire's motion for summary judgment as to the legality of the conversion policy's minimum aggregate lifetime benefit of $500,000 is granted. [FN10]

CONCLUSION

For the foregoing reasons,

1) plaintiff's motion for summary judgment is GRANTED as to the lack of ERISA preemption and the application of California law to all of plaintiff's claims;

2) defendant's motion for summary judgment is DENIED as to ERISA preemption and the application of New York law to plaintiff's claims and GRANTED as to the legality of the conversion policy's aggregate lifetime benefit of $500,000.

IT IS SO ORDERED.

FN1. Empire is incorporated and maintains its primary place of business in New York. Scarpone's primary residence was in California at all relevant times. The parties do not dispute that Scarpone is domiciled in California and is therefore a California citizen for jurisdictional purposes. For choice of law purposes, however, the parties agree that Scarpone claimed dual residency between California and New York prior to 1992, and in 1993 and 1994.

FN2. Empire argues that the Employee Retirement Income Security Act of 1974 ("ERISA") governs the insurance policies at issue here and that Scarpone's state law claims are therefore preempted by ERISA.

FN3. As the name suggests, the maximum aggregate benefit payable under the group policy was $1,000,000.00.

FN4. Before February 1992, Empire had offered a direct pay contract with lifetime aggregate benefits of a million dollars, but Empire had discontinued this contract by the time Scarpone applied for conversion to a direct pay contract.

FN5. The court notes that, as the record develops, new evidence may compel reevaluation of the ERISA preemption issue.

For example, defendants argue that further discovery may indicate that employer contributions did, in fact, take place.

FN6. Scarpone makes an additional argument based on Longoria v. Cearley, 796 F. Supp. 997 (W.D. Tex. 1992). However, that case is neither controlling nor particularly persuasive authority here. In Longoria, an insurer denied a plaintiff coverage under the employer's group policy because of a preexisting condition and recommended an alternative insurance plan. Id. at 1000-01. The alternative plan was issued but then rescinded because of the agent's misrepresentations in the application. Id. at 1001. The court held the rescission was unrelated to an ERISA plan because although the employer intended to offer a plan benefit, the insurer's rescission made it impossible. Id. at 1007-10. Scarpone argues that Longoria establishes the proposition that a plan may not be an ERISA plan despite employer-paid premiums where the employer lacks substantive control over the plan. The case cannot be read so broadly. Summary judgment is only appropriate here if there is no genuine issue of fact regarding the applicability of the exemption regulation.

FN7. Empire issued the group policy to Scarpone in 1983, when Scarpone undisputedly maintained his primary residence in California. In 1993, Scarpone signed an application for the direct pay contract which contained the following clause: "You must reside in one of the [28 specified counties in New York] to be eligible to enroll.... Proof of residency (i.e. copy of voter registration card, driver's license, car registration, utility bill, certificate of residency) must be submitted with the application." Joint Statement, Ex. 4 at 2. However, Scarpone disclosed his California address on the application, and if he submitted any proof of New York residency at the time, it is not in the record. See Id. at 3. This should have been enough to put Empire on notice that Scarpone's primary residence was in California and that the contract would be executed there.

FN8. All correspondence between Empire and Scarpone occurred between Empire's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 231026 (N.D.Cal.)
**(Cite as: 1996 WL 231026 (N.D.Cal.))**

Page 7

New York office and Scarpone's California address.

FN9.  Considering the facts that Empire solicits business only in New York and that its direct pay contract with Scarpone selects New York law, the choice of law issue is a close one. It is possible that other evidence developed in the course of discovery, such as the details of Scarpone's dual residency, might compel the application of New York law. The court reserves the right to reconsider the appropriate choice of law in light of newly discovered evidence.

FN10.  If, as discussed above, newly discovered evidence were to compel the conclusion that New York law were appropriate, the same result would likely obtain.
New York law requires that, upon cancellation of a group policy, insurers must offer an option to convert to a direct pay contract "then being issued by [the insurer] which provides benefits most nearly comparable" to the group policy benefits. N.Y. Ins. Law § 4305(d)(1) (Supp. 1996). At the time of conversion, the highest available lifetime aggregate benefit in a direct pay contract was $500,000. Earlier, Empire had offered a contract with a million dollar aggregate benefit, but it was discontinued before Scarpone applied for conversion. Thus, it appears that Empire offered the direct pay contract with benefits most nearly comparable to the group plan. Scarpone argues that section 4305(d)(1) was amended effective January 1, 1993, with the following provision: "if the corporation does not issue ... a major medical contract, then [the group plan must provide for conversion] to a comprehensive or comparable type of coverage which is most commonly being sold to group remitting agents." Scarpone then points to the group plan's conversion clause to establish that at Empire, "Major Medical benefits are not available on a direct-payment basis." Joint Statement, Ex. 2 at 23, subsection 3; see also Lariviere Dec., Ex. 2 (O'Laughlin Depo.) at 66:16-67-19 (noting that Scarpone received an "extended medical" plan and not a "major medical" plan). However, Scarpone's group plan was issued in 1983, long before the amended statute took effect. Scarpone's

argument that Empire modified the group plan in 1993 by notifying Readia that the minimum enrollment requirement was temporarily not met is without merit. Empire neither canceled nor modified the group plan at that time because Readia enrolled a new member to satisfy the requirement.

 Not Reported in F.Supp., 1996 WL 231026 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.